**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHESTER UPLAND SCHOOL DISTRICT, et al. | : | CIVIL ACTION |
| v. | : | |
| COMMONWEALTH OF PENNSYLVANIA, et al. | : | NO. 12-132 |

<u>**MEMORANDUM RE: SUBJECT MATTER JURISDICTION**</u>

**Baylson, J.**                                                   **March 16, 2012**

I.      **Introduction**

If there is one sacred cow in the pasture of public education, it is the concept that public schools should stay open during the school year.

The Chester Upland School District ("District") filed this case when it was about to run out of operating funds in the middle of the school year. The parties dispute the reasons for this, but an infusion of funds from the Pennsylvania Department of Education has kept the District Schools open so far, and they are likely to stay open through the end of this school year, June 2012.[1]

This Memorandum addresses subject matter jurisdiction – what claims by the parties may be heard in federal court. This threshold issue is important because federal courts have only limited jurisdiction. The District and the other Plaintiffs assert only claims arising under federal

---

[1] <u>See</u> Secretary of Education's Report and Recommendation Regarding Funding for District and Charter Schools Serving Children in the Chester Upland School District (March 1-June 30, 2012), (ECF No. 81), prepared by the Secretary's designee, Stephen J. Harmelin, Esquire, as part of a settlement dialogue with the parties.

law, but some of the Intervenor parties also assert claims under Pennsylvania law.[2]

### A.    Education and Federal Courts

Education is expensive, until one considers the alternatives. There is no one "true way" to educate school children, nor is there any federal rule of law mandating a particular method of education. Congress has, however, for more than 40 years, enacted many provisions, and appropriated billions of dollars, which impact elementary and secondary education. Federal regulations binding on state and localities follow the appropriations of money, thus giving federal courts jurisdiction over disputes arising under these federal statutes and regulations.[3]

Reviewing what is now a very large footprint which Congress has planted over the education landscape, one may be surprised at the many federal cases involving education, filed and decided in federal courts, from the Supreme Court down. Thus, it cannot be said that federal courts have no impact on education; but the federal court role is limited to protecting constitutional rights and interpreting the laws passed by Congress. Despite the familiar shibboleth that education is purely a local concern, federal statutes and judicial decisions have impacted educational practices in Pennsylvania and across the United States.

### B.    Students with Disabilities

Federal laws enacted by Congress concern students with disabilities, who are eligible for special education services. These students have specific rights under federal law, including a

---

[2] Several parties involved in the education of District students have intervened pursuant to Rule 24, Federal Rules of Civil Procedure.  See pp 13-15 below.

[3] The Supreme Court has held that even though federal courts may have jurisdiction to grant relief for claims brought under federal statutes, state law and standards may apply.  See Wheeler v. Barrere, 417 U. S. 402 (1974).

private right of action to secure what is referred to as a "free and appropriate public education" ("FAPE"). One of the important allegations brought by the District (and by parents) is that the alleged funding curtailments by the Defendants will prevent the schools from providing a FAPE to these students.

Plaintiffs alleged that without emergency financing the District would no longer be able to provide the requisite services to students with disabilities, emphasizing that this result would violate federal law.

However, there are no assurances that adequate funding for students with disabilities will continue into the 2012-13 school year, which will constitute the principal inquiry for the upcoming trial, scheduled to start on May 7, 2012.[4]

### C.    Sovereign Immunity

Sovereign immunity under the Eleventh Amendment impacts subject matter jurisdiction. Generally, federal courts do not have jurisdiction to hear suits against state governments or state officials, but, as with every rule, there are exceptions. One exception is that a state, such as Pennsylvania, which has accepted federal funds, may waive its sovereign immunity on certain claims. Under another exception, a state and its officials are subject to a federal court issuing prospective injunctive relief to enjoin ongoing violations of federal law.

### D.    Supplemental Jurisdiction

Although Congress has permitted federal courts to entertain some state law claims, when asserted along with federal claims (called "supplemental jurisdiction" under 28 U.S.C. § 1367),

---

[4] Federal law requires that students with disabilities must be educated in the least restrictive environment.  This Court's jurisdiction must extend to ensure compliance with this amorphous concept.

this Court has discretion whether to hear the Pennsylvania state law claims.

This Court will exercise supplemental jurisdiction over state law claims asserted by the Intervenors to a limited extent. The presence of companion litigation pending in the Commonwealth Court of Pennsylvania is a strong factor against this Court considering all Pennsylvania law claims, because some of them are already pending in the Commonwealth Court, and others could surely be added.[5]

### E.    Charter Schools and Funding

One issue that pervades the pleadings in this case, as well as the Secretary's report, concerns the dispute between the District and the charter schools over their expected entitlements. Their in-fighting resembles the battles between the Capulets and the Montagues in Romeo and Juliet. This is not an issue of federal law and this Court is not the place to resolve disputes between the District and charter schools.

This Court has no jurisdiction to require appropriations by the state in any specific amount or to any specific school. The Secretary, exercising his authority and his discretion under Pennsylvania state law must act like Sarastro, the sage/philosopher in Mozart's The Magic Flute.

## II.   Plaintiffs' Legal Claims

On January 12, 2012, Plaintiffs Chester Upland School District ("District"), the Board of School Directors of the District ("Board"), a resident of the District, a taxpayer of the District, a

---

[5] Federal claims pending in this Court could also be raised in Commonwealth Court. This raises the concept of "abstention" – whether, even though this Court has jurisdiction, it should abstain from exercising its jurisdiction in favor of the Commonwealth Court deciding all of the disputes between the parties, federal and state.  Again, under precedents by the Supreme Court and the Third Circuit Court of Appeals, whether this Court should abstain is a difficult question that will be addressed in a future decision.

parent of a student receiving special education services, and a parent of a general education

student, initiated this civil action. Their Complaint asserts claims against the following

Defendants: the Commonwealth of Pennsylvania ("Commonwealth"); the Department of

Education of the Commonwealth ("Department of Education" or "Department"); Ronald

Tomalis, the Secretary of Education of the Commonwealth ("Secretary")[6]; Joseph P. Scarnati III,

President Pro Tempore of the Senate of the Commonwealth, in his official capacity ("President

Pro Tempore"); Samuel H. Smith, Speaker of the House of Representatives of the

Commonwealth, in his official capacity ("Speaker"); and Tom Corbett, Governor of the

Commonwealth, in his official capacity ("Governor") (ECF No. 1).[7]

Plaintiffs assert their claims as a class action on behalf of all similarly situated persons,

pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). Plaintiffs initially brought

substantive claims for declaratory, mandamus, and injunctive relief based on a variety of

constitutional, federal statutory, and state law grounds, all arising out of an alleged lack of

adequate funding to ensure the District's continued operation. Plaintiffs later amended their

Complaint (ECF No. 67), discarding entirely their state law claims and asserting causes of action

---

[6] Although not specified in the caption, the Court assumes Plaintiffs assert their claims against the Secretary in his official capacity.

[7] The Commonwealth and the Department of Education together shall be called "the Commonwealth Defendants." The Court notes that it uses this phrase differently than the parties, who do not use it consistently. The Secretary, President Pro Tempore, Speaker, and Governor together shall be called "the Individual Defendants." The Commonwealth Defendants and the Individual Defendants shall collectively be called "Defendants." The District and its Board, when sued as third-party Defendants by certain Intervenors, shall be called "the School District Defendants."

as follows.[8]

## A.    Count I - IDEA

Count I alleges that a number of funding decisions by Defendants—especially certain preferential funding allocations made to charter schools—have resulted in reductions in funding to the District that will "prevent the School District from providing educational services to special education and regular students in the School District, effectively requiring the closing of schools in the School District." Am. Compl. ¶ 42. The subsequent school closings would trigger violations of the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq.,[9] including the requirement that all students with disabilities be provided a free appropriate public education ("FAPE"), and the requirement that students protected under the IDEA receive at least ten days notice of a change in educational placement. Am. Compl. ¶¶ 42-43. To remedy these alleged violations, Plaintiff requests a declaration that Defendants have a duty under federal law to maintain services for District students with disabilities in their current placement and in the least-restrictive environment ("LRE") with their non-disabled peers. Am. Compl. at 12. Plaintiffs further request that the Court enjoin Defendants from failing to provide the District funding to maintain its special education programs. Am. Compl. at 12.[10]

## B.    Count II - IDEA and Other Federal Claims

Count II alleges that students with disabilities are a protected class, and that the

---

[8] Some Intervenors still assert state law claims, which are discussed below.

[9] The Individuals with Disabilities Education Improvement Act, which was signed into law on December 3, 2004, reauthorized the Individuals with Disabilities with Education Act.

[10] Plaintiffs also seek attorneys fees and costs in connection with all claims in the Amended Complaint.

Pennsylvania special education subsidy payment formula (P.S. § 25-2509-5) violates the IDEA,

Section 504 of the Rehabilitation Act ("Section 504"), Equal Protection and Substantive Due

Process under the Fourteenth Amendment, and Title I of the Elementary and Secondary

Education Act ("ESEA"), 20 U.S.C. § 6301 et seq. Am. Compl. ¶ 46. Plaintiffs ask the Court to

"enjoin Defendants from using and implementing a state special education subsidy formula that

discriminates against students with disabilities in favor of non-disabled students." Am. Compl. at

12.

### C.   Count III - Federal Statutory and Constitutional Claims

Count III avers that the reduction in state educational funding to the District has

disproportionately impacted racial minority students—as well as school districts with high

percentages of racial minority students—and, moreover, that Defendants intended to bring about

this result. Am. Compl. ¶ 49. According to Plaintiffs, this conduct violates the Equal Protection

Clause, Substantive Due Process, Title IV of the Civil Rights Act, Title I of the ESEA, and the

No Child Left Behind Act ("NCLB").[11] Am. Compl. ¶ 50. Plaintiffs ask the Court to enjoin

Defendants from reducing funding to the District at a rate different from that to school districts

with low percentages of minority students, and from funding the District "in a racially

discriminatory manner." Am. Compl. at 13.

### D.   Count IV - IDEA

Count IV alleges that through the state cap on funding to the District, Defendants have

violated the IDEA by failing to use federal IDEA funds to support special education services for

---

[11]  Plaintiffs cite both Title I of the ESEA and NCLB as bases for this claim. Because NCLB amended the ESEA, P.L. 107-110, 115 Stat. 1425, the Court will assume that these causes of action are one and the same.

students with disabilities in the District. Am. Compl. ¶¶ 52-55. Plaintiffs ask the Court to declare

that Defendants are required to use IDEA funds "primarily to provide services to students with

disabilities" including those in the District, and to enjoin Defendants from using those federal

funds for other purposes. Am. Compl. at 14.

### E.      Count V - Federal Constitutional Claims

Finally, Count V of the Amended Complaint avers that all students in the District have a

right to public education that cannot be interrupted without due process. Am. Compl. ¶ 57.

According to Plaintiffs, the District's imminent closure would consequently deny its students an

education, in violation of the Equal Protection Clause and the Due Process Clause of the

Fourteenth Amendment. Am. Compl. ¶ 59. Plaintiffs therefore seek an injunction that both

prohibits Defendants from depriving the District's students of educational services without

procedural due process, and prevents Defendants from providing the District students an

education that is not comparable to that of their peers in other districts. Am. Compl. at 15.

## III.   Facts as Asserted by Plaintiffs

A detailed review of the allegations of the Amended Complaint and the facts asserted in

the Affidavits of Dr. Thomas Persing ("Persing Aff."), Acting Deputy Superintendent for the

District, and Herbert Schectman ("Schectman Aff."), Assistant Chief Financial Officer for the

District, filed in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary

Injunction will provide the factual background of the jurisdictional discussion below.[12] Though

the Complaint and the affidavits contain substantial historical and background information

---

[12]  As noted in the March 8, 2012 Scheduling Order (ECF No. 77), the Court will consider
the facts alleged in these Affidavits as incorporated into the Amended Complaint.

concerning the operations, administration, and finances of the District, only the facts most pertinent to Plaintiffs' claims will be discussed.

The District encompasses the City of Chester, the Township of Chester, and the Borough of Upland. Am. Compl. ¶ 16; Persing Aff. ¶ 2. Because of the depressed economic condition of these areas, the District relies primarily on state and federal subsidies to operate its schools. Am. Compl. ¶¶ 16, 18, 26; Persing Aff. ¶¶ 2, 7; Schectman Aff. ¶ 15.[13] The District funds both charter and non-charter schools with these subsidies. Am. Compl. ¶ 29, 31, 33; Persing Aff. ¶¶ 7, 10; Schectman Aff. ¶¶ 15, 17.

Over 3,000 students are enrolled in the District-run schools, while over 3,000 students attend charter schools in the District. Am. Compl. ¶ 18; Persing Aff. ¶ 2. Ninety-eight percent (98%) of the students enrolled in the District are racial minorities, and over twenty percent of the students (20.4%) have disabilities, a substantial number of whom have severe handicaps. Am. Compl. ¶¶ 16-17; Persing Aff. ¶ 2.

The District has suffered financial difficulties for many years. Am. Compl. ¶¶ 16, 19; Persing Aff. ¶ 2. Although the Amended Complaint omits this information, Plaintiffs' original Complaint alleged that in 1994, the Commonwealth officially declared the District to be financially distressed and took over direct responsibility of governing the District from its

---

[13]The District's financial problems stem in part from its diminished tax base: over half the assessed properties in the District are exempt from real estate taxes. Am. Compl. ¶ 27; Persing Aff. ¶ 8. The District is one of the most heavily taxed school districts in the state. Am. Compl. ¶ 27; Persing Aff. ¶ 8; Schectman Aff. ¶ 16. Moreover, approximately 29% of the taxes assessed in the District are delinquent. Am. Compl. ¶ 28; Persing Aff. ¶ 9. This explains in part why the reduced state and federal funding, described later, has caused such a grave financial crisis for the District, which relies on state and federal funds for almost 80% of its budget. Am. Compl. ¶¶ 26-27; Persing Aff. ¶ 7; Schectman Aff. ¶ 15.

Elected Board of School Directors (the "Elected Board"). Compl. ¶ 18. Subsequently, in 2006, due to continuing financial difficulties, the Secretary was appointed receiver for the District. Compl. ¶ 19. In that capacity, the Secretary was charged with financial oversight of the District, including the authority to monitor, assess, and report on its financial condition, and to approve all expenditures and contracts in excess of $5,000. Compl. ¶ 19.

From 2006-2011, the Secretary allegedly made a number of funding decisions that significantly diminished the District's financial position. These decisions included, among other things: an increase in the District's budget from $85 million to $113 million during that period; an increase in the number of employees in the District from 590 to 735 employees, even though student enrollment in the District had declined from 4,609 to 3,717 during that period; the depletion of the District's reserve funds to finance its expenditures; approval of the 2009-2010 District budget, which resulted in over-expenditures of $2.8 million by the District; failure to satisfy obligations to special education contractors and employee pension contributions in the amounts of $962,000 and $364,000, respectively; and approval of the 2010-2011 District budget, which resulted in a $4.5 million reduction in revenue to the District. Schectman Aff. ¶¶ 2-6, 9-11. These decisions led to a substantial increase in the District's debt. Schectman Aff. ¶ 2.

Eventually the elected School Board resumed governing the District. During the 2010-2011 school year, the Board requested that the Secretary permit it to fund the debt it inherited through a proposed bond issue, but the Secretary refused. Schectman Aff. ¶ 8. At the end of that school year, however, the District received an advance of $8.7 million from the Commonwealth to cover salaries and the funds the District needed to pay the charter schools. Persing Aff. ¶ 3; Schectman Aff. ¶ 12.

The District's budget for the 2011-2012 school year is $96 million. Am. Compl. ¶ 30. For that period, state and federal subsidies to the District have been reduced from the previous year by a total of $23 million, which includes $8.7 million of state subsidies that the Secretary has withheld as repayment for the advance made to the District by the Commonwealth. Am. Compl. ¶ 30; Persing Aff. ¶ 3; Schectman Aff. ¶¶ 13, 14.

Under both state and federal law, the District is required to provide special education services to students with disabilities. Am. Compl. ¶ 35. The Commonwealth requires the District to allocate funds for these services in accordance with the formula set forth in the Pennsylvania Charter School Law, 24 P.S. § 25-2509.5. Am. Compl. ¶¶ 29; Persing Aff. ¶ 10; Schectman Aff. ¶ 17. Under this formula, charter schools are allocated a separate dollar amount for each enrolled regular education and special education student. Am. Compl. ¶ 29; Persing Aff. ¶ 10; Schectman Aff. ¶ 17. For the 2011-2012 school year, the District is required to provide charter schools $9,858 for each regular education student and $24,500 for each special education student, while non-charter schools are allocated $3,600 for each special education student. Am. Compl. ¶¶ 29, 31; Persing Aff. ¶¶ 10, 12; Schectman Aff. ¶¶ 17, 18.

The Affidavits provide no explanation of, nor any rationale for, the funding disparity between the District schools and charter schools. The $23 million reduction in state and federal subsidies to the District was not accompanied by a corresponding adjustment to the formula for funding charter schools. Am. Compl. ¶¶ 30; Persing Aff. ¶ 11. Accordingly, over forty-four percent (44.8%) of the District's $96 million budget for the 2011-2012 school year is devoted to charter schools. Am. Compl. ¶ 29; Persing Aff. ¶ 10; Schectman Aff. ¶ 17.

As a result of the reduction in state and federal subsidies to the District without a

corresponding adjustment to the funding formula, the District has been unable to pay the Charter School the full amount required under the Pennsylvania Charter School Law. Am. Compl. ¶ 33. The Secretary has withheld $18 million from the District's subsidies in order to pay the charter schools directly. Am. Compl. ¶ 34.

The financial crisis has also impacted District staff and students. The District has already furloughed teachers and support staff and increased class sizes. Am. Compl. ¶ 24. The decreased state funding also caused the District to cut certain educational programs, including music, art, language and advanced academic classes. Am. Compl. ¶¶ 24-25. Plaintiffs allege that these programming cuts adversely impact racial minority students and students with disabilities, who no longer have access to the enrichment courses available to their peers in neighboring districts. Am. Compl. ¶ 25.

Although the Commonwealth has provided certain funds to the District since litigation commenced, Plaintiffs allege that if the Secretary continues to withhold the District's subsidies, the District will be unable to meet its payroll obligations and other operating expenses.[14] Am. Compl. ¶¶ 36-38, 40; Persing Aff. ¶¶ 14, 17-20. This will force non-charter schools in the District to close. Am. Compl. ¶ 32; Persing Aff. ¶ 14. On February 27, 2012, when they filed their Amended Complaint, Plaintiffs predicted that the District would not be able to fulfill its financial obligations as of March 1, 2012. Am. Compl. ¶¶ 32, 40.

## III.   Intervenors and Amicus Curiae

The Court permitted the below-listed parties to intervene in this case. In their respective

---

[14]The Delaware County Intermediate Unit, an Intervenor in this case, which provides special education students to over 200 District students with disabilities, already notified the District of its intention to cancel its contract due to non-payment. Am. Compl. ¶ 37.

Intervenor Complaints, they allege the following:

### A.    __District Parents__

Intervenors T.F., B.C., M.F., and K.H. ("District Parents") are taxpaying parents of

School District students receiving special education services or those in the general education

program. On behalf of a class of similarly situated individuals, the District Parents assert an equal

protection claim (Count I) against the Commonwealth Defendants and the Secretary.[15] They also

assert a due process claim (Count II), citing federal and state law, and an IDEA claim (Count III)

against the Commonwealth Defendants, the Secretary, and the School District Defendants.

(Compl. of District Parents, ECF No. 13).

### B.    PA-NAACP

Intervenor Pennsylvania State Conference of the National Association for the

Advancement of Colored People ("PA-NAACP") is a non-partisan organization that has actively

worked in Chester Upland—holding forums for students, parents, and teachers— to further its

goal of ensuring that all students in the Commonwealth have the same opportunity to obtain a

high-quality public education. PA-NAACP asserts claims against the Commonwealth Defendants

and the Secretary, as well as against the School District Defendants. PA-NAACP alleges the

same causes of action as the District Parents against the same Defendants.[16] (PA-NAACP

---

[15]While the District Parents seem at first glance to name all the same Defendants as Plaintiffs, they only list the Commonwealth, Department of Education, and the Secretary specifically. See Compl. of District Parents at ¶ 6. They also bring claims against the School District Defendants. Id. at ¶ 7.

[16]PA-NAACP notes that it would have joined in the District Parents' Complaint "except for the delay necessary to obtain clearance from the national NAACP which is required before any affiliate using the NAACP name may participate in litigation." PA-NAACP Compl. ¶ 8.

Compl., ECF No. 79).

### C.   Charter School

Intervenor Chester Community Charter School ("Charter School") is a public charter school that educates approximately 3,000 students in a total of two elementary and two middle school campuses in the City of Chester. It receives the bulk of its funding from the District. Making state law demands only, the Charter School seeks a declaratory judgment and a permanent injunction against the Department of Education and the Secretary of Education (Counts I and II) and against School District Defendants (Counts III and IV), based on the funding provision of the Pennsylvania Charter School Law, 24 P.S. § 17-1725-A. (Charter School Compl., ECF No. 40).

### D.   Charter School Parents

Intervenors N.F., E.W. and S.K. ("Charter School Parents") are parents of minor students at Chester Community Charter School. Some of the parents' children receive special education services, including accelerated programs, while it appears that others do not. They allege that the Secretary has violated the Charter School Law (Count I) and the Pennsylvania Constitution (Count V). Against the School District Defendants, they allege violations of the funding provision of the Pennsylvania Charter School Law, 24 P.S. § 17-1725-A. (Count II). Against the Department and the Secretary only, they allege violations of the IDEA (Count VI) and two counts under the Equal Protection Clause (Counts III and IV). They seek, inter alia, orders enjoining the Department and Secretary from violating the Charter School Law or the IDEA, and compelling Defendants to remit all funds owed to the Charter School. (Am. Compl. of Charter School Parents, ECF No. 76).

### E.   <u>Delaware County Intermediate Unit and Technical Schools</u>

Pursuant to Pennsylvania law and a contract with the District, Intervenor Delaware County Intermediate Unit ("DCIU") provides special education services to some students in the District while Intervenor Delaware County Technical Schools ("DCTS") enrolls students from the District in its Career and Technical Education programs. The District owes DCIU over two million dollars and DCTS over $200,000.00. DCIU and DCTS seek the money owed to them, plus interest, costs, and attorney fees. (Compl. of DCIU and DCTS, ECF No. 50). DCIU and DCTS assert no federal causes of action, but instead allege a breach of contract claim against the District. Tr. Hearing 03/05/2012 at 14:7-12 (ECF No. 85) (counsel for DCIU and DCTS clarifying that they assert a breach of contact claim).

### F.   **Amicus Curiae** <u>Pennsylvania State Education Association</u>

<u>Amicus Curiae</u> Pennsylvania State Education Association ("PSEA"), which filed a brief in support of Plaintiffs, is a nonprofit "committed to promoting the general educational welfare of the Commonwealth and to protecting and advancing the interests of its members[,]" who are active and retired Pennsylvania public school employees. It argues that Defendants are violating the IDEA, Section 504, and the Equal Protection Clause. (PSEA Br., ECF No. 20).

## IV.   **Commonwealth Court Actions**

Many parties to this action are simultaneously litigating a similar funding dispute before the Honorable James Gardner Colins of the Commonwealth Court of Pennsylvania. The Charter School commenced that action on December 28, 2011, by filing a Complaint seeking a declaratory judgment, writ of mandamus, permanent injunction, and other equitable relief against the Commonwealth, the Department, the Secretary, the District and the Board. <u>Chester Cmty,</u>

Charter Sch. v. Commonwealth of Pennsylvania, No. 632 M.D. 2011, slip op. at 1 (Pa. Commw. Ct. Jan. 30, 2011). The Charter School's claims before the Commonwealth Court are based exclusively on those Defendants' alleged failure to make the required payments under the Pennsylvania Charter School Law, 24 P.S. § 1725-A(a). Id. at 1-2. Judge Colins considered the Charter's School application for a preliminary injunction, as well as the Department's and the District's motions to dismiss for failure to join indispensable parties. Id. at 2-3.

After making extensive factual findings, Judge Colins denied all motions. Id. at 18, 29. In denying the Charter School's Application for a Special and Preliminary Injunction, Judge Colins determined first that the Charter School had not demonstrated immediate harm. Id. at 25. Although the lack of funding would harm the Charter School eventually, the Charter School did not "establish that the harm to it for not granting the injunction would be greater than the catastrophic harm that will befall the School District if payments for the School District continued to be directed to the Charter School." Id. at 25-26. Judge Colins also held that the Charter School did not establish a likelihood of success on the merits. Id. at 26.

There are at least two other related cases pending in Commonwealth Court. Before withdrawing its state-law claims before this Court, Plaintiffs filed a Complaint in Commonwealth Court asserting state law claims against the same Defendants. Chester Upland Sch. Dist. v. Commonwealth of Pennsylvania, No. 213 MD 2012 (Pa. Cmmw. Ct). Plaintiffs ask the Commonwealth Court for a writ of mandamus, a declaratory judgment, and injunctive relief related to Defendants' alleged duty under Pennsylvania law to provide certain funding to the District so that its schools can continue to function.

Another group of students and parents in the District, along with the community group

Chester Upland Citizens for Educational Progress, filed a separate Complaint in Commonwealth Court against the Department of Education and the District for violations of certain Pennsylvania statutes and the Pennsylvania Constitution. Plaintiffs in that matter, captioned R.S.B. v. Dep't of Educ., No. 27 MD 2012 (Pa. Cmmw. Ct), are represented by Public Interest Law Center of Philadelphia (also counsel for Intervenors the District Parents and PA-NAACP in the present matter) and Education Law Center. Those plaintiffs seek a writ of mandamus and injunctive relief with the overall goal that the District students continue to receive the education to which they are allegedly entitled under the Pennsylvania Constitution as well as multiple Pennsylvania statutory sections providing for and governing the provision of education in the Commonwealth.

## V.      Procedural History

Plaintiffs originally moved for a Temporary Restraining Order[17] ("TRO") (ECF No. 2), on which this Court held a hearing on January 12, 2012. The hearing was scheduled to continue on January 17, 2012; however, before the hearing, by consent of the parties, the Court entered an Order resolving the TRO. Among other things, the Order required the Department of Education to release 3.2 million dollars to the District as an advance on its June 2012 Basic Education Subsidy (ECF No. 17).

The Court subsequently considered and granted several motions to intervene, which are discussed above (ECF Nos. 25, 49 and 84). On January 18, 2012, Intervenor Chester Community Charter Schools filed an Emergency Motion to Reconsider the January 17, 2012 TRO and/or to Abstain (ECF No. 19). The next day, Intervenors N.F., E.W. and S.K. also filed an Emergency Motion to Reconsider the January 17, 2012 Order (ECF No. 23). Additionally, Plaintiffs filed a

---

[17]Plaintiffs simultaneously moved for a Preliminary Injunction, which remains pending.

Supplemental Petition for TRO (ECF No. 36) on January 30, 2012.

The Court then held a hearing with all parties on February 1, 2012. At the hearing, through his counsel, the Secretary agreed to convene a settlement conference with all parties to discuss funding issues, and to make a final report and recommendation by March 10, 2012. Following argument about the effect of the Court's January 17, 2012 Order on Charter Schools, the Court dissolved that Order (ECF No. 17), thereby granting in part the Motions for Reconsideration.

The Court then set a briefing schedule on the issue of federal subject matter jurisdiction over Plaintiffs' other claims. The Court directed Plaintiffs, and any intervenor asserting that this Court has subject matter jurisdiction over claims other than the IDEA or Rehabilitation Act, to submit a brief describing the basis for that jurisdiction.[18]

Per the Court's Order, on February 10, 2012, Plaintiffs, joined by Intervenors the District Parents and the Charter School Parents, filed a brief arguing that the IDEA, Section 504, Title I of the Elementary and Secondary Education Act, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as the Supremacy Clause, confer jurisdiction on this Court

---

[18]The Court noted that the parties need not brief federal jurisdiction under the IDEA or Rehabilitation Act unless they dispute that the Court has subject matter jurisdiction over those claims. (Order and Report Following Hearing on February 1, 2012, ECF No. 49). The Court also explained that it preferred to have Plaintiffs file their brief first, and for Defendants to respond with a Motion to Dismiss. Additionally, the Court clarified that because it had limited the issue for briefing to subject matter jurisdiction, Defendants would not waive alternative bases for dismissal by submitting their brief on subject matter jurisdiction alone. The Court deferred briefing and decision on ripeness, standing, abstention, immunities other than sovereign immunity, and all other possible bases for dismissal.

(ECF Nos. 54, 55).[19] Defendants filed a Motion to Dismiss for lack of subject matter jurisdiction on February 17, 2012 (ECF No. 58), as well as a supporting brief (ECF No. 59). The Charter School submitted its own brief on February 24, 2012 (ECF No. 65). The same day, Plaintiffs, again joined by the District Parents and the Charter School Parents, filed their own Reply Brief (ECF No. 66). On February 27, 2012, Plaintiffs filed the Amended Complaint described above (ECF No. 67).

Following two status teleconferences, the Court held oral argument on March 5, 2012. At that hearing, Plaintiffs clarified that their intent was to drop all state law claims from the federal lawsuit and pursue them in Commonwealth Court. Counsel for the President Pro Tempore made a number of arguments, discussed below, that sovereign immunity[20] bars many of Plaintiffs' claims. Counsel for the Commonwealth Defendants also emphasized that its Motion to Dismiss extended to all claims brought by the Intervenors.

Following the hearing, the Court issued an Order (ECF No. 77), permitting the parties to submit supplemental letter briefs on the issue of subject matter jurisdiction, and setting pre-trial, trial, and post-trial deadlines. On March 12, 2012, Defendants and Plaintiffs filed supplemental briefs (ECF No. 78, 80). The next day, the Charter School Parents filed a short response to an argument put forth in a footnote in Defendants' supplemental brief (ECF No. 82).

---

[19]Plaintiffs filed the brief on February 10, 2012, and then submitted a revised brief on February 15, 2012 (ECF No. 55) correcting certain typographical errors and correcting the erroneous representation that the Charter School signed onto the brief.

[20]Although a state's immunity from suit may derive from the Eleventh Amendment or other sources of sovereign immunity, the Court will use these phrases interchangeably. See Va. Office for Protection & Advocacy v. Stewart, 131 S. Ct. 1632, 1637 (2011) (the principle of sovereign immunity arises not only from the text of the Eleventh Amendment but also the "understanding that States entered the Union with their sovereign immunity intact").

Also on March 12, 2012, pursuant to the Court's Order of February 2, 2012, the Secretary[21] submitted a "Report and Recommendation Regarding Funding for District and Charter Schools Serving Children in the Chester Upland School District (March 1 - June 30, 2012)" ("Report") (ECF No. 81). As is clear from the Report's title, the Report contains a plan designed to ensure that all schools in the District will remain open for the rest of the 2011-12 school year. Report at 1, 16. With that goal in mind, the Secretary identifies expenses he considers essential to the continued operation of the schools, including special education services and other instructional spending. Report at 16. Accordingly, assisted by the independent financial consultant the PFM Group, the Report details various opportunities for cuts in the District and Charter School budgets. Report at 1, 18-33. The Secretary details precisely how the funds should be allocated and paid, including a recommendation that the Department make certain payments directly to creditors and critical vendors, including DCIU. Report at 3. Because the essential funds exceed the funds allocated to the District for the remainder of the year, the Secretary suggests utilizing some of the state empowerment funds. Report at 17. Citing the District's financial mismanagement, the Secretary also recommends that a third party be appointed to receive the dispersed funds and evaluate the District's financial needs for the 2012-13 school year. Report at 19, 28-30, 34.

---

[21]The Report was prepared by the Secretary's Designee, Stephen J. Harmelin, Esquire but the Secretary then adopted the Report.

**VI.    The Parties' Contentions Regarding Subject Matter Jurisdiction**

    **A.    Brief Filed by Plaintiffs, the District Parents and the Charter School Parents**

Plaintiffs[22] argue that sovereign immunity is no bar to their claims. First, Plaintiffs contend that by receiving money under the IDEA and Rehabilitation Act, Pennsylvania waived its sovereign immunity. Pl. Br. at 2. Moreover, Plaintiffs assert that sovereign immunity does not bar injunctive relief against state officials under the doctrine of Ex Parte Young, 209 U.S. 123 (1908) and its progeny. Id. Plaintiffs also cite Papasan v. Allain, 478 U.S. 265 (1986), in arguing that sovereign immunity does not bar injunctions to correct violations of federal law, even when the injunction has a "substantial ancillary effect on the state treasury." Id. (citing Papasan, 478 U.S. at 278). Plaintiffs then make a series of points underscoring the Court's jurisdiction under the IDEA, Section 504, and Title I of the Elementary and Secondary Education Act, to protect the rights of all the students in the District. Plaintiffs also assert arguments that implicate the merits of their federal claims, and argue that the Court must maintain jurisdiction to safeguard these interests.

    **B.    Defendants' Brief**

In response, Defendants argue that sovereign immunity does indeed bar the majority of Plaintiffs' claims. Defendants concede that Ex Parte Young provides an exception to sovereign immunity when a state official seeks an injunction against a state official. Def. Br. at 6. Nonetheless, Defendants cite Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1984), Edelman v. Jordan, 415 U.S. 651 (1974), and Virginia Office for Protection and

---

[22]Plaintiffs filed their brief with the District Parents and the Charter School Parents, but for purposes of brevity, the Court will use the term "Plaintiffs" when describing the arguments set forth in the brief.

Advocacy v. Stewart, 131 S. Ct. 1632 (2011), to argue that Ex Parte Young does not apply to injunctions that require payment from a State's treasury. Id. at 7. Defendants contend that Papasan does not support Plaintiffs' claims because, there, the substantial effect on the state treasury was only ancillary to an injunction to correct an ongoing violation of federal law—Defendants contend that the monetary remedy Plaintiffs seek is not ancillary to an injunction to correct a constitutional infirmity. Id. at 8. Defendants also argue that the NCLB sets up its own remedial mechanism, and thus Plaintiffs' NCLB claims are barred under Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996). Id. at 11. In addition, although Defendants recognize that the Commonwealth has waived sovereign immunity under the IDEA and Rehabilitation Act, Defendants nevertheless argue that Plaintiffs are incorrect to assume that those waivers of sovereign immunity extend to all their claims. Id. at 9-10. Finally, Defendants contend that Plaintiffs' federal claims cannot provide the remedies Plaintiffs seek.

### C.      **The Charter School's Brief**

The Charter School submitted its own brief to argue that the Court should not exercise jurisdiction over claims that attempt to alter the General Assembly's funding decisions and, moreover, that the funding dispute at issue poses a political question inappropriate for federal court review.[23]

### D.      **Reply Filed by Plaintiffs, the District Parents, and the Charter School Parents**

Plaintiffs argue that sovereign immunity does not bar the Court from ordering

---

[23]The Charter School also argued that the District does not have standing to assert claims under the IDEA and Rehabilitation Act; however, the Court will defer decision on standing and other issues not strictly pertaining to subject matter jurisdiction.

Commonwealth officials to expend money from the state treasury in order to comply with federal law.[24] Plaintiffs' final argument is that the Commonwealth waived sovereign immunity as to all claims arising under the IDEA, Section 504, and Title I of the ESEA.[25]

### E.    Supplemental Briefs

After the hearing on March 5, 2012, Defendants submitted a letter brief arguing that for Ex Parte Young to apply, state officials must be sued in their individual capacities. Citing Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), Defendants also contend that Congress could not have abrogated sovereign immunity under the IDEA, despite its clear intent to do so, because Congress is unable to do so under its Article I powers. (Defs. March 12, 2012 Letter Br., EFC No. 78). Plaintiffs, however, who submitted their own letter brief, argue that Third Circuit precedent makes clear that Pennsylvania waived sovereign immunity under the IDEA and Rehabilitation Act or, in the alternative, that Congress abrogated such immunity. (Pls. March 12, 2012 Letter Br., ECF No. 80). On March 13, 2012, the Charter School Parents also submitted a letter brief in response to Defendants' brief. Among other things, the Charter School Parents contend that Defendants' argument that the Plaintiffs' and Intervenors' claims are barred because they seek money fails under Milliken v. Bradley, 433 U.S. 267, 280 (1977). (Charter School Parents' March 13, 2012 Statement, ECF No. 82).

---

[24]Plaintiffs' Reply also notes that they had voluntarily withdrawn all state law claims and would assert them before the Commonwealth Court. The Charter School, Charter School Parents, and DCUI/DCTS still assert state law claims, however.

[25]Plaintiffs, however, did not cite any authority regarding the waiver of sovereign immunity under Title I of the ESEA/NCLB, and did not repeat this argument in their supplemental brief or at the hearing.

## VII.    Discussion of Subject Matter Jurisdiction

Federal courts "have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C. §1331. Although federal courts are

"courts of limited jurisdiction," they nevertheless "have no more right to decline the exercise of

jurisdiction which is given, then [sic] to usurp that which is not given." Mims v. Arrow Financial

Servs., LLC, 132 S. Ct. 740, 747 (2012) (quoting Kokkonen v. Guardian Life Ins. Co. of

America, 511 U.S. 375, 377 (1994); Cohens v. Virginia, 6 Wheat. 264 (1821)). With the

exception of state law claims raised by the Charter School, the Charter School Parents, and

DCUI/DCTS, all claims before the Court in this matter arise from federal statutes or the U.S.

Constitution and properly fall into this Court's federal question jurisdiction. There are

nonetheless certain other barriers to subject matter jurisdiction which this Court has an obligation

to consider.

¶       The first is, in light of the Supreme Court's instruction that most educational

        policy decisions be left to state and local authorities, whether this Court may

        entertain the array of educational claims at issue in this case, which seem at their

        core to stem from a fight for the limited educational funds available in this

        distressed economic climate.[26]

¶       The second is the concept of sovereign immunity, which, apart from certain

---

[26]Claims arising under the Equal Protection and Due Process clauses, as well as under the Civil Rights Act, do not directly implicate educational decisions in the way the same way as the claims under the statutes specifically addressing education. Indeed, apart from raising sovereign immunity arguments, no party disputes that this Court has jurisdiction to hear those claims. 28 U.S.C. § 1434 provides additional bases for subject matter jurisdiction over the civil rights and equal protection claims. Accordingly, as to these claims, the Court need only discuss whether sovereign immunity presents a jurisdictional bar.

exceptions, protects states, state governmental departments, and state officials

from suit in federal court.

### A. __Jurisdiction under the IDEA__

The Court is cognizant of the Supreme Court's caution that federal courts not embroil

themselves in most educational policy decisions.[27] The Supreme Court long ago instructed that:

> By and large, public education in our Nation is committed to the
> control of state and local authorities. Courts do not and cannot
> intervene in the resolution of conflicts which arise in the daily
> operation of school systems and which do not directly and sharply
> implicate basic constitutional values.

Epperson v. Arkansas, 393 U.S. 97, 104 (1968). Nevertheless, the IDEA is an important and

robust statute, enacted in view of Congressional findings that, inter alia, "[i]mproving

educational results for children with disabilities is an essential element of our national policy of

ensuring equal opportunity, full participation, independent living, and economic self-sufficiency

for individuals with disabilities." 20 U.S.C. § 1400(c)(1).

Under the IDEA, states receiving federal funding must have "in effect a policy that

ensures all children with disabilities the right to [FAPE]." T.R. v. Kingwood Twp. Bd. of Educ.,

205 F.3d 572, 576-77 (3d Cir. 2000) (citing 20 U.S.C. § 1412(1)). Students with disabilities

must receive FAPE in the least restrictive environment. Id. at 577. This means they must receive

"significant learning" and a "meaningful educational benefit" in an environment that "to the

greatest extent possible, satisfactorily educates disabled children together with children who are

not disabled, in the same school the disabled child would attend if the child were not disabled."

---

[27] The Court also notes the Charter School's argument that this case presents a political question outside the scope of federal judicial review. (Charter School Br., ECF No. 65).

Id. at 578-79 (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995)); see also

20 U.S.C. § 1412(a)(5)(A).[28]

To function, the IDEA "conditions a state's receipt of federal funds on the

implementation of statewide special education programs guaranteeing [FAPE] to eligible"

children with disabilities. C.G. v. Commonwealth of Pa. Dep't of Educ., No. 06-CV-1523, 2009

WL 3182599, at *1 (M.D. Pa. Sept. 29, 2009) ("C.G. I") (citing 20 U.S.C. § 1412(a)(1)(A)).

Pennsylvania then appropriates funding to local school districts to meet these special education

obligations. Id. (citing 24 P.S. § 25-2509.5). As the Third Circuit has explained:

> The IDEA frequently has been described as a model of cooperative
> federalism. Schaffer v. Weast, 546 U.S. 49, 52 (2005). It "leaves to the
> States the primary responsibility for developing and executing educational
> programs for handicapped children, [but] imposes significant requirements
> to be followed in the discharge of that responsibility." Bd. of Educ. v.
> Rowley, 458 U.S. 176, 183 (1982). To that end, the IDEA requires that each
> state receiving federal funds ensure that state rules, regulations, and policies
> conform to the purposes of the IDEA. 20 U.S.C. § 1407.

L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ., 384 F. App'x 58, 61 (3d Cir. 2010).

Congress provided for limited federal court jurisdiction over disputes arising under the

IDEA. See 20 U.S.C. § 1415(f)(1)(B)(iii)(II), (i)(2)(A), (i)(3)(A). Typically a plaintiff must

exhaust his or her administrative remedies before seeking relief in federal court. Beth V. ex rel.

Yvonne V. v. Carroll, 87 F.3d 80, 88 (3d Cir. 1996) (citing 20 U.S.C. § 1415). Plaintiffs who

"allege systemic legal deficiencies and, correspondingly, request system-wide relief" are,

however, excused from this exhaustion requirement. Id. at 89.

---

[28] The Court need not yet determine whether the IDEA's least-restrictive-environment
requirement suffices to give the non-disabled student Plaintiffs and their parents standing to
assert IDEA claims.

In C.G., the federal case most analogous, students—with and without disabilities—in economically-distressed schools with high populations of either students eligible for special education services or students with limited English proficiency, sought, inter alia, an injunction requiring the Secretary "to abandon the current funding formula and to distribute special-education funds based on the actual number of students with disabilities and the actual costs of their special-education needs." C.G. I, 2009 WL 3182599, at *2. Judge Kane of the Middle District certified two classes of students, id. at *8, and later considered Defendants' Motion for Summary Judgment and Plaintiffs' cross-motion for summary judgment. C.G. v. Commonwealth of Pennsylvania, No. 06-CV-1523, 2011 WL 318289 (M.D. Pa. Jan. 28, 2011) ("C.G. II"). Judge Kane denied Plaintiffs' motion and granted Defendants' motion in part and denied it in part. Id. at *1. Relevant to the Court's analysis here, Judge Kane allowed Plaintiffs' IDEA claim to proceed due to remaining material questions of fact. Id. at *6. Judge Kane explained that "a reasonable fact finder could deduce from the available evidence . . . that the funding scheme [was] responsible for the denial of FAPE and that a change in the funding scheme [would] resolve these issues." Id.

Federal courts, including the Third Circuit, have also considered class claims for systemic violations of the IDEA in other contexts. In Beth V., the plaintiffs—two children with learning disabilities and their mothers, along with the non-profit educational advocacy organization Parents Union for Public Schools—had asserted claims for declaratory and injunction relief against the Pennsylvania Department of Education and Pennsylvania Secretary of Education based on the Commonwealth's alleged failure to comply with U.S. regulations governing procedures for complaint resolution under the IDEA. 87 F.3d at 81. The district court found there

27

was no private right of action, and dismissed the plaintiffs' claims accordingly. Id. The Third

Circuit, in an opinion authored by Judge Sloviter, reversed and remanded, holding that there is an

express private right of action under the IDEA. Id. at 81-82.

The Court consequently concludes that Plaintiffs' claims—averring imminent widespread

violations of the IDEA—are an appropriate subject matter for federal court jurisdiction.

### B.      Jurisdiction under Section 504

Section 504 prohibits programs that receive federal funding from discriminating on the

basis of disability. P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009). Included

within the protections for individuals with disabilities is a requirement that school districts

provide FAPE to students with disabilities. 34 C.F.R. § 104.33(a). Accordingly, although an

IDEA violation is not a per se Section 504 violation, "violations of Part B of the IDEA are almost

always violations of [Section 504]."[29] Andrew M. v. Del. Cnty. Office of Mental Health &

Mental Retardation, 490 F.3d 337, 349-50 (3d Cir. 2007). Specifically, to prove a Section 504

violation, a plaintiff must demonstrate that: "(1) he is disabled as defined by the Act; (2) he is

otherwise qualified to participate in school activities; (3) the school or the board of education

receives federal financial assistance; and (4) he was excluded from participation in, denied the

---

[29]Section 504 in fact covers more students than the IDEA does. Brendan K. ex rel. Lisa K. v. Easton Area Sch. Dist., No. 05-CV-4179, 2007 WL 1160377, at *12 (E.D. Pa. Apr. 16, 2007). Section 504 applies to individuals who are or are suspected of having "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B) (referencing the definition established by 42 U.S.C. § 12102(1)(A)). The phrase "child with a disability" under the IDEA refers to a child "with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities. . . who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A)(i)-(ii).

benefits of, or subject to discrimination at, the school." Id. at 350 (internal quotation marks

omitted). The Court finds that Plaintiffs' Section 504 claims, like their IDEA counterparts, are

properly pursued in federal court.[30]

### C.      Jurisdiction over Title I of the ESEA/NCLB Claim

Title I of the ESEA, which NCLB amended, is designed "to ensure that all children have

a fair, equal, and significant opportunity to obtain a high quality education and reach, at a

minimum, proficiency on challenging State academic achievement standards and state academic

assessments." 20 U.S.C. § 6301 (footnote omitted). While Title I provides and requires many

things to meet that goal, Plaintiffs appear to base their claims on Part A, entitled "Basic Programs

Operated by Local Educational Agencies," under which local educational agencies (LEAs) can

receive federal funding for educational programs serving high percentages of children from low-

income families.[31] U.S. Dep't of Educ., Elementary & Secondary Education: Improving Basic

Programs Operated by Local Educational Agencies (Title I, Part A), Program Description,

http://www2.ed.gov/programs/titleiparta/index.html; 20 U.S.C. §§ 6302(i), 6303(g), 6311(a)(1),

6312(a)(1), 6313, 6316(a)(1). States that participate in the program receive federal funds but

must comply with the Act's "extensive educational requirements on participating States and

school districts." Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ., 584 F.3d 253, 257

(6th Cir. 2009) (en banc); see also Newark Parents Ass'n v. Newark Public Schs., 547 F.3d 199,

---

[30]It would appear from Third Circuit precedent that individuals cannot be held liable
under Section 504. See A.W., 486 F.3d at 804; C.G. II, 2011 WL 318289, at *3. This is another
issue that the Court will defer to the next stage of litigation.

[31]Even this much is not entirely clear, however. Moving forward, Plaintiffs should be sure
to define precisely the contours of this claim.

200 (3d Cir. 2008) (describing NCLB's "simple quid pro quo").

The Court declines to address Defendants' contention that any Title I/NCLB claim seeking prospective, injunctive relief against the individual Defendants is barred under Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), at this time. The Supreme Court and the Third Circuit have determined that there is no private right of action under certain provisions of the NCLB. Horne v. Flores, 557 U.S. 433, 129 S. Ct. 2579, 2598 n.6 (2009); Newark Parents Assn. v. Newark Public Schs., 547 F.3d 199, 200 (3d Cir. 2008). Consequently, the Court strongly suspects that these precedents bar Plaintiffs' NCLB claim. However, the parties have not had the opportunity to fully brief whether there is any private right of action under Title I of the NCLB. The Court will therefore defer decision on this issue, as well as the Seminole Tribe issue, until the parties have developed these arguments completely.

### D.    Sovereign Immunity

States—including the state's agencies or departments and state officials sued in their official capacities—are generally immune from suit.[32] Va. Office for Protection & Advocacy v.

---

[32]Notably, Justice Brennan has criticized the Supreme Court's Eleventh Amendment jurisprudence as convoluted:

> To my mind, the Court's restatement [of the principles underlying the Eleventh Amendment] simply underscored the implausibility of the entire venture, for it clearly demonstrates that the Court's Eleventh Amendment jurisprudence consists of little more than a number of ad hoc and unmanageable rules bearing little or no relation to one another or to any coherent framework; indeed, the Court's best efforts to impose order on the cases in this area has produced only the conclusion that for Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct . . . This hodgepodge produces no positive benefits to society. Its only effect is to impair or prevent effective enforcement of federal law.

Stewart ("VOPA"), 131 S. Ct. 1632, 1637-38 (2011); Pennhurst State Sch. & Hosp. v.

Halderman, 465 U.S. 89, 100 (1984); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)

("[A] suit against a state official in his or her official capacity is not a suit against the official but

rather is a suit against the official's office" and therefore "is not different from a suit against the

State itself."). Because all Defendants, excluding the School District Defendants, are the State or

its departments and representatives, the Court must operate from the baseline assumption that

they are immune from suit in this action. The Court will now analyze whether any of the

exceptions to sovereign immunity apply.

### 1.     Waiver of Sovereign Immunity for IDEA and Section 504 Claims

States waive sovereign immunity "by voluntarily participating in federal spending

programs where Congress has conditioned such participation on the states's consent to waive its

sovereign immunity." O.F. ex rel. N.S. v. Chester Upland Sch. Dist., 246 F. Supp. 2d 409, 425

(E.D. Pa. 2002) (citing College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527

U.S. 666, 686 (1999)). The IDEA and Section 504 trigger such a waiver. 20 U.S.C. § 1403(a); 42

U.S.C. § 2000d-7(a)(1); M.A. ex rel. E.S. v. State-Operated Sch. Dist., 344 F.3d 335, 346 (3d

Cir. 2003) ("One clear and unmistakable component of the IDEA is a state's waiver of Eleventh

Amendment immunity."); A.W. v. Jersey City Public Schs., 341 F.3d 234, 250 (3d Cir. 2003)

("[W]e hold that section 1403 constitutes a clear statement of Congress's intent to condition the

receipt of federal IDEA funds on a state's waiver of Eleventh Amendment immunity."); O.F., 246

F. Supp. 2d at 426 (Section 504 includes "an unambiguous waiver of the States' Eleventh

---

Papasan, 478 U.S. at 292 (Brennan, J., concurring in part and dissenting in part) (internal
quotation marks and citation omitted). In deciding the question of subject matter jurisdiction
today, this Court has endeavored to extract clarity from this "hodgepodge."

Amendment immunity" (quoting <u>Lane v. Pena</u>, 518 U.S. 187, 200 (1996)); <u>Koslow v.
Commonwealth of Pennsylvania</u>, 302 F.3d 161, 171 (3d Cir. 2002) ("[I]f a state accepts federal
funds for a specific department or agency, it voluntarily waives sovereign immunity for
Rehabilitation Act claims against the department or agency-but only against that department or
agency."). Defendants do not dispute that the Commonwealth, including the Department of
Education, receives the relevant federal funding. Although Defendants argue that under <u>Seminole
Tribe</u>, Congress had no power to <u>abrogate</u> sovereign immunity under the IDEA or Rehabilitation
Act, this Court is bound by the clear Third Circuit precedent finding that states accepting federal
funds under the IDEA and Section 504 have waived sovereign immunity.[33]

For Section 504 purposes, this waiver is limited to the state department or agency
accepting the relevant federal funds.[34] <u>Koslow</u>, 302 F.3d at 171. The Third Circuit has left open
whether waiver of sovereign immunity under the IDEA is restricted in the same way. <u>A.W.</u>, 341
F.3d at 255 n.16. In <u>A.W.</u>, the Third Circuit, noting that it was "unclear" whether the waiver
would be limited under the IDEA as it is under Section 504, explained that the Section 504
limitation was based on language in that Act for which there was no corollary in the IDEA. <u>Id.</u>
Moreover, the Commonwealth does not argue that it should be dismissed based on this

---

[33]The Court acknowledges that the Third Circuit used the term "abrogated" instead of
waived when it referenced sovereign immunity under the IDEA in a footnote in <u>Lawrence Twp.
Bd. of Educ. v. New Jersey</u>, 417 F.3d 368, 370 n.3 (3d Cir. 2005). Whether "abrogated" as stated
in <u>Lawrence</u>, or "waived" as stated in other Third Circuit cases that discuss the issue at length,
such as <u>M.A. ex rel. E.S. v. State-Operated School Dist.</u>, 344 F.3d 335 (3d Cir. 2003) and <u>A.W.
v. Jersey City Public Schools</u>, 341 F.3d 234 (3d Cir. 2003), this Court is bound either way to
conclude that the Commonwealth lacks sovereign immunity for IDEA and Section 504 claims.

[34]No party disputes that the Department of Education receives funds under the
Rehabilitation Act.

distinction.[35] Finding no other bar to jurisdiction, the Court therefore holds that it has subject

matter jurisdiction to hear all Plaintiffs' and Intervenors' claims under the IDEA against all

Defendants and Plaintiffs' claims under Section 504 against the Department of Education. The

Court now turns to the remaining claims.

## 2.    Ex Parte Young

In Ex Parte Young, 209 U.S. 123 (1908), the Supreme Court expounded another

exception to sovereign immunity: federal courts may award prospective relief against state

officials for violations of federal law. VOPA, 131 S. Ct. at 1638-39. Ex Parte Young "rests on

the premise—less delicately called a 'fiction,' that when a federal court commands a state official

to do nothing more than refrain from violating federal law, he is not the State for sovereign-

immunity purposes." Id. at 1638. Ex Parte Young also applies to prospective declaratory

judgments. See, e.g. Alden v. Maine, 527 U.S. 706, 747 (1999) ("In particular, the exception to

our sovereign immunity doctrine recognized in Ex Parte Young . . . is based in part on the

premise that sovereign immunity bars relief against States and their officers in both state and

federal courts, and that certain suits for declaratory or injunctive relief against state officers must

therefore be permitted if the Constitution is to remain the supreme law of the land."); Verizon

Maryland, Inc. v. Public Serv. Comm'n of Maryland, 535 U.S. 635, 646 (2002) (plaintiff's prayer

for declaratory relief permissible under Ex Parte Young because it "it does not impose upon the

---

[35]In addition, in M.A., the Third Circuit found that "the State" of New Jersey was a proper party to the lawsuit and that "the state of New Jersey had waived its Eleventh Amendment immunity." 344 F.3d at 351-52. This is not dispositive of this issue because the only state parties sued in that case appear to be state education departments or state officials. Nonetheless, this broad language bolsters this Court's conclusion that the Commonwealth itself lacks sovereign immunity for IDEA claims.

State a monetary loss resulting from a past breach of legal duty on the part of the defendant state officials."(citing Edelman, 415 U.S. at 668) (internal quotation marks omitted) (emphasis in original))). The recent Supreme Court case VOPA left no doubt that the Ex Parte Young doctrine is alive and well.

Because Ex Parte Young only applies to prospective injunction or declaratory relief pursued against state officials, the doctrine does not provide Plaintiffs or the Intervenors an escape-hatch through which to pursue their remaining claims against the Commonwealth itself or the Department of Education. Finding no other applicable exception to sovereign immunity, the Court holds that it lacks subject matter jurisdiction to hear Plaintiffs' claims against the Commonwealth and the Department of Education except for the claims for which sovereign immunity has been waived (IDEA and Section 504).

Claims for injunctive and declaratory relief asserted under these statutes against the Secretary, the President Pro Tempore, the Speaker, and the Governor may be permissible under Ex Parte Young. Defendants argue that to invoke Ex Parte Young, Plaintiffs must assert claims against state officials in their individual capacities. Defendants rely principally on the Third Circuit's language in MCI Telecommunication Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491 (3d Cir. 2001), describing Ex Parte Young as a doctrine "under which individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law." Id. at 506. The Court does not interpret this language to mean that Ex Parte Young only applies to suits where the caption states that the officer is sued "in his individual capacity." In fact, in MCI, the plaintiffs asserted claims against the individual actors "in their official capacities as Commissioners of the Pennsylvania Public

34

Utility Commission," and the Third Circuit nevertheless found that Ex Parte Young applied. Id. at 491, 514-15. This Court can therefore only conclude that the Third Circuit was referring to the fact that, as the Third Circuit later mentioned, "[t]he Commissioners individually [were] parties to the suit." See id. at 514. Indeed, in determining whether Ex Parte Young applied, the Third Circuit simply performed the "straightforward" analysis of determining whether "a plaintiff seeks prospective relief against individual state officers from an ongoing violation of federal law." Id. The Supreme Court has explained that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and, "[a]s such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The Supreme Court, however, went on to clarify that "official-capacity actions for prospective relief are not treated as actions against the State." Id. at 71 n.10 (citing Kentucky v. Graham, 472 U.S. 159, 167 n.14 (1985); Ex Parte Young, 209 U.S. at 159-160).[36]

As a threshold matter, therefore, Plaintiffs' and Intervenors' claims asserted against state officials in their official capacities may properly fall under Ex Parte Young. Nevertheless, Ex Parte Young has several limitations, which the Court will now discuss in detail to determine which claims remain.

### 3.      The Pennhurst Doctrine

Ex Parte Young does not extend to state law claims asserted against state officers. Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89 (1984). In Pennhurst, the Supreme Court determined that there is no basis for the Ex Parte Young doctrine "when a

---

[36]"When a state official is sued and held liable in his individual capacity . . . even damages may be awarded." Papasan v. Allain, 478 U.S. 265, 278 n. 11 (1986).

plaintiff alleges that a state official has violated <u>state</u> law." <u>Id.</u> at 106. The Supreme Court

explained:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate th supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignly than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

<u>Id.</u> VOPA reiterated this distinction, citing Pennhurst for the proposition that Ex Parte Young

"permit[s] the federal court to vindicate federal rights." 131 S. Ct. at 1638 (emphasis added)

(quoting Pennhurst, 465 U.S. at 105).

Plaintiffs have withdrawn all state law claims, but the Charter School, the Charter School

Parents, DCUI/DCTS, and potentially the District Parents and PA-NAACP still assert state law

claims.[37] State law claims asserted against the School District Defendants do not implicate

sovereign immunity as the District and its Board are not an arm of the state. Nevertheless, under

Pennhurst, the Court holds that it lacks jurisdiction to hear the Charter School's and the Charter

School Parents' claims for injunctive and declaratory relief that are asserted against state officials

for violations of state law. The Court also holds that the Charter School Parents' "Equal

Protection" claims, although styled as federal claims, in fact ask this Court to order state

Defendants to comply with or apply Pennsylvania state Charter School Law. These claims, no

matter what the Charter School Parents call them, are state law claims for which the only

possible remedy would require this Court to order the Commonwealth or its officials to apply

---

[37] The Court notes that under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the Intervenor's state law claims even if Plaintiffs no longer raise any state law claims. Supplemental jurisdiction is discussed below.

state law in a certain way. Under <u>Pennhurst</u>, this Court has no power to order such relief.

Additionally, the District Parents' and PA-NAACP's due process claim appears to rely on both Pennsylvania and federal law.[38] Their claims can only proceed against the Secretary for the alleged ongoing federal law violations.

**4.     Injunctions Requiring the Payment of Funds from the State Treasury**

Another limitation on <u>Ex Parte Young</u> is that it only permits a plaintiff to seek prospective relief arising out of a continuing violation of federal law, not retroactive relief that involves the payment of funds from the state treasury. <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974). The prospective-retroactive relief doctrine is somewhat elusive, and warrants a detailed discussion.

**a.     <u>Edelman v. Jordan</u>**

<u>Edelman</u> held that under <u>Ex Parte Young</u>, even when a plaintiff's requested relief is styled as an injunction against a state official, if "the action is in essence one for recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." <u>Id.</u> (quoting <u>Ford Motor Co. v. Dep't of Treasury</u>, 323 U.S. 459, 464 (1945)). In <u>Edelman</u>, plaintiff John Jordan sought, on behalf of himself and as a class action, declaratory and injunctive relief against two Illinois state officials. 415 U.S. at 653. Jordan alleged that the officials' administration of the Aid to the Aged, Blind, or Disabled (AABD) program violated federal regulations and the Fourteenth Amendment. <u>Id.</u> The district court agreed, and ordered the state

---

[38]The District Parents' and PA-NAACP's Equal Protection claim also cites state law, but it appears to raise only a federal constitutional claim. If in fact this claim does rely in part on state law, it is barred to that extent.

official defendants to "release and remit AABD benefits wrongfully withheld" from the date the

federal regulations went into effect to the date the district court had issued a preliminary

injunction in the case. Id. at 656. On appeal, the Seventh Circuit considered and rejected

arguments by the state officials that the Eleventh Amendment barred the district court's order. Id.

at 657-58. The Seventh Circuit held, inter alia, that Ex Parte Young, read in concert with other

Supreme Court precedent, authorized the district court to order equitable relief in the form of the

benefits payments. Id. at 663-64.

     Reversing the Seventh Circuit, the Supreme Court held that Ex Parte Young permitted

prospective relief only, and concluded that payment of past AABD benefits constituted

impermissible retroactive relief. See id. at 664. Chief Justice Rehquist writing for the majority

acknowledged that "the difference between the type of relief barred by the Eleventh Amendment

and that permitted under Ex Parte Young will not in many instances be that between day and

night." Id. at 667. The Supreme Court nevertheless illuminated some distinctions. It contrasted

Ex Parte Young, which required a state official to behave in a manner consistent with the

Constitution in the future, with the district's court's order in Edelman. The district court's order

that the state official pay past benefits "resembles far more closely [a] monetary award against

the State itself . . . than it does the prospective injunction relief award in Ex Parte Young." Id. at

665. The Supreme Court also approved of the line drawn by Judge McGowan, sitting by

designation on the Second Circuit, in a similar case:

> It is one thing to tell [a state official] that he must comply with the
> federal standards for the future if the state is to have the benefit of
> federal funds in the program he administers. It is quite another thing
> to order the [state official] to use state funds to make reparation for
> the past. The latter would appear to us to fall afoul of the Eleventh

> Amendment if that basic constitutional provision is to be conceived
> of as having any force.

Id. at 665 (quoting Rothstein v. Wyman, 467 F.2d 226, 236-37 (2d Cir. 1972)).

Critical to this Court's present analysis, however, the Supreme Court did confirm that the Eleventh Amendment presents no bar to certain injunctions affecting a state's treasury. Id. at 667-68. Rather, Ex Parte Young permits "fiscal consequences to state treasuries [that are] the necessary result of compliance with decrees which by their terms were prospective in nature." Id. The Court went on:

> State officials, in order to shape their official conduct to the
> mandate of the Court's decrees, would more likely have to spend
> money from the state treasury than if they had been left free to
> pursue their previous course of conduct. Such an ancillary effect of
> the state treasury is a permissible and often an inevitable
> consequence of the principle announced in Ex Parte Young.

Id. at 668. Nevertheless, the Supreme Court determined that the district court's order "requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation" which "is in practical effect indistinguishable in many respects from an award of damages against the State." Id. at 668.

Although Plaintiffs do not cite Edelman, Plaintiffs rely heavily on Papasan v. Allain, 478 U.S. 265 (1986). Pl. Br. at 10. Papasan relies in part on Milliken v. Bradley, 433 U.S. 267 (1977), which this Court will therefore examine first.

### b.      Milliken v. Bradley

Milliken provides an example of a district court order which, although it would affect the state treasury, was sufficiently prospective that it did not trigger an Eleventh Amendment bar. The claims stemmed from de jure segregation in Detroit public school system. Id. at 269. The

case was litigated for seven years before it reached the Supreme Court for this second time. Id. At issue was the appropriate remedy, specifically, the district court's order that state defendants partially fund a remedial education program for the children subjected to past unconstitutional school segregation. Id. at 289.

Chief Justice Burger, writing for a strong majority, rejected the state official defendants' arguments that sovereign immunity, as interpreted in Edelman, barred the district court's order. Id. The defendants maintained that funding part of the educational components was "in practical effect, indistinguishable from an award of money damages against the state based upon the asserted prior misconduct of state officials," which Edelman determined to be barred. Id.

The Supreme Court was unpersuaded. Contrasting Edelman, the Supreme Court reasoned that the injunction ordered in Milliken "looks to the future, not simply to presently compensating victims for conduct and consequences completed in the past." Id. at 290 n.21. "Unlike the award in Edelman," the Supreme Court opined, "the injunction entered [in Milliken] could not instantaneously restore the victims of unlawful conduct to their rightful condition." Id. Additionally, the programs in Milliken, "were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in Edelman." Id. at 290. Indeed, unlike in Edelman, the district court's order in Milliken did not involve a monetary award for the plaintiff or any member of his class. Id. at 290 n. 22. "This case," the Supreme Court explained, "simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability." Id. Instead, "[t]he educational components, which the District Court ordered into effect prospectively, are plainly designed to wipe out continuing conditions of inequality produced by the inherently unequal dual school

system long maintained by Detroit." Id. at 290.

The Supreme Court specifically highlighted the special nature of both the underlying

violation—i.e. the segregation—and its lasting effects. Id. The educational deficiencies the

segregation caused "could not be eliminated by judicial fiat," but rather required the "time,

patience, and the care of specially trained teachers" in the court-ordered remedial programs. Id.

Therefore, although the remedial programs were "compensatory," they nonetheless

constituted "prospective relief" compatible with the Eleventh Amendment.[39]

### c.      Papasan v. Allain

Papasan, the case on which Plaintiffs principally rely, reiterates the critical distinctions

between permissible prospective relief and relief that is impermissible under the Eleventh

Amendment because it is akin to a retroactive damages award. There, the Supreme Court found

one form of relief acceptable under the Eleventh Amendment while striking down another. 478

U.S. at 279-82. The plaintiffs were schoolchildren and local school officials asserting federal

claims against state officials. Their claims stemmed from public school lands the United States

granted Mississippi—but not the northern part of the state which at that time was owned by the

Chickasaw Indian Nation—a century earlier. Id. at 270-75. The plaintiffs first alleged that the

land grants created a binding trust for the benefit of public schools, and that Mississippi, the

purported trustee, breached that trust. Id. at 279. In arguing that the claim did not offend the

Eleventh Amendment, the plaintiffs analogized it to Ex Parte Young: they sought only a

"prospective, injunctive remedy . . . requiring state officials to meet [a] continuing federal

---

[39]The Court finds Milliken analogous to the facts at hand but nevertheless is mindful of
Justice Powell's concurrence describing the unique posture of the parties in Milliken, and
overtones of racial discrimination. 433 U.S. at 292-98.

obligation by providing the Chickasaw Cessation schools with appropriate trust income." Id.

The Supreme Court rejected this argument, reasoning that "[t]he distinction between a continuing obligation on the part of a trustee and an ongoing liability for past breach of trust is essentially a formal distinction of the sort we rejected in Edelman." Id. at 279-81. "In both cases," the Supreme Court explained, "the trustee is required, because the past loss of the trust corpus, to use its own resources to take the place of the corpus or the lost income from the corpus." Id. at 281 (emphasis added). Continuing payments under the trust were no different than a one-time payment of "an accrued monetary liability" akin to the "retroactive award of monetary relief" disallowed by Edelman. Id. at 281(quoting Milliken, 433 U.S. at 289 (quoting Edelman, 415 U.S. at 664)).

In contrast, the Supreme Court held that the Eleventh Amendment did not bar the plaintiffs' equal protection claim. Id. at 281. The plaintiffs had averred that the state defendants deliberately denied them equal protection by depriving them—in the past, present and future—of the benefits of the school lands. Id. at 281-82. They also claimed that "these same actions denied them their rights to an interest in a minimally adequate level of education, or reasonable opportunity therefor, while assuring such right to other schoolchildren in the State." Id. at 282 (internal quotation marks omitted). The Supreme Court determined that "the alleged ongoing continuing violation—the unequal distribution by the State of the benefits of the State's school lands—is precisely the type of continuing violation for which a remedy may permissibly be fashioned under Young." Id. Even if the present inequality resulted directly from past wrongs—indeed, the same wrongs at the heart of the previously-discussed trust claim, which the Supreme Court found barred by the Eleventh Amendment—the "essence" of the equal protection

claim was the present disparity in land distribution. Id. An appropriate remedy might require state

funding, but would focus on the state officials' behavior in the future. Id. The Supreme Court

likened the remedy to that in Milliken—it would require "'compliance in the future with a

substantive federal-question determination' rather than bestow an award for accrued monetary

liability." Id. (quoting Milliken, 433 U.S. at 289 (quoting Edelman, 415 U.S. at 668)) (emphasis

in original).

### d.  Virginia Office for Protection and Advocacy ("VOPA") v. Stewart

Most recently, in VOPA, the Supreme Court addressed whether the Eleventh Amendment

permits injunctions that have an effect on the state treasury. VOPA involved the somewhat

unique scenario of a state agency suing an official of the same state. This anomaly was born from

two federal laws[40] which allocate funding to the states for programming for individuals with

certain disabilities. 131 S. Ct. at 1635-36. To receive the funding, states must develop a system

for protecting and advocating ("P & A") for the rights of the individuals with disabilities covered

by the Acts. Id. at 1636. The P & A system must be able "to investigate incidents of abuse and

neglect," obtain access to "all records" of abused individuals, and "pursue legal, administrative,

and other appropriate remedies." Id. (internal citations omitted). A state may designate a private

or state entity as its P & A system, and Virginia chose to create an "independent state

agency"—the Virginia Office of Protection and Advocacy ("VOPA"). Id. In exercising its duties,

VOPA asked state officials (the respondents) at a state-run mental hospital to produce certain

---

[40] The relevant statutes were the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 et seq., and the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 et seq.

records. Id. When the officials refused to provide them, VOPA filed a federal lawsuit requesting

declaratory relief and an injunction requiring the officials "to provide access to the records and

refrain in the future from interfering with VOPA's right of access to them." Id. The officials

claimed the injunction was barred under the Eleventh Amendment. Id. The district court denied

the motion, comparing the injunction to that in Ex Parte Young, and the parties appealed to the

Fourth Circuit and then the Supreme Court. The issue presented in VOPA was "whether Ex Parte

Young . . . allows a federal court to hear a lawsuit for prospective relief against state officials

brought by another agency of the same State." Id. at 1635.

In detailing the background of its Eleventh Amendment jurisprudence, the Supreme Court

specifically stated in VOPA that the Ex Parte Young doctrine "does not apply when the state is

the real, substantial party in interest . . . as when the judgment sought would expend itself on the

public treasury or domain, or interfere with public administration." Id. at 1638. The Supreme

Court reiterated that "Ex Parte Young cannot be used to obtain an injunction requiring the

payment of funds from the State's treasury." Id. at 1639.

### e.    Conclusion

This Court concludes that the Ex Parte Young analysis put forth in Edelman and

subsequent cases including Milliken and Papasan, is still valid. VOPA did not turn on whether

the requested injunction was "prospective" nor on whether the injunction would require payment

from state coffers. Indeed, the state officer respondents conceded that the Ex Parte Young would

permit the requested injunction if pursued by a private entity. Id. at 1639. Rather, VOPA stands

for the proposition that the same Ex Parte Young analysis applies even when the plaintiff is in

fact a state agency, when state law that created that entity and gave it the power to sue. Id. at

44

1642. In expounding this rule, the Supreme Court did not change the analysis established by Ex Parte Young and its progeny. Id. (noting that the Supreme Court "straightforwardly appl[ied] Ex Parte Young to allow this suit"). This Court therefore determines that notwithstanding the comments in VOPA that Ex Parte Young does not permit an injunction affecting the state treasury, the nuances to this rule as developed in Edelman and Milliken remain intact. This Court will not dismiss or deny Plaintiffs' or Intervenors' claims for injunctive relief merely because they may implicate state funds.

Indeed, the Court finds that Plaintiffs' Counts II, III, and V, and District Parents' and PA-NAACP's Counts I and II,[41] are forward-looking, based on alleged continuing violations of federal law. To the extent that the claims stem from past state funding decisions, Plaintiffs' claims are nonetheless forward-looking because, much like the unequal land distribution in Papasan, the "essence" of the claims are the present and ongoing disparities and allegedly imminent denial of educational services without due process.

The Court also finds that it could fashion appropriate relief for these claims, without offending the Eleventh Amendment, by enjoining state officials from violating federal law in the future. Although such injunctions would likely have an effect on the state treasury, such effect would be substantially "ancillary" to the permissible injunction. In so finding, however, the Court leaves open the door that certain remedies for these claims would be barred.[42] Having found that

---

[41] Plaintiffs' Counts I and IV, the District Parents' and PA-NAACP's Count III, and the Charter School Parents' Count VI are purely IDEA claims, and because, as explained above, the Commonwealth has already waived its sovereign immunity for IDEA claims, the Court need not perform an Ex Parte Young analysis, but it would likely apply.

[42] For example, the District Parents' and PA-NAACP's first item of requested relief—an Order that Defendants provide the District appropriated funds to meet its federal obligations—is

there is a possibility of permissible relief for the parties' claims, the Court is satisfied that it has jurisdiction to consider them. The Court need not confront the specifics of appropriate relief until liability has been established.[43]

## VIII.   Supplemental Jurisdiction

While, as discussed above, federal district courts have original jurisdiction to hear federal claims, such courts can also exercise "supplemental jurisdiction over all other claims," including those of intervening parties, "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Court finds that several of the state law claims brought by the Charter School, Charter School Parents, and DCUI/DCTS that are not otherwise barred due to sovereign immunity do form part of the same case or controversy at issue in the federal claims. This Court therefore could exercise jurisdiction over those claims. "It has consistently been recognized that pendent jurisdiction," now called supplemental jurisdiction, "is a doctrine of discretion, not of a plaintiff's right." De Asencio v. Tyson Foods, Inc., 342 F.3d 301 (3d Cir. 2003) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966), and finding the district court abused its discretion in exercising supplemental jurisdiction). A district court may decline to exercise such jurisdiction when:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district

---

likely barred as the equivalent of a damages award that is impermissible even under Ex Parte Young. Moreover, the Court cannot "substitute[] its own educational and budgetary policy judgments for those of the state and local officials to whom such decision are properly entrusted." Horne v. Flores, 129 S. Ct. 2579, 2597 (2009).

[43]For a recent review of the federal education legislative scheme, see Katherine Burdick, et al., Creating Positive Consequences: Improving Education Outcomes for Youth Adjudicated Delinquent, 3 Duke F. Law & Soc. Change 5, 13-21 (2011).

court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4). The Court finds that under subsection (4) it should decline to exercise supplemental jurisdiction over the remaining claims of the Charter School (Count III and IV) and Charter School Parents (Count II), which ask this Court to enforce the state Charter School Law spending scheme against the School District Defendants. These claims are substantially similar to those pending before Judge Colins in the Commonwealth Court. There are compelling circumstances to decline jurisdiction over them in order to avoid piecemeal litigation, undue expense, and having two courts of competent jurisdiction to decide the same issue. Additionally, this is a complex case involving multiple parties and a matter of great public interest. The Court finds that the parties will be best served by this Court focusing on the federal claims which are its principal concern, especially given that the relevant parties have another forum in which to assert their state law claims.

The Court will retain jurisdiction over the breach of contract claim raised by DCUI/DCTS as it does not appear to have been asserted before the Commonwealth Court, will require this Court to apply relatively simple Pennsylvania contract law, and is directly related to this Court's task of ensuring, among other things, that all students eligible for special education services in the District continue to receive those services.

## IX.    Conclusion

In sum, Defendants' Motion is granted in part and denied in part. This Court has jurisdiction over all federal claims except to the extent certain Defendants possess sovereign immunity that insulates them from suit, and the Court will decline to exercise supplemental

jurisdiction over the remaining state law claims of the Charter School and Charter School

Parents, but will exercise it as to the claim brought by DCUI/DCTS.

O:\CIVIL 11-12\12-132 Chester v Comm\Chester v Comm Memo re Subject Matter Jursidction 3-16-12.wpd