## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHESTER UPLAND SCHOOL | : | |
| DISTRICT, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 12-cv-0132 |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, *et al.*, | : | |
| | : | |
| Defendants. | : | (Baylson, J.) |

## EXECUTIVE BRANCH DEFENDANTS'
## RESPONSES TO QUESTIONS FOR COUNSEL

The Commonwealth of Pennsylvania, the Pennsylvania Department of Education and the Secretary of Education (collectively, the "Executive Branch Defendants"), submit these Responses to the Court's Questions for Counsel (Doc. 204).  Where appropriate, the Executive Branch Defendants further provide brief replies to Plaintiffs' Responses to the Court's Questions ("Pls. Answers") (Doc. 223).[1]

**Question 1:**

**Does a local school district have an obligation to prioritize funding special education, as may be necessary to provide a free and appropriate public education ("FAPE")?**

**Response to Question 1:**

Yes.  Simply stated, special education students enjoy statutory and regulatory protections and rights not available to regular education students.

---

[1] The Executive Branch Defendants limit this filing to responding to the questions posed by the Court.  Because other factual and legal issues are directly relevant to the Court's disposition of this litigation, however, the Executive Branch Defendants incorporate by reference their Proposed Findings of Fact and Conclusions of Law, filed on this date.

It cannot be disputed that Pennsylvania's school districts are responsible, in the first instance, for the provision of FAPE and all related procedural safeguards. *See* 20 U.S.C. §§ 1413(a)(1), 1415(a); 34 C.F.R. §§ 300.200-230 and 300.500. *See also* 24 P.S. § 13-1372; 22 Pa. Code § 14.104. "The school district, and none other, is charged with the responsibility, pursuant to federal and state law, of ensuring the provision of special education programming and services to eligible students." *Neshaminy Sch. Dist. v. Karla B*., No. 96-3865, 1997 WL 137197, at *3 n.2 (E.D. Pa. March 20, 1997). (A true and correct copy of *Karla B.* is attached as Exhibit A.) *See also R.B. ex rel. Parent v. Mastery Charter Sch.,* 762 F. Supp. 2d 745, 752 (E.D. Pa. 2010) (each district "has an affirmative obligation to identify and serve appropriately all eligible children with disabilities within its jurisdiction.").

In order to fulfill that obligation, districts must turn to their local, state and federal funds, including state basic education funding subsidy ("BEF"), as was discussed by several witnesses at trial, including Plaintiffs' expert, Dr. Baker. (5/16/12 Transcript of Trial ("Tr.") at 49:25-50:1; 58:20-59:10; 5/29/12 Tr. at 18:18-19:5; 54:10-13; and 71:11-19.) Doing so necessarily requires that districts make the funding of special education a priority. As testified to by Carolyn Dumaresq, former superintendent of two Pennsylvania school districts and current Deputy Secretary for Elementary and Secondary Education for the Pennsylvania Department of Education, there is not a school district in Pennsylvania that provides special education services without reaching beyond those funds specifically earmarked for special education. (5/16/12 Tr. at 59:25-60:6.)

The IDEA requires that the District, "in providing for the education of children with disabilities within its jurisdiction, [must have] in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412." 20 U.S.C.

§ 1413(a)(1).  Accordingly, the District must take all steps necessary, ***including prioritizing***

***funding***, to ensure that it has in place policies and procedures to deliver FAPE.  In fact, the

District provided the Department assurances, signed by Plaintiff Wanda Mann, President of the

District's Board of Directors, that it will do just that.  (Trial Exhibit (hereinafter "Exhibit") D-39

at PDE-00290.)

**Reply to Plaintiffs' Answer to Question 1:**

Plaintiffs believe that the District's only obligation under the IDEA is to "not reduce

funding pursuant to the [IDEA's] maintenance of effort" provision.  (Pls. Answers at 6.)  Clearly,

such is not the case.  In taking this position, Plaintiffs conveniently ignore not only the

assurances they provided to the Department of Education (Exhibit D-39 at PDE-00290), but also

the IDEA itself, which requires school districts to have "in effect policies, procedures, and

programs that are consistent with the State policies and procedures …."  20 U.S.C. § 1413(a)(1).

Plaintiffs' argument on this point is particularly difficult to accept given that the District Parents

have a claim pending ***against the District*** for alleged violations of the IDEA.[2]

Plaintiffs seem to suggest that if the District meets the maintenance of effort provision

and claims it is unable to provide special education services, the Department is required to

---

[2] Although not relevant to the Court's question, Plaintiffs incorrectly state what they purport are
the required and allowable uses for the $36-38 million of set-aside funds.  Contrary to Plaintiffs'
mischaracterization of Ms. Hozella's testimony, the Department cannot simply use the funds for
any purpose.  First, the Department has certain required uses for the set-aside funds.  *See* 34
C.F.R. § 300.704(b)(iv)(3) (the set-aside funds "***must be used*** to carry out the following
activities: [f]or monitoring, enforcement, and complaint investigation; and [t]o establish and
implement the mediation process …, including providing for the costs of mediators and support
personnel.") (emphasis added).  Following the required expenditures, the Department may use
the remaining funds for any of the eleven allowable expenditures.  *See* 34 C.F.R. §
300.704(b)(iv)(4)(i)-(xi).  Moreover, in order for the Department to receive the funds, it reports
to the United States Department of Education ("USDE") "[h]ow amounts retained for State
administration and State-level activities under § 300.704 will be used to meet the requirements of
this part," and USDE approves that use.  34 C.F.R. § 300.171(a)(1).  *See also* 5/22/12 Tr. at

provide such services and to fund the associated costs.  Plaintiffs fail to recognize, however, that if the Department determines that it is necessary to step in and provide special education services, it is entitled to – and will – pay for those services with not only the District's IDEA funds, but also virtually any State appropriation, including the BEF.  20 U.S.C. § 1413(g)(1), 34 C.F.R. § 299.227(a)(1), 24 P.S. § 13-1372(5).

It should be noted that Plaintiffs improperly point to the Common Core standards as those academic standards that must be met.  To the contrary, the Common Core standards do not go into effect until July 2013.  22 Pa. Code § 4.12(a)(8)(iv) and (a)(9).  Generally, school districts are required to meet the academic standards set forth in 22 Pa. Code Chapter 4.

**Question 2:**

**Does a school district have any minimum standards to apply in providing a FAPE?**

      **a.**    **If so, what are those standards and where can they be found in writing?**

      **b.**    **Is there any statute or regulation, state or federal, which provides such a standard?**

      **c.**    **What Third Circuit precedential opinions provide standards for evaluating whether a FAPE has been provided?**

**Response to Question 2:**

Yes.

The definition for FAPE is provided at 20 U.S.C. § 1404(9) and 34 C.F.R. § 300.17, with requirements found at 34 C.F.R. §§ 300.101-300.113.  Generally, FAPE "consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction."  *W.B. v.*

_____

29:16-30:9, 70:21-24, and 102:23-103:6.

*Matula*, 67 F.3d 484, 491 (3d Cir. 1995) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982)).   In other words, FAPE is a student-specific concept, as established by each individual student's Individualized Education Plan ("IEP").   *Melissa S. v. Sch. Dist. Of Pittsburgh*, 183 F. App'x 184, 186-87 (3d Cir. 2006).   That being said, however, a district's failure to fully implement every aspect of a student's IEP does not equate to a denial of FAPE.   *See id*. at 187. Rather, a denial of FAPE is only found if "***substantial or significant*** provisions" of the child's IEP are not being implemented, resulting in a denial of a "meaningful educational benefit."   *Id* (emphasis added).   This is why an examination of a child's IEP – and the exhaustion of administrative remedies when there is an alleged failure to provide services to an individual student – is so important.

## Reply to Plaintiffs' Answer to Question 2:

Plaintiffs state that there is a four-part test to determine whether FAPE is being provided, citing *Cordero v. Pa. Dept. of Educ.*, 795 F. Supp. 1352, 1362 (M.D. Pa. 1992).   *Cordero*, however, simply does not provide such a test.

Even under Plaintiffs' unauthorized "test," however, Plaintiffs have failed to meet their burden.   One element of Plaintiffs' "test" is that the state educational agency – that is, the Department – must be aware of the deprivation.   (Pls. Answers at 13.)   Plaintiffs' Complaints (Docs. 39 and 67), however, are devoid of ***any allegations whatsoever*** that students were not receiving special education services during the 2011-2012 school year.   In fact, to the contrary, Intervenor-Plaintiffs (the "District Parents") allege that they will have claims "if the District … closes its doors, reduces or limits, or in some cases for the special education students involved, changes services."   Intervenor Complaint, ¶ 11 (Doc. 39).   Plaintiffs' concerns as pleaded in the Complaints are all prospective – that is, that services would be denied if the schools closed.

Mary Payne, the District's Special Education Supervisor, did not file a single complaint with the Department during the 2011-2012 school year alleging that the District was not able to provide special education services. Anita Brown, Charles Walker and Lakeidra Mitchell, the special education teachers who testified at trial, did not file a single complaint with the Department during the 2011-2012 school year alleging that the District was not able to provide special education services.  (*See, e.g.*, 5/10/12 Tr. at 174:6-13.)  Tamika Friend, the only parent to testify at trial, has not filed a complaint alleging that the District is not providing special education services to her son with the Department during the 2011-2012 school year.  (5/10/12 Tr. at 20:3-7.)  In fact, as of the time of trial, there was ***not a single pending complaint*** filed with the Department by ***anyone*** regarding the District's provision of special education services.  (5/21/12 at 19:17-20.)  Maybe the District fabricated its failures for purposes of trial.  If the failures actually exist, maybe the District created them by irresponsibly choosing to spend funds elsewhere.  In any event, it is clear that that information was not shared with the Department ***until trial***.  Plaintiffs should not be permitted to wait until trial – not even the eve of trial, but trial itself – to exploit the alleged failures that they now point to as the basis for their claims, particularly when those failures are nowhere to be found in the pleadings that commenced this litigation.[3]

If any "test" is to be garnered from *Cordero*, it would be to determine if there is a systemic violation of the IDEA.  The test would be whether:  (1) there are recurring and continuous denials of FAPE; (2) the denials were caused by a state-wide system; and (3) the denials cannot be rectified through the ordinary hearing process.  *Cordero*, 795 F. Supp. at 1362-

---

[3] By strategically waiting until trial to "spring" the alleged deficiencies on the Department, the District has left everyone a bit hamstrung.  Federal regulations dictate a detailed investigation process, including a 60-day investigation and response time.  34 C.F.R. § 300.152(a).

63.  Here, (1) there is no evidence of recurring and continuous denials of FAPE; (2) the Plaintiffs have not demonstrated that the alleged denials of FAPE were caused by a state-wide system; and (3) the only evidence of denial of services – those testified to by Tamika Friend – could have been (and can be) rectified through the ordinary administrative process, which, again, she failed to invoke.

**Question 3:**

**When a school district is not providing a FAPE to some students due to lack of funds, does it have an obligation to terminate discretionary programs so that it provides the FAPE?  Is this required by federal law?  Should a school district terminate those programs even if such cuts would ultimately cost that district money – i.e. because students would leave the district schools for charter schools?**

**Response to Question 3:**

Yes.[4]

Again, as set forth in response to Question 1, school districts have an obligation to provide FAPE.  "Discretionary" programs, of course, are not mandated.  The provision of FAPE, on the other hand, is mandated.  If a school district is not able to provide FAPE for funding reasons, it must make cuts, including of discretionary programs.  In fact, the trial record is replete with testimony about the difficult decisions school districts around the Commonwealth are making to make their financial ends meet.  (*See, e.g.*, 5/16/12 Tr. at 65:4-67:8; Exhibit D-27 at 28-31.)  The District's position that it does not have to cut such discretionary programs when school districts around the Commonwealth are doing so is stunning in its arrogance.

---

[4] Preliminarily, Defendants respectfully object to the premise underlying this question.  First, Defendants deny that Plaintiffs proved there has been a denial of FAPE as to any student.  Second, Defendants deny that if there has been a denial of FAPE, Plaintiffs have proved that such denial was the result of a lack of funding.  Third, Defendants deny that Plaintiffs have proved that cutting discretionary programs would cost the District money.

**Reply to Plaintiffs' Answer to Question 3:**

The case law cited by Plaintiffs does not support the proposition that the District is not required to prioritize its programs to comply with the IDEA.  In fact, such an argument is specifically contrary to the mandates of the IDEA and the District's own assurances that it will comply with its requirements.  (Exhibit D-39 at PDE-00290.)

Plaintiffs blatantly misrepresent the decision of the ***Denver County (Colorado) state court*** in *Lobato v. Colorado*, claiming it stands for the ***legal*** proposition that a state is "abdicating its responsibilities under special education law to provide FAPE by placing burden [*sic*] on local districts to fund majority [*sic*] of special education law [*sic*]"  Pls. Answers at 16.[5] To the contrary, this was a finding of ***fact*** of the *Lobato* court based on the testimony of a single witness under the specific circumstances of that case.  It was not the court's conclusion of law. Moreover, the *Lobato* case was decided under the ***Constitution of the State of Colorado***, not the IDEA.  This unreported, Colorado state-court case is entirely irrelevant to this matter.

**Question 4:**

**What other mandatory programs or priorities, if any, besides special education, are required under either federal or state law?**

**Response to Question 4:**

Other than the obligations referenced in Plaintiffs' Answer (No Child Left Behind's Adequate Yearly Progress, 180 days of instruction, subjects to be taught, etc.) – which allow

---

[5] Plaintiffs do not provide a citation for or copy of the *Lobato* opinion.  Defendants located what appears to be the referenced Findings of Fact and Conclusions of Law at: www.coloradoattorneygeneral.gov/sites/default/files/120911%20District%20Court%20Order.pdf. Although Plaintiffs cite June 6, 2012 as the date of this opinion, it is dated December 9, 2011.

school districts considerable flexibility for implementation and lack the statutory protections available to special education requirements – the District has limited specific legal obligations related to the scope of regular education with which to comply.  It must, therefore, prioritize spending to ensure that it is meeting these specific legal obligations, including its obligations under the IDEA, before spending money on programs or services that are not required by law. Plaintiffs introduced no evidence at trial to support a contention that the District is unable to meet its obligations under the IDEA because it is spending its funds on other *mandatory* programs, or that it is unable to provide other mandated programs because it is striving to provide special education services.

**Question 5**

**Does the record show what extracurricular activities are still being provided by Chester Upland?  Are any of these mandated by federal or state law?  Before this Court grants any relief to the Plaintiffs, does Chester Upland School District have a burden of showing that it has terminated all extracurricular programs, but still does not have funds to meet accepted standards for mandatory programs or basic education subjects (English, math)?**

**Response to Question 5:**

No.

Preliminarily, Defendants note that the relevant question is not simply whether the District is still providing extracurricular activities.  Rather, there are multiple relevant questions including, among other things, whether the District is properly managing its funds, and whether the District has made all the cuts its can, including with regard to transportation, curriculum, the physical plant and extra-curriculars, and still comply with applicable law.  The District is not required to simply cut extracurricular activities; rather, it must manage its finances and operations – extracurricular, co-curricular and otherwise – in such a manner that permits it to adopt and implement a balanced budget while meeting state and federal education requirements

– just like every other district in the Commonwealth.

That being said, there was incidental testimony at trial that the District operates a basketball program, as well as a football program.  In fact, Wanda Mann, President of the District's Board, testified at her deposition, the relevant excerpt of which was made an exhibit at trial, that the District did not cut its football program, because it recently purchased helmets at the cost of $1,500 each.  (D-15 at 66:3-13.)

The Executive Branch Defendants are unaware of any federal or state law requiring extracurricular activities.  Certainly if extracurricular activities are made available for regular education students, they should be made available for special education students.  Neither the IDEA, nor any other federal or state law, however, requires they be provided in the first instance.

**Reply to Plaintiffs' Answer to Question 5:**

Plaintiffs make the following incorrect statement:  "If the Court decides the state has the responsibility, then the Court need not reach the issue of whether or not the [District] has exhausted its financial options."  (Pls. Answers at 23.)  This is an attempt by Plaintiffs to avoid the fact that they have not and cannot demonstrate that the District's alleged inability to deliver FAPE is the result of a lack of funds, as opposed to its failure to properly manage its finances and make necessary adjustments in its operations.  The District has the burden to prove that it has made all appropriate and available efforts to manage and adjust its finances and operations before it can even hope to establish that it cannot provide FAPE due to a lack of funds.  Even then, however, the District cannot just say "we can't provide FAPE, so give us money."  Rather, if the District is not providing FAPE, it is up to the Department to direct corrective action and, ultimately, step in to provide services *using the District's funds*, if necessary.  *See* 20 U.S.C. § 1413(d)(1) ("the State educational agency shall reduce or shall not provide any further payments

to the local educational agency or State agency until the State educational agency is satisfied that the local educational agency or State agency, as the case may be, is complying with that requirement"); *see also* 20 U.S.C. § 1413(g)(1) ("A State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that local educational agency … if the State education agency determines that local education agency … is unable to establish and maintain programs of free appropriate public education [FAPE]."); 24 P.S. § 13-1372(5).   Plaintiffs seem to think the District can abdicate all responsibility - claiming the District is not providing FAPE and simply expecting more money.  That simply is not the case under any legal construct.

Plaintiffs again mischaracterize the record in response to this question – specifically, the testimony of Deputy Dumaresq, as well as the March 12, 2012 Report of the Secretary's Designee.  Contrary to Plaintiffs' assertion in their Answer, Deputy Dumaresq certainly did not testify that she has no recommendations for additional cuts.  To the contrary, she discussed at length several cost saving measures she would explore, but was unable to place a dollar value on those measures because the District was either unwilling or unable to provide the data necessary to make such calculations.   (5/16/12 Tr. at 84:13-19.)   Likewise, the Secretary's Designee indicated that he was not suggestest additional staffing reductions *at the time of his report*, primarily because of time constraints in conducting the examination underlying his report.  (*See* Secretary of Education's report and Recommendation at 30-31, Doc. 81.)  Of course, the Report of the Secretary's Designee was for purposes of helping to ensure the District stayed open for the remainder of the 2011-2012 school year, not to explore reductions for purposes of providing special education services within a balanced budget during 2012-2013, arguably the point of the

current trial.

**Question 5A:**

**It appears that certain concepts, such as class size and teacher salary, are not mandated and are subject to change by a local district. Should a federal court intervene and order relief when a local school board has the power to increase class size or decrease the number of teachers, e.g., and to provide extra money to special education through these means?**

**Response to Question 5A:**

No.

Simply stated, the District is responsible for providing special education services and balancing its budget. Courts should not intervene to excuse any school district's failure to implement all cost savings measures necessary to do so.

**Question 6:**

**Do federal or state regulations provide any kind of framework to determine whether the special education services provided by an individual school, an entire school district, or an entire state are inadequate?**

**Response to Question 6:**

Yes, however, the focus is on the individual special education student's rights and expectations.

The regulatory and statutory framework for special education services is detailed in the Executive Branch Defendants' Pretrial Memorandum at pages 5-9. (Doc. 140.) The services to be provided are determined on a student-by-student basis, as determined by that student's IEP.

**Question 7:**

**To what extent is Defendants' position correct, that a school district is expected to use all revenues, including local tax revenues as well as other funds provided by the state, to provide special education services? Are there any regulations on this point?**

**Response to Question 7:**

Defendants' position is correct and the Plaintiffs concede as much.  (Pls. Answers at 24.)

Dr. Baker, Plaintiffs' expert, agreed as well.  (5/29/12 Tr. at 18:18-19:5; 54:10-13; 71:11-19.)

Even Class Counsel, Mr. Churchill, agreed.  (5/9/12 at 30:1-8 ("in Pennsylvania, funding for

special education students in the District comes from multiple sources.  It doesn't come only

from the Special Education Funding Grant that is made explicitly for that … to understand

whether or not there is sufficient funds to meet the costs of providing that, you need to look at …

all of the sources….).)

School districts have an obligation to provide special education services and, generally,

have all of their dollars available to them for that purpose.  This is not to say that a district should

have to spend *every* dollar on its special education program.  Rather, the point is that dollars

beyond those specifically earmarked for special education are available for the provision of such

services.

As cited above, the relevant statutes and regulations are those that require a school

district to provide FAPE.  Additionally, however,

- 20 U.S.C. § 1412(a)(17)(C) provides:  "[F]unds paid to a State under this subchapter will
  be used to *supplement* the level of Federal, State, and *local funds* … expended for
  special education and related services provided to children with disabilities under this
  subchapter and in *no case to supplant* such Federal, State, and *local funds* …."  *Id*.
  (emphasis added).  (As previously noted, the State funds available for this purpose
  include the Commonwealth's Basic Education Funding subsidy.)

- 34 C.F.R. § 300.162(c) provides:  "[F]unds paid to a State under Part B of the Act must
  be used to *supplement* the level of Federal, State, and *local funds* … expended for

special education and related services provided to children with disabilities under Part B of the Act, and in ***no case to supplant*** those Federal, State, and **local funds**." *Id.* (emphasis added).

**Response to Plaintiffs' Answer to Question 7:**

Plaintiffs concede this issue.   In a blatant attempt to distract the Court, however, Plaintiffs' Answer provides unfounded allegations that the Executive Branch Defendants are in violation of the IDEA's maintenance of effort provision because of a reduction in general education funding state-wide.   Plaintiffs attempt to confuse the issues is unpersuasive and illogical, and unsupported by the record.   The record is devoid of any evidence whatsoever that the Commonwealth has not met its maintenance of effort obligations.

Plaintiffs argue that if a state reduces ***any*** educational funding, a violation of the maintenance of effort provision will result because the general education funds ***may*** be used for special education purposes.   This, however, is not how the maintenance of effort provision is calculated and maintained.  (5/21/12 Tr. at 30:10:34:12.)

**Question 8**

**What effect does the Pennsylvania method of distributing the 15% federal poverty supplement have on Chester Upland? Is this improper under federal or state law? Is it discriminatory under federal or state law?  If so, what is the remedy?  Have Plaintiffs alleged a claim that this particular funding structure violates the law?**

**Response to Question 8:**

There is no "15% federal poverty supplement."  Rather, there are IDEA-B funds that are distributed as a single pot, with 15% of that distribution being based on poverty factors.  In other words, that 15% is not distributed separate from the remainder of IDEA-B funds.  Regardless, the Department's distribution of IDEA-B funds is not at issue in this case – it is nowhere to be

found in the Plaintiffs' Complaints.  Rather, Patricia Hozella, the Department's witness, testified about these funds *after Plaintiffs' case was closed* and *in response to questions from the Court*. Plaintiffs made no allegation during their case-in-chief that challenged that distribution.  The Department's distribution of these funds under 20 U.S.C. § 1411(f)(1) has never been at issue in this case.  Throughout the past five months, Plaintiffs have been permitted to continuously change their claims – like a chameleon, the claims change to fit whatever happens to work for Plaintiffs in that given moment.  Plaintiffs should not be permitted to capitalize on a simple line of questioning *from the Court* to now state yet another new claim.  Doing so at this late date substantially prejudices Defendants' ability to defend against Plaintiffs' claims.

Plaintiffs do not dispute that the "15% poverty supplement" has never before been an issue in this case.  In fact, the Court correctly noted that "the 15 percent that I heard this morning [upon the direct examination of Ms. Hozella, the last fact witness in *Defendants' case*], that was something *new to me*."  (5/22/12 Tr. at 128:6-7 (emphasis added).)  Further, it has long been the rule in this Circuit that plaintiffs may not amend their complaints midtrial when doing so "would shift the theory of the trial and force the defendants to prepare a mid-trial defense *on a new issue*."  *Johnson v. Trueblood*, 629 F.2d 287, 294 (3d Cir. 1980) (emphasis added).

Notwithstanding the above objections, the distribution of these funds, consistent with federal law, is reported to and approved by USDE on an annual basis.  (5/21/12 Tr. at 29:7–30:9.)  In fact, Pennsylvania has been distributing funds in this manner, with the approval of USDE, for almost 30 years.  (5/22/12 Tr. at 29:11-30:9, 6/18/12 Tr. at 25:14-27:2.)

**Question 9:**

**What evidence is in the record showing that the Chester Upland School District has already made so many cuts in regular education or discretionary programs that it is not offering FAPE to many students?**

**Response to Question 9:**

None.  There is no such evidence in the record.  In fact, the Court has already recognized as much.  (5/29/12 Tr. at 204:18-:205:18.)

**Question 9A:**

**Have Plaintiffs demonstrated that any denial of FAPE is due to forces beyond their control, as opposed to the District's unwillingness to make even more "hard choices?"**

**Response to Question 9A:**

No.  In fact, the evidence shows that the District is unwilling to take additional cost savings measures.  Just by way of example, Dr. Persing testified that the district has not performed a facilities study to determine needs and examine potential cost-saving measures, including optimizing space and efficiencies, for purposes of the 2012-2013 budget.  (5/16/12 Tr. at 178:19–179:8.)  He further testified that for purposes of the 2012-2013 school year, the District has not yet performed any analysis to determine the number of teachers required to properly service the District's students.  (5/16/12 Tr. at 179:9-13.)  At her deposition, Wanda Mann, the Board's President testified that the financial recovery option being considered by the Board was only the instant lawsuit – not cutting costs, examining personnel needs or streamlining operations, but this lawsuit.  (Exhibit D-15 at 152:15-20.)

**Question 9B:**

**What does the record allow the Court to find in regards to FAPE in the least restrictive environment ("LRE") for the 2012-13 school year? What evidence exists in the record to suggest that students are currently not receiving a FAPE in the LRE will be unlikely to receive a FAPE in the LRE for the 2012-13 school year?**

**Response to Question 9B:**

Nothing and none.  Again, there is no claim in the Complaints that students did not receive FAPE in the LRE during the 2011-2012 school year, and such a claim cannot be manufactured for the first time at trial.  Rather, the concern as pled by Plaintiffs is that the Department's plan for the temporary provision of special education services if the District's schools were to close for a short period during the 2011-2012 school year did not constitute the provision of FAPE in the LRE.  As has now been testified to at length, however, that plan was to be a temporary, emergency fix – akin to what would happen in the event of a strike or natural disaster.  The emergency plan was not finalized, because the schools did not close.  Further, it is not anticipated that the draft emergency would be the one to be implemented if the schools were to close permanently during the 2012-2013 school year.   (5/16/12 Tr. at 17:3-18:6 and; 18:11-14; 5/21/12 Tr. at 45:15-19, 45:22-46:23; and 48:7-49:5.)  In short, that plan is irrelevant to the trial of this matter.

**Defendants' Response to Plaintiffs' Answer to Question 9B:**

Plaintiffs mischaracterize the testimony of John Tommasini, the Department's Director of the Bureau of Special Education, in an attempt to demonstrate that the Department was not concerned with LRE requirements in developing the January 2012 draft emergency special education plan.  Specifically, Plaintiffs state that Mr. Tommasini testified "that complying with LRE requirements was not his concern."  (Pls. Answers at 31.)  In actuality, Mr. Tommasini testified at his deposition:  "I felt that the number one priority [in the event of an emergency closure] was to see that the needs of those children were met in the best … way possible under a difficult circumstance should it come to be."  (Exhibit P-61(a) at 20:12-16.)

**Question 9C:**

**Do these questions correctly describe Plaintiffs' burden of proof?**

**Response to Question 9C:**

Respectfully, no.  They do, however, highlight the District's failure to properly manage its finances and operations.

Plaintiffs remaining claims, for which they must meet their burden of proof, are as follows:

- District's First Amended Complaint (Doc. 67), Count I – The District seeks relief under the IDEA against the Executive Branch Defendants.  This count is based on the allegation that the reduction in funding by the Pennsylvania General Assembly is "effectively requiring the closing of schools in the School District."

- District's First Amended Complaint, Count II – The District seeks relief under the IDEA and Section 504.  This count is based on the allegation that the state special education subsidy payment formula violates the IDEA and the Rehabilitation Act by discriminating against students with disabilities.

- District's First Amended Complaint, Count IV – The District seeks relief under the IDEA against the Executive Branch Defendants for the Department's alleged misuse of IDEA funds that are designated for administrative purposes.

- Intervenor-Plaintiffs' Complaint (Docs. 39 and 87), Count III – Plaintiffs set forth a claim against the Executive Branch Defendants and the ***District*** under the IDEA.  This count is based on the allegation that if schools in the District close or there is a reduction in services, the Department might not comply with its alleged duties to:  (1) determine which children may have disabilities through "child find"; (2) provide a FAPE to special education students; (3) provide parents of special education students notice of a change in placement; and (4) provide an educational setting for special education students in the least restrictive environment.

Plaintiffs must also establish that they have standing, and have exhausted their administrative remedies, as set forth in Defendants Post-Trial Brief.

**Question 9D:**

**If not, what is Plaintiffs' burden? If the Court finds that Plaintiffs' burden, however described, is not met, what is Plaintiffs' position?**

**Response to Question 9D:**

The key proof-related element to the Plaintiffs' claims is essentially a matter of causation, or linkage – they must prove that a reduction in funding will cause a deprivation of FAPE during the 2012-2013 school year.  Because Plaintiffs cannot demonstrate that any future deprivation is caused by a reduction in funding, they cannot (and did not) meet the burden of the case they pleaded.  The Court found exactly that.  (*See* 5/29/12 Tr. at 20418-205:18.)  Because the Court found that the Plaintiffs have not met their burden, judgment on partial findings should be entered in favor of the Executive Branch Defendants.  Such a motion was made at the close of Plaintiffs' case-in-chief, and decision was reserved.  That motion should now be granted.

**Response to Plaintiffs' Answer to Question 9D:**

Plaintiffs assert that their burden of proof is to "simply show that the services required by 20 U.S.C. § 1411 and 1413(a) are not being provided."  (Pls. Answers at 36.)  However, the cases cited by Plaintiffs do not support this assertion.  Instead, as set forth above, the burden to show a denial of FAPE requires the Plaintiffs to show that "substantial or significant provisions" of IEPs are not being provided such that the disabled child is denied a "meaningful educational benefit."  *See Melissa S.*, 183 F. App'x at 187.  To prove the systemic violation they suggest, Plaintiffs must prove that denials of FAPE are recurring and continuous, caused by a state-wide system, and cannot be rectified through the administrative process.  *Cordero*, 795 F. Supp. at 1362.  They have not met these burdens on this record.

**Question 10:**

**Have Plaintiffs proven enough facts to come under the Third Circuit's holding in <u>Beth V. ex rel. Yvonne V. v. Carroll</u>, 87 F.3d 80, 89 (3d Cir. 1996) that plaintiffs who "allege systemic legal deficiencies and, correspondingly, request system-wide relief' are excused from the IDEA's exhaustion requirement, as well as Judge Robreno's opinion in <u>Gaskin v. Pennsylvania</u>, No. 94-cv-4048, 1995 WL 154801 (E.D. Pa. March 30, 1995) and Judge Davis's decision in <u>P.V. ex rel. Valentin v. Sch. Dist. of Philadelphia</u>, No. 11-cv-4027, 2011 WL 5127850 (E.D. Pa. Oct. 31, 2011) regarding exceptions to the IDEA exhaustion requirement? If yes, what is the proper remedy?**

**Response to Question 10:**

No.

To determine whether exhaustion is excused, the Court must first examine whether Plaintiffs' claims allege systemic legal deficiencies. While the Third Circuit has not defined "systemic" in this context, in *P.V. ex rel Valentin v. Sch. Dist. of Philadelphia*, the Court stated that "an IDEA claim is systemic if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with [the] IDEA, while a claim is not systemic if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem."  No. 11-cv-04027, 2011 WL 5127850, at *7 (E.D. Pa. Oct. 31, 2011) (internal quotation marks omitted) (citing *Doe v. Ariz. Dep't of Educ.*, 111 F.3d 678, 682 (9th Cir. 1997); *MG ex rel. LG v. Caldwell-West Caldwell Bd. of Educ.*, No. 09-cv-1869, 2011 WL 2607523, at *7 (D.N.J. June 30, 2011) (citing *Grieco v. N.J. Dep't of Educ.*, No. 06-cv-4077, 2007 WL 1876498, at *6 (D.N.J. June 27, 2007))).  A claim is not systemic when the "overwhelming focus" of the claim is that the school district is not "provid[ing] [] students with the FAPE to which they are entitled." *Blunt v. Lower Merion Sch. Dist.*, 559 F. Supp. 2d 548, 559 (E.D. Pa. 2008).

The only claims remaining in this matter that assert system-wide issues are District

Plaintiffs' Counts II and IV.  The other claims – District Plaintiffs' Count I and Intervenor-Plaintiffs III – clearly do not allege system-wide issues and overwhelmingly are focused on allegation that the Department is not ensuring that the District is providing its students with the FAPE to which they are allegedly entitled.  Moreover, each claim can be addressed by the administrative process.

When presented with almost the identical claims, the *N.A.* and *Blunt* courts rejected the special education parents' claims that exhaustion was not necessary.  *N.A.*, 820 F. Supp. 2d at 652-4; *Blunt*, 559 F. Supp. 2d at 558-60.

In *N.A.*, the Plaintiffs sought, in addition to class certification:

that th[e] Court direct the School District to provide accurate progress monitoring data; to retrain its personnel on progress monitoring and data collection; to provide appropriate special education services sufficient to address the needs of autistic children; to reconvene IEP teams for current plaintiffs to consider whether IEP modifications are necessary; to provide IEPs at public expense, and to provide full days of compensatory education.

*N.A.*, 820 F. Supp. 2d at 653 n.2.  The Court found that the relief sought was not systemic in nature and could be resolved using the administrative process, and, therefore the plaintiffs were required exhaust their administrative remedies.  *Id.* at 652-53.

The Court considered plaintiffs' argument that their claims did not have to be exhausted pursuant to *Beth V.* and *Gaskin* because they alleged "systemic legal deficiencies."  *Id.* at 653. The Court rejected plaintiffs' argument because their claims were not alleging deficiencies "at the state level," rather they implicated deficiencies at "the school district level."  *Id.*  The Court determined that plaintiffs' claims were similar to those in *Blunt* where "the overwhelming focus" of plaintiffs' claims was on the "School District defendants' failure to provide [] students with the FAPE to which they are entitled."  *Id.* (quoting *Blunt*, 559 F. Supp. 2d at 559)).

Here, like *N.A.* and *Blunt*, the overwhelming focus of District Plaintiffs' Count I and Intervenor-Plaintiffs' Count III is on whether there has been a denial of FAPE. Accordingly, the Plaintiffs have failed to exhaust the required administrative remedies, and, therefore, these claims must be dismissed.

**Question 11:**

**In enacting the IDEA, did Congress envision that as to a student who was entitled to special education services, but was not receiving them, that the sole remedy is to institute a "due process" claim or other administrative claim, and if denied, to pursue the claim in federal district court? Does the statute require individual actions because the Individual Education Plan ("IEP") has to be individualized and tailored to the specific student?**

**Response to Question 11:**

Yes.

Individuals who allege they are not receiving special education services, must first exhaust their administrative remedies. As explained above, systemic claims are the only exception recognized to the exhaustion requirement. No exception exists for the types of individual claims that are the subject of Question 11.

**Question 12:**

**As part of any remedy in this case, should this Court institute any procedures to facilitate the filing of complaints or due process claims under IDEA? Is there any evidence in the record as to how many such actions have been filed in recent years by parents of Chester Upland? If none, why not?**

**Response to Question 12:**

No.

The procedures to facilitate the filing of complaints or due process claims already exist under the IDEA. 20 U.S.C. § 1415; 34 C.F.R. §§ 300.500-300.520. Should the Court establish an additional procedure, it would be permitting Plaintiffs to circumvent, over Defendants'

objection, the administrative process that already exists under the IDEA.

**Defendants' Response to Plaintiffs' Answer to Question 12:**

Plaintiffs argue that the Court should appoint a special master to administer the complaint process "to avoid overwhelming the state special education hearing system." (Pls. Answers at 41.) There is absolutely no evidence that the state hearing system is or will be overwhelmed. Accordingly, it is unnecessary for the Court to appoint a special master to implement a review process. Moreover, given that the evidence of alleged deficiencies was introduced for the first time at trial, Defendants object to the appointment of a special master before they have the opportunity to address the District's IDEA issues consistent with their regulatory authority. As stated above, under the federal regulations implementing the IDEA, the Department has 60 days to conduct its investigation into alleged violations. 34 C.F.F. § 300.152(a).

**Question 13:**

**Can the evidence be fairly construed to establish that Chester Upland is undergoing a cost squeeze, i.e., revenues are decreasing largely because of students shifting to charter schools, there is no opportunity to raise taxes yet expenses, both fixed and variable, are much higher than revenue, and special education services have been cut? Is the state ultimately responsible for this since the legislature dictated the charter school scheme? Or, is this purely the School District's problem to fix?**

**Response to Question 13:**

No.

The record is replete with evidence that the District is unable to verify the accuracy of any of its financials, does not have proper cost controls in place, and has not properly prioritized its spending. There is no evidence of a "cost-squeeze" and the concept is not relevant to any issue to be decided. The record contains only the District's self-serving, uncorroborated assertions that there "isn't enough money" – there is no District-proffered evidence as to any of

the what, where, why, when or how, particularly as to the 2012-13 school year, which was to be the subject of this trial. The Court's inference that the District lacks revenue is improper absent proof beyond unsubstantiated allegations of "lack of funding." Any conclusion to the contrary would be to consider facts outside of the record and legal arguments not before the Court. In addition, as this Court has stated on numerous occasions, the charter school funding scheme is not an issue before the Court.

The simplest example of what is lacking in Plaintiffs' proof is seen in the allegation that the Columbus School ran out of paper. (5/14/12 Tr. at 17:16-25.) If the school, as Mr. Walker testified, was able to get paper from another District school, the proper inference is that there was either poor paper planning, or too much paper used at the Columbus School, not that there was not enough money to buy paper for the Columbus School. Clearly, there was paper available – it just was not in the right building at the right time. A similar analysis deflates all assertions by the District that there is any denial of services due to a lack of funding; the other reasons must be excluded before that reason can be established, let alone inferred.

**Response to Plaintiffs' Answer to Question 13:**

Plaintiffs simply have not provided evidence supporting any allegation of "dire financial distress" for the 2012-2013 school year. At this juncture, any allegation concerning the future circumstances to surround the 2012-2013 school year remains purely speculative.

**Question 14:**

**The evidence shows IEPs are not in compliance. Is there sufficient evidence to show FAPE lacking for many? Even if not a fault of the state, does the Court have responsibility under federal law to remedy this? Is this the basis of PILCOP's claims against Chester Upland School District?**

**Response to Question 14:**

Respectfully, there is no evidence that IEPs are not in compliance.  In fact, Plaintiffs'

expert, Dr. Thurman, testified that he reviewed only 2 of 840 IEPs.  (5/22/12 Tr. at 58:14-23.)

There is evidence that a report generated in the spring of 2012 reflects that IEPs and

Reevaluations are untimely.  However, the District's Supervisor of Special Education, Mary

Payne, confirmed that the point of the report was to demonstrate that the data being entered into

that tracking system is bad or outdated, not that the IEPs or Reevaluations themselves were

lacking.  In fact, the District does not have a sufficient handle on its process to determine which,

if any, of those IEPs are actually out of compliance.  (5/10/12 Tr. at 114:14-115:25; 117:1-11;

118:4-6; and 119:15-120:15.)

As to whether there is sufficient evidence of FAPE lacking for many, there is not.  To

show a denial of FAPE by a failure to implement an IEP, the Plaintiffs must show that the child

did not receive "substantial or significant provisions of the IEP … such that the disabled child

was denied meaningful educational benefit."  *Melissa S.*, 183 F. App'x at 187.  Here, there is no

evidence that "many" students were not receiving "substantial or significant provisions" of their

IEPs.

As to whether the Court has responsibility under federal law to order a remedy, at this

time, it does not.  The Court can only remedy individual allegations of FAPE following the

exhaustion administrative remedies.  (*See* Response to Question 10.)  Plaintiffs have admittedly

not availed themselves to this process, and as a result, the Court cannot consider such claims at

this time.

**Defendants' Response to Plaintiffs' Answer to Question 14:**

Plaintiffs make the statement that a failure to fully implement an IEP is "the definition of

a denial of FAPE." (Pls. Answers at 44.) This, however, is ***not*** the definition of a denial of

FAPE. *See Melissa S.*, 183 F. App'x at 187.

Respectfully submitted,


Dated:  June 22, 2012                 /s/ Amy C. Foerster
                                      Amy C. Foerster, Esquire
                                      Michael A. Finio, Esquire
                                      Cory S. Winter, Esquire
                                      SAUL EWING LLP
                                      2 North Second Street, 7th floor
                                      Harrisburg, PA  17101
                                      (717) 257-7573 – Ms. Foerster
                                      *Attorneys for the Commonwealth of Pennsylvania,*
                                      *Department of Education, Governor Corbett, and*
                                      *Secretary Tomalis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answer* to be served upon the following via the Court's ECF system:

Leo Hackett, Esquire
Law Offices of Leo A. Hackett
Jamestown Building
102 Chesley Drive, Suite 1A
Media, PA 19063

Benjamin D. Geffen, Esquire
Michael Churchill, Esquire
Sonja D. Kerr, Esquire
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway, Second Floor
Philadelphia, PA 19103

Michael V. Puppio, Jr., Esquire
Raffaele & Puppio, LLP
19 West Third Street
Media, PA 19063

Lynne L. Wilson, Esquire
Pennsylvania State Education Association
400 N. Third Street
PO Box 1724
Harrisburg, PA 17105

Gregg L. Zeff, Esquire
Zeff Law Firm, LLC
1528 Walnut Street, Suite 1401
Philadelphia, Pennsylvania 19102

Date:   June 22, 2012                           /s/ Amy C. Foerster _____
                                                Amy C. Foerster