# EXHIBIT A



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

Mr. John Tommasini
Director of Special Education
Pennsylvania Department of Education
333 Market Street
Harrisburg, Pennsylvania 17126

JUL 2 4 2012

Dear Mr. Tommasini:

We are writing to follow up on your inquiry regarding a reference in the June 27, 2012 Office of Special Education Programs (OSEP) determination letter to the Pennsylvania Department of Education (PDE) concerning allegations made against PDE in *Chester Upland School District, et al. v. Commonwealth of Pennsylvania Department of Education, et al*, Civil Action No. 12-0132. This case presents allegations of denial of a free appropriate public education (FAPE) to eligible students with disabilities enrolled in the Chester Upland School District (CUSD) in violation of Part B of the Individuals with Disabilities Education Act (IDEA), that may stem, in part, from an alleged failure to fund CUSD sufficiently in the 2012-2013 school year. We noted in the determination letter to PDE that, although not considered for this year's determination that meets Pennsylvania "meets requirements" under IDEA section 616(d), we may consider any conclusions or findings of law from this case, or any relevant information in this case, as a factor in future determinations for Pennsylvania. Under section 616(d)(2)(A), OSEP may use any relevant publicly available information when making determinations, and has used this type of information in the past in making determinations for other States.

As you know, FAPE includes, among other elements, the provision of special education and related services at no cost to parents in accordance with an individualized education program (IEP) that meets the requirements of State and federal law, including the provisions regarding placement in the least restrictive environment (LRE). 20 U.S.C. § 1401(9). It is our understanding that the Court has discussed factual findings of violations of IDEA for the 2011-2012 school year. Transcript of Trial Before the Honorable Michael M. Baylson, May 29, 2012 pp. 201 and 206. Thus, even though the United States is not a party to this lawsuit, as the Federal agency responsible for administering IDEA, the U.S. Department of Education (Department) has an interest in ensuring that eligible students with disabilities are not denied FAPE, and that States and school districts meet all of their statutory and regulatory obligations under IDEA.

As you also know, under IDEA, the Federal government makes grants to participating States to assist them in providing a public education to eligible children with disabilities. *See* generally 20 U.S.C. § 1400(d). The Secretary of Education, in providing grants of IDEA funds to PDE, has received assurances from the State agency that it "has in effect policies and procedures to ensure that it meets" IDEA's requirements. These include but are not limited to, assurances addressing: the provision of a FAPE to all eligible children with disabilities residing in the State; the requirement that IEPs are properly developed, reviewed and revised; the education of students with disabilities with their nondisabled peers in the least restrictive environment (LRE); and

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2600

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Mr. John Tommasini

ensuring that children with disabilities and their parents are afforded specific procedural safeguards. See 20 U.S.C. §§ 1412(a)(1), (4), (5) and (6). IDEA, in combination with the General Education Provisions Act, requires that the State exercise general supervision over all educational programs for children with disabilities administered within the State to ensure that all such programs meet State education standards and the requirements of IDEA, monitor compliance of each of its local educational agencies with the requirements of IDEA, and require timely correction of any noncompliance identified by the state educational agency (SEA). 20 U.S.C. §§ 1232d(3)(A) and (b)(3)(E); 20 U.S.C. §§ 1412(a)(11) and 1416(a), and 34 CFR §§300.149 and 300.600.

Because Pennsylvania has chosen to participate in the IDEA program, it is responsible for ensuring that all public agencies in the State, including public school districts, comply with IDEA's requirements. This includes monitoring compliance and taking appropriate actions to ensure that each participating school district is carrying out the requirements of IDEA. Moreover, in situations where the State agency is on notice that students with disabilities in a participating school district were, or will soon be, denied FAPE due to the district's actions or inactions, the State agency must take the necessary steps to address and, as appropriate, redress the situation. These are part of the State agency responsibilities under IDEA.

The Department is following the developments in this case and will consider this and other relevant information to help ensure that PDE takes appropriate actions to ensure that CUSD students with disabilities receive FAPE as required by IDEA.

We are glad to respond to your questions and we appreciate your prompt attention to this matter.

Sincerely,

Melody Musgrove, Ed.D.
Director
Office of Special Education Programs

cc:  The Honorable Ronald J. Tomalis

# EXHIBIT B



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

JUN 27 2012

Honorable Ronald J. Tomalis
Pennsylvania Department of Education
333 Market Street
Harrisburg, PA  17126

Dear Secretary Tomalis:

Thank you for the timely submission of Pennsylvania's Federal fiscal year (FFY) 2010 Annual Performance Report (APR) and revised State Performance Plan (SPP) under Part B of the Individuals with Disabilities Education Act (IDEA).

The Department has determined that, under IDEA section 616(d)(2)(A)(i), Pennsylvania meets the requirements of Part B of IDEA.  The Department's determination is based on the totality of the State's data and information, including the State's FFY 2010 APR and revised SPP, other State-reported data, and other publicly available information.  See the enclosure entitled "How the Department Made Determinations under Section 616(d) of the IDEA in 2012: Part B" for further details.

Specific factors affecting the determination made by the Office of Special Education Programs (OSEP) that Pennsylvania meets requirements under IDEA section 616(d) include that:  (1) Pennsylvania provided valid and reliable FFY 2010 data reflecting the measurement for each indicator; and (2) Pennsylvania reported high levels of compliance or correction for Indicators 4B, 9, 10, 11, 12, 13, 15, 16, 17, and 20. We commend Pennsylvania for its performance.

Although not a factor in this year's determination, we are aware of serious allegations regarding the failure to ensure the provision of a free appropriate public education in the least restrictive environment (34 CFR §§300.101, 300.112 and 300.114) to students with disabilities, raised in the case of the Chester Upland School District, et. al. vs. the Commonwealth of Pennsylvania, et al.  Please be advised that the Department may consider any conclusions or findings of law from that case as a factor in future determinations for Pennsylvania.

The enclosed table provides OSEP's analysis of the State's FFY 2010 APR and revised SPP and identifies, by indicator, OSEP's review of any revisions the State made to its targets, improvement activities (timelines and resources) and baseline data in the State's SPP.  The table also identifies, by indicator: (1) the State's reported FFY 2010 data; (2) whether such data met the State's FFY 2010 targets and reflect progress or slippage from the prior year's data; and (3) whether the State corrected findings of noncompliance.

As you know, pursuant to IDEA section 616(b)(2)(C)(ii)(l) and 34 CFR §300.602(b)(1)(i)(A), your State must report annually to the public on the performance of each local educational agency (LEA) located in the State on the targets in the SPP as soon as practicable, but no later than June 1, 2012.  In addition, your State must: (1) review LEA performance against targets in the State's SPP; (2) determine if each LEA "meets requirements" of Part B, or "needs assistance," "needs intervention," or "needs substantial intervention" in implementing Part B of the IDEA; (3) take appropriate enforcement action; and (4) inform each LEA of its determination, 34 CFR §300.600(a)(2) and (3).  For further information regarding these

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

requirements, see "The Right IDEA" Web site at: http://therightidea.tadnet.org/determinations. Finally, please ensure that your updated SPP is posted on the State educational agency's Web site and made available to the public, consistent with 34 CFR §300.602(b)(1)(i)(B).

OSEP is committed to supporting Pennsylvania's efforts to improve results for children and youth with disabilities and looks forward to working with your State over the next year. If you have any questions, would like to discuss this further, or want to request technical assistance, please contact Melissa Turner, your OSEP State Contact, at 202-245-6415.

Sincerely,

Melody Musgrove, Ed.D.
Director
Office of Special Education Programs

Enclosures

cc:  State Director of Special Education

# EXHIBIT C

**17 IDELR 522**

17 LRP 1319

### Letter to Kohn

### Office of Special Education and Rehabilitative Services

### February 13, 1991

### Related Index Numbers

**100.005 Compensatory Education, In General**

**168. EDUCATION FOR ALL HANDICAPPED CHILDREN ACT (EHA)**

**200.030 Free Appropriate Public Education (FAPE), FAPE Generally**

**160.045 Due Process Hearings, Scope of Hearing Officer's Authority**

### Judge / Administrative Officer

**Robert R. Davila, Assistant Secretary**

### Case Summary

Is compensatory education a proper means to provide FAPE to a child with disabilities who was previously denied an appropriate education?

Compensatory education is a proper method to provide FAPE to children with disabilities who were entitled to, but were denied, FAPE. Moreover, compensatory education may be the only means to provide FAPE to children with disabilities who have been forced to remain in inappropriate public placements due to their parents' financial inability to pay for private placements.

### Full Text

### Appearances:

Ms. Margaret A. Kohn

Bogan and Eig

Attorneys at Law

Suite 330

1400 Sixteenth Street, N.W.

Washington, DC 20036

### Text of Inquiry

I am writing for a policy interpretation of the Education of the Handicapped Act concerning compensatory education for handicapped children who have been denied appropriate special education services or programs. Having represented many handicapped children in due process hearings conducted pursuant to the EHA, I seek clarification of the authority of an independent hearing officer to award compensatory education services to a child, upon a finding that the school system failed, in the past, to provide the child a free appropriate public education. In addition, may compensatory education services take the form of summer school programming as well as or instead of additional months or years of special education added on at the end of the child's eligibility for special education.

I have found that it is often most advantageous for a student who has been denied appropriate special education services over an extended period of time to attend a specialized special education summer school program in addition to the school year program. The added content frequently allows the child to catch up on some of the skills and learning she or he would have already been able to master had the previous educational programs been appropriate. The earlier the intervention, the more constructive and profitable the services are likely to be. To require the delivery of compensatory education services be withheld until after age 21 is fiscally imprudent, and counter productive for many children. It is not consistent with the basic tenet of special education---that decisions about programming for a handicapped child be designed to meet his/her unique individual needs. Hearing officers, as well as courts, need a variety of remedial options so that the individual needs of the handicapped student can be met and so that society can benefit most from the education provided.

This issue is especially important in school systems with limited special education summer school offerings. The opportunity to attend a summer school program that is not designed to meet the needs of the handicapped student may be all that is available to a handicapped student, unless a hearing officer has the

Copyright © 2012 LRP Publications

power and authority to require the school district to provide compensatory education in the form of special education summer school.

I look forward to your response.

## Text of Response

This is in response to your letter to the Office of Special Education Programs (OSEP) concerning: (1) the authority of hearing officers under Part B of the Individuals with Disabilities Education Act (Part B) to award compensatory education services to a child, upon a finding that the school system failed, in the past, to provide the child a free appropriate public education (FAPE); and (2) the provision of compensatory education services in the form of summer school programming as well as or instead of additional months or years of special education added on at the end of the child's eligibility for special education.

Your concerns raise several issues, namely, whether: (1) compensatory education is an appropriate method for providing FAPE to a child with disabilities for whom FAPE has previously been denied; (2) a hearing officer has the authority to award compensatory education to a child with disabilities who has previously been denied FAPE; and (3) a hearing officer, upon awarding compensatory education to a child with disabilities who has previously been denied FAPE, can determine its scope. We will address the above issues separately.

In response to the first issue raised, OSEP's position, which is supported by several court decisions,[1] is that compensatory education is an appropriate means for providing FAPE to a child with disabilities who had previously been denied FAPE. A major purpose of Part B is to insure that all children with disabilities are provided FAPE. 34 C.F.R. § 300.1. Compensatory education effectuates this purpose by providing the FAPE which the child was originally entitled to receive. Further, compensatory education may be the only means through which children are forced to remain in an inappropriate placement due to their parents' financial inability to pay for an appropriate private placement would receive FAPE.

The second issue raised by your letter concerns the authority of a hearing officer to award compensatory education to a child with disabilities who had been denied FAPE.

Under Part B, parents have the right to initiate a hearing on any matter relating to the provision of FAPE for their child. 34 C.F.R. §§ 300.504(a)(1) and (2); 300.506(a). The due process hearing provisions of Part B: (1) enumerate criteria for appointment of impartial hearing officers (34 C.F.R. § 300.507); (2) specify hearing rights (34 C.F.R. § 300.508); (3) require that findings of fact and decisions, with the deletion of personally identifiable information, be made available to the public (20 U.S.C. § 1415(d); and (4) prescribe a 45-day timeline for issuance of hearing decisions, unless an extension of the 45-day timeline is granted (34 C.F.R. § 300.512).

Part B and its legislative history evince the importance attached by the Congress to the procedural safeguards as a method of ensuring that FAPE is made available to children with disabilities. Therefore, OSEP's position is that Part B intends an impartial hearing officer to exercise his/her authority in a manner which ensures that the right to a due process hearing is a meaningful mechanism for resolving disputes between parents and responsible public agencies concerning issues relating to the provision of FAPE to a child.[2] Although Part B does not address the specific remedies an impartial hearing officer may order upon a finding that a child has been denied FAPE, OSEP's position is that, based upon the facts and circumstances of each individual case, an impartial hearing officer has the authority to grant any relief he/she deems necessary, inclusive of compensatory education, to ensure that a child receives the FAPE to which he/she is entitled.

The decision of the impartial hearing officer is binding unless an aggrieved party appeals through applicable administrative or judicial procedures. 34 C.F.R. §§ 300.509-300.511.

Copyright © 2012 LRP Publications

The third issue raised by your letter asks whether compensatory education may take the form of summer school programming as well as or instead of additional months or years of special education added on at the end of the child's eligibility for special education.

The scope of compensatory education ordered in an impartial hearing officer's decision must be consistent with a child's entitlement to FAPE, but should not impose obligations that would go beyond entitlement. Therefore, a hearing officer who concludes that a child with disabilities is entitled to compensatory education may order, as a means of redressing the denial of FAPE to that child, that compensatory education include or take the form of summer school programming.

I hope the above information is helpful. If we may provide further assistance, please let me know.

Robert R. Davila

[1] See, *Lester H. v. K. Gilhool and The Chester Upland School District,* 916 F.2d 865 (3rd. Cir. 1990); *Burr by Burr v. Ambach,* 863 F.2d 1071 (2nd. Cir. 1988); *Meiner v. State of Missouri,* 800 F.2d 749 (8th Cir. 1986) and *Campbell v. Talladega County Board of Education,* 518 F. Supp. 47 (N.D. Ala. 1981).

[2] OSEP's position is in concert with recent court and State educational agency decisions. See, *Burr by Burr v. Ambach,* 863 F.2d 1071 (2nd. Cir. 1988); (court of appeals reinstated hearing officer's award of compensatory education to a child with disabilities); and *Auburn City Board of Education,* 16 EHLR 390 (1989) (hearing officer awarded tutorial services to child with disabilities who had been denied FAPE, holding that he had the authority, just as a federal or state court would have, to grant the relief sought).

--

# EXHIBIT D

109 LRP 56531

### Bristol Township School District
### Pennsylvania State Educational Agency
9931/08-09 KE
### August 11, 2009
### Judge / Administrative Officer
Deborah G. DeLauro, Hearing Officer

## Full Text
## Appearances:

APPEARANCES:

Representative: Pro Se

School District Attorney; Heather L. Durrant, Esquire, Rudolph, Pizzo & Clarke, LLC, Eight Neshaminy Interplex, Ste. 215, Trevose, PA 19053

## Decision
## I. Background

Student is an elementary age resident of the Bristol Township School District (hereinafter "District") who has just completed the third grade at the [ ] Elementary School (hereinafter "School"). Although Student has a history of attention problems, Student is on grade level in both reading and math. In March 2008 when Student was in the second grade, Ms. [ ] (hereinafter "Parent") requested that her child be tested to determine whether the child qualified for special education services through an Individual Education Plan (hereinafter "IEP"). The Parent requested the evaluation due to her concerns regarding Student's academic performance. The District conducted an initial evaluation (hereinafter "ER") in May 2008 and although there were indications of attention problems, auditory comprehension difficulties and motivation, found that Student did not qualify for specially designed instruction under the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"). The District also found that Student did not qualify for a Section 504 Service Plan under the Rehabilitation Act of 1973 (hereinafter "Section 504")

The Parent disapproved the Notice of Educational Placement (hereinafter "NOREP") and after unsuccessful attempts to resolve the dispute through Mediation and further due process, requested that the District fund an Independent Education Evaluation (hereinafter "IEE"). The District agreed and an independent neuro-psychological evaluation was conducted in January 2009 which resulted in an IEE report in February 2009. The District reviewed the IEE as well as a speech and language evaluation, an issued a Re-Evaluation Report (hereinafter "RR") in April 2009 again finding Student ineligible for both special education services under IDEIA and accommodations under Section 504. In addition, an Auditory Processing Evaluation was conducted by the District in April 2009 which found Student to have underdeveloped auditory skills and recommended compensatory strategies. In April 2009, Parent filed a request for a due process hearing with the Office for Dispute Resolution (hereinafter "ODR"). After a Sufficiency Challenge filed by the District, the Parent amended her Complaint in May 2009 wherein she specifically requested that if her child did not qualify for special education services under the IDEIA, that Student be provided with a Section 504 Service Plan. Accordingly, a due process hearing was held in July 2009 to determine the following issues.

## II. Issues

1. Whether the District failed to identify Student as a student with a disability under IDEIA?

1) Whether the District's evaluation was appropriate?

2) Whether the District appropriately considered the independent educational evaluation conducted by [independent evaluator]?

3) If not, then whether Student qualifies for a Section 504 Service Plan under the Rehabilitation Act of 1973?

For the reasons stated below, this hearing officer finds that the District's evaluation is appropriate; that Student does not qualify for specially designed instruction under the IDEIA; but that the District did

Copyright © 2012 LRP Publications

not properly consider the independent educational evaluation; and based on the weight of the evidence, Student does qualify for accommodations and modifications under Section 504.

## III. Findings of Fact

1. Student is an elementary age student, born [ ]. Student is a resident of the Bristol Township School District.

2. Student is a regular education student having just completed the 3rd grade at Elementary School.

3. Student was evaluated in May 2008 when Student was in second grade and was found to be non-exceptional and not in need of specially designed instruction under the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"). [S-18]

4. Student's mother requested the evaluation due to her concerns regarding her child's academic performance.[1] Although there were indications that issues relating to attention, auditory comprehension and motivation may impact Student's performance at times, the school psychologist, found that there was no evidence that Student's academic achievement had been hindered. [S-18]

5. The school psychologist found that Student was performing at benchmark in both reading and math and obtained average to above-average scores on achievement measures. Therefore, the school psychologist concluded that Student did not meet the requirements to be considered a student with a learning disability. [S-18]

6. The following recommendations for consideration by the school psychologist regarding "special education and related services" needed to enable Student to be involved and progress in the general education curriculum were indicated as follows:

4) Obtain Student's attention before giving instructions. This can be done by calling Student's name or by a gentle tap.

5) Monitor comprehension by periodically asking Student questions related to the subject under discussion.

6) When asking questions of Student, first, assure Student is listening, then pose the question and allow Student time to process the question and then formulate the answer.

7) Provide visual aids and handouts.

8) Flexible preferential seating. Assigned seat should be away from the hall and street noise and not more than 6 feet from the teacher.

9) Teach Student to be an advocate for listening, including recognition of the adverse listening conditions and development of coping strategies.

10) Be sensitive to listening fatigue, as Student will expend more effort in paying attention and discriminating information than other children.

11) Seat Student by a student with good work habits, whom Student can turn to for clarification when confused. [S-18]

7. The Parent testified that she understood that the above list of recommendations constituted an Individual Instruction Plan or "IIP" which would follow Student and that every teacher would be aware that Student needed special accommodations and instructions. [N.T. pp. 31, 35; S-18] Parent also testified that when she asked the third grade teacher, if she was aware of the IIP, she had no idea what Parent was referring to until Parent showed her the recommendations on the ER. The teacher then said that she was already implementing some of the recommendations as "best practices" but that she would try to implement all of them now that she was aware. [N.T. pp. 35, 123]

8. The school psychologist stated that she never called the recommendations an IIP but that all of Student's teachers would follow them through Student's school years. [N.T. pp. 155-156]

9. Parent disapproved of the non-eligibility finding as stated on the NOREP dated May 29, 2008. The Parent stated her reason for disapproval was because Student had auditory processing difficulties,

Copyright © 2012 LRP Publications

low working memory Index, and clinically significant ratings by Student's 2nd grade teacher and Student's mother on the Conners Rating System. Parent also indicated that because her child struggled academically in general education, it was lowering Student's self-esteem. [S-17]

10. The Parties were unsuccessful in their attempts to Mediate the dispute in June and July 2008. [S-16; S-15; S-14] On July 17, 2008, the District issued another NOREP of non-eligibility which the Parent disapproved and requested a due process hearing. [S-13]

11. On September 16, 2008, upon receipt of a request for a due process hearing, the ODR issued a notice for a due process hearing scheduled for October 22, 2008.[S-12]

12. As part of the resolution process, however, the District agreed to fund an IEE and on February 6, 2009 the independent neuropsychological evaluation was conducted by an extern in neuro-psychology at [ ] Hospital for Children [Hospital] and supervised by a pediatric neurologist and licensed psychologist at Hospital . On February 24, 2009 the IEE report was issued.[S-11]

13. The independent evaluator summarized her impression as follows: Student has a history of attention problems. Although Student is on grade level academically, Student reportedly needs substantial supportive home to maintain progress. For the most part, [the independent evaluator] found that Student's cognitive abilities fell within the average range, although cognitively inefficiencies were noted in attention and executive functioning as well as learning and memory. More importantly, the independent evaluator noted that although Student's current teacher denied significant inattention in the classroom, given behavioral observations during the current evaluation, current reports from Student's mother, and reports provided by several educators at the time of the April 2008 evaluation, Student is a child at risk for attention deficit hyperactivity disorder (hereinafter "ADHD") and the appropriateness of this diagnosis should continue to be considered. At this time, Student's problems with attentional processing and inhibition are likely affecting Student's ability to learn and Student's academic performance, such that interventions and accommodations used for children with ADHD should be considered. Finally, the independent evaluator found that it is likely that inefficiencies in attention, response inhibition, and encoding of new information are affecting Student's learning and academic progress, such that Student may benefit from specific interventions and accommodations to address these difficulties. Based on these results, he found that Student is a child who is at risk of having difficulty maintaining academic progress without the provision of appropriate interventions. [S-11]

14. The following recommendations were delineated in the IEE:

1) The District should continue to provide Student with educational support through the response to intervention model, we should also include more intensive and frequent small group instruction in academic subject areas.

2) The District should develop a Section 504 plan to document accommodations necessary to address problems with attention, response inhibition, and encoding of information.

3) The District should consider providing Student with resource room services to allow Student an opportunity to further review information being taught in the classroom and to complete class work and/or homework with necessary assistance in comprehending task instructions and content.

4) Because of Student's difficulties with verbal learning/memory, Student's tendency to make an unusual number of intrusion errors on learning tasks, Student's difficulty comprehending complex task instructions, the tangential nature of Student's conversational speech may reflect deficits in higher-level semantic and syntactic language processing. Therefore, it is recommended that a speech and language evaluation be completed with a significant focus on higher-level language processing,

Copyright © 2012 LRP Publications

semantic organization, and comprehension.

5) Multi-sensory instructional strategies.

6) Medication for attentional difficulties should be considered.

[S-11]

15. The Special Education Supervisor stated that Student's performance was compromised on the IEE because the testing was conducted over a 6 to 8 hour period. This explanation was also provided by the third grade teacher. [N.T. pp. 80-84]

16. On March 5, 2009, the District issued a Permission to Evaluate (hereinafter "PTE") in order to review the IEE and conduct a speech and language evaluation. [S-10] The District conducted a speech and language evaluation on March 25, 2009, April 1, 2009 and April 8, 2009 and determined that Student's speech and language skills were within the average range for Student's age. Possible auditory processing difficulties may be addressed in the classroom through the continued use of strategies. Based on a criteria established by the Bucks County Intermediate Unit (hereinafter "IU") school age speech language program, speech and language services are not recommended at this time. [S-6]

17. On March 12, 2009, the District issued a NOREP indicating that they had reviewed the IEE and determined that Student did not present with the eligibility criteria needed for special education services. They did however agree to implement the recommendations included in the IEE report. [S-9] The Parent requested a due process hearing stating that her child was struggling academically and was missing important instructions due to daydreaming. [S-9]

18. On April 1, 2009, Parent filed for a due process hearing stating that the District refused to comply with the recommendations of the independent neuro-psychologist. [S-8]

19. On April 23, 2009, the IU conducted an Auditory Processing Evaluation and found that Student has underdeveloped auditory skills that may improve with compensatory strategies and/or

maturation. Other learning difficulties may coexist with this diagnosis of auditory processing difficulties that impact Student's educational success. [S-7]

20. On April 30, 2009, the District completed a Re-Evaluation Report and again found that Student was not eligible for special education services. [S-6]

21. On May 19, 2009, Parent submitted an Amended Complaint wherein she clearly stated that based on the IEE, she believed that Student was at-risk of having difficulty maintaining academic progress without the provision of appropriate interventions. The Parent stated further that she wanted the District to provide her child with more intensive and/or frequent small group instruction in academic areas, and if the option for an IEP is denied, she wanted a 504 Plan developed to document accommodations necessary to address Student's problems with attention, response inhibition and encoding information. [S-5]

22. On June 4, 2009, the District issued another NOREP indicating that based on their review of the IEE, Student was not eligible for special education services because Student does not present with the two-pronged eligibility criteria necessary to qualify for special education services, and that a speech and language evaluation was conducted which also did not identify Student as a student with a speech/language impairment. [S-4]

23. On July 14, 2009, the Parties convened a Resolution meeting to discuss the issues in dispute, but were not able to come to an agreement. [S-1]

24. On July 20, 2009, a due process hearing was held.

25. The Special Education Supervisor testified that the District had developed and was implementing a Response to Intervention (hereinafter "RTI") program where the step is to evaluate all of the students in order to get baselines for academic performance. Step Two then is to determine whether they performing at the benchmark level, the middle level or the at risk level. She testified further that the teachers were trained in specific interventions that

Copyright © 2012 LRP Publications

were categorized as Tier 1, Tier 2 or Tier 3 interventions. [N.T. pp. 85, 87-89 91-96]

26. The Special Education Supervisor credibly testified that Student was tested and determined to have a weakness in reading comprehension which could be addressed through Tier 1 RTI strategies. [N.T. pp. 98-100. 105-106]

27. The Special Education Supervisor however, misstated the eligibility standard for qualifying for a Section 504 Service Plan when she stated that Student did not need an IEP or a 504 Plan because Student did not have a disability and therefore would not benefit from a 504 Plan. [N.T. p. 112]

28. The Instructional Support Teacher, (hereinafter "IST") stated that most of the students who had IEPs were receiving RTI in Tier III and that would be the same for students with 504 Plans. She stated further that she felt that an IEP or 504 plan would be completely unnecessary and would hinder Student's academic achievement. [N.T. pp. 102-103; 112] Moreover, when asked to explain why Student wouldn't benefit from having accommodations identified in a Section 504 Plan, the IST stated that Student wouldn't benefit because Student didn't have a disability; and secondly, the kinds of strategies that we're doing are best practice, and not anything they above and beyond what we would do for any student. [N.T. p. 112]

29. The third grade teacher testified that Student did not complete the 100 Book Challenge and Parent did not complete the communication log on a regular basis, the implication being that Student's reading would be better if Parent had made sure that Student's log was filled out and that Student was completing the 100 Book Challenge. [N.T. pp. 119-123]

30. The third grade teacher also testified that the only adjustment which she made after she read the ER recommendations was to change Student's seat. [N.T. p. 124] This was contradictory to Parent's testimony. [N.T. pp. 35, 123]

31. The third grade teacher acknowledged that Student frequently "is distracted... looks out the window... is a daydreamer" but then added that Student needs no more re-direction that the other students in the class. [N.T. pp. 128-130] Teacher then contradicted herself again when she stated to the independent neuro-psychologist that Student "takes more time to complete work than Student's classmates" and "sometimes needs assistance to complete work." [N.T. pp. 135; S-11]

32. The third grade teacher stated that she was only "somewhat" familiar with ADHD, but then stated that she absolutely doesn't feel that Student displays any behaviors associated with ADHD. [N.T. p. 131]

33. The school psychologist contradicted the results of the Conner she administered to Student when she testified that Student doesn't display signs of ADHD to the degree that would be clinically significant. [N.T. pp. 142-143; S-18]

34. The school psychologist revealed that she did not understand what is necessary to determine whether a student qualifies for a 504 Plan due to ADHD when she testified that Student doesn't have ADHD because the Conners is a rating scale and cannot "stand alone." [N.T. p. 144]

35. The school psychologist further demonstrated that she did not understand the eligibility standards under Section 504 when she testified that because there was no discrepancy between Student's ability and achievement, and there was no evidence to find that Student was in need of special "exam instruction," Student did not qualify for a 504 Plan. [N.T. pp. 146-147]

36. The school psychologist and the Special Education Supervisor testified that giving Student an IEP or a 504 Plan would hinder Student because Student would be pulled out of class and would miss valuable instruction. [N.T. pp. 66-67]

37. When asked by the Parent on cross examination "How would these instructions in the IIP differ from a 504 Plan?" The school psychologist stated that she was not familiar with eligibility requirements for a 504 Plan. [N.T. 158-159]

Copyright © 2012 LRP Publications

## IV. Credibility of Witnesses

Hearing officers are empowered to judge the credibility of witnesses, weigh evidence and, accordingly, render a decision incorporating findings of fact, discussion and conclusions upon law. The decision should be based solely upon the substantial evidence presented at the hearing.[2] Quite often, testimony or documentary evidence conflicts; which is to be expected as, had the parties been in full accord, there would have been no need for a hearing. Thus, part of the responsibility of the hearing officer is to assign weight to the testimony and documentary evidence concerning a child's special education experience. Hearing officers have the plenary responsibility to make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses". *Blount v. Lancaster-Lebanon Intermediate Unit,* 2003 LEXIS 21639 (2003). This is a particularly important function, as in many cases the hearing officer level is the only forum in which the witnesses will be appearing in person. This hearing officer found the District's Supervisor of Special Education to be highly credible and it was her testimony about the District's Response to Intervention program as well as her knowledge about the appropriate criteria for speech and language services which established a significant part of the District's case. On the other hand, although the District's Instructional Support Teacher was highly knowledgeable and to her credit, appears to be a major force in developing and implementing the District's RTI program, her testimony was weak when she consistently equated eligibility under IDEIA and Section 504. Her explanation about why Student wouldn't benefit from a 504 Plan was of particular concern as it was not only legally incorrect but also somewhat evasive. Although the school psychologist testified credibly, it was clear from her testimony that she did not fully understand the eligibility criteria under Section 504 when she stated that because student did not have an official medical diagnosis of ADHD and in spite of the fact that Student was in the clinically significant range in the following categories on the Conners Rating Scale: Oppositional; Cognitive Problems/Inattentive; as well as on the Conners' ADHD Index, Student was not eligible for a Section 504 Service Plan due to Student's ADHD behaviors. The only District witness this hearing officer found in general not to be credible was the third grade teacher. Her testimony particularly about Student's attentional difficulties in class lacked sufficient legal weight to counter evidence on the record. Furthermore, her testimony that she was only somewhat familiar with ADHD but was absolutely sure that Student did not display any behaviors associated with ADHD was contradicted by her previous statements to the independent neuro-psychologist, her statements to the Parent and her notations on Student's report card. [S-2]

The Parent is clearly committed to her child and concerned that Student receive an accurate classification and an appropriate educational program. This is not a Parent who is satisfied with waiting to see if her child fails, she has been proactive and persistent in making sure that Student has the necessary academic support to make meaningful progress in the curriculum. This hearing officer appreciates the perserverence this Parent has demonstrated in the face of the District's consistent refusal to find Student eligible for special education services under the IDEIA or for accommodations under a 504 Service Plan.

## V. Discussion and Conclusions of Law

### A. Special Education

Special education issues are governed by the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA" or "IDEA 2004" or "IDEA"), which took effect on July 1, 2005, and amends the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 et seq. (as amended, 2004).

### A. Child Find

IDEA's so-called "Child Find" provision requires that states ensure that:

"... All children with disabilities residing in the

Copyright © 2012 LRP Publications

State, including children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving special education and related services." 20 U.S.C. § 1412(a)(3).

A 'child with a disability' means a child evaluated in accordance with §§ 300.530-300.536 as having mental retardation, a hearing impairment including deafness, a speech or language impairment, a visual impairment including blindness, serious emotional disturbance (hereafter referred to as emotional disturbance), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services. (emphasis omitted) 34 C.F.R. § 300.7

### D. Burden of Proof

In November 2005 the U.S. Supreme Court held that, in an administrative hearing, The burden of persuasion for cases brought under the IDEA is properly placed upon the Party seeking relief. *Schaffer v. Weast,* 126 S. Ct. 528, 537 (2005). The Third Circuit addressed this matter as well more recently. *L.E. v. Ramsey Board of Education,* 435 F.3d. 384; 2006 U.S. App. LEXIS 1582, at 14-18 (3d Cir. 2006). The party bearing the burden of persuasion must prove its case by a preponderance of the evidence. This burden remains on that party throughout the case. *Jaffess v. Council Rock School District,* 2006 WL 3097939 (E.D. Pa. October 26, 2006). The Parent requested this hearing to challenge the District's determination that Student is not eligible for special education services under the IDEIA and is therefore assigned both the burden of persuasion and the burden of production (presenting its evidence first) in the hearing. Application of the burden of persuasion does not enter into play unless the evidence is in equipoise, that is, unless the evidence is equally balanced so as to create a 50/50 ratio. This is

not the case here.

Typically, the burden of proof in an administrative hearing alleging a FAPE denial is upon the party seeking relief. *Schaffer v. Weast,* 546 U.S. 49, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005); *L.E. v. Ramsey Bd. Of Educ.,* 435 F.3d 384 (3d Cir. 2006); *In Re a Student in the Ambridge Area School District,* Special Education Opinion No. 1763 (2006) Here, the substantive dispute in this case centered not only on the School District's evaluation from which it concluded that Student was not eligible for IDEIA special education services but also on the District's consideration of the IEE and eligibility under Section 504. In the instant matter, the appropriateness and accuracy of the School District's evaluation and the resulting eligibility determination were not raised in the context of the Parents' request for the District to fund an Independent Educational Evaluation (hereinafter "IEE"), since the District agreed to fund an independent neuro-psychological evaluation, but instead focused on the District's consideration of the IEE and the question of eligibility under IDEIA and Section 504. Therefore, although the District typically has the burden of proving that its evaluation is appropriate and that it correctly determined that Student is not IDEIA eligible, in this instance, the Parent has the burden of proving that the District failed to provide FAPE by denying student eligibility under the IDEIA, by not properly considering the IEE and appropriately determining Student's eligibility under Section 504.

### E. Independent Educational Evaluation

Parents have a conditional right to an independent educational evaluation at public expense if the parent disagrees with the District's evaluation. 34 C.F.R. 300.502(b). Parents also have the right to have the IEE considered by the District in any decision made with respect to providing FAPE for that student. 34 C.F.R. 300.502(c)(1) Consideration, however, is contingent on the IEE meeting District's criteria. This section of the statute imposes an affirmative obligation on the District to consider the results of an IEE in any decision regarding the

---

provision of FAPE to the student, if that evaluation meets District criteria. The requirement, however, does not mean that the District is compelled to consider the IEE in its decision regarding the provision of FAPE, if it does not meet District criteria. If the District believes that the IEE does not meet agency criteria, it would be appropriate for the District to explain to the parent why. 71 Fed. Reg. 46,690 (2006)

Here the District made much of the fact that the independent evaluator made reference to "Resource Room" services which are no longer the model for delivering special education in the District. [S-11; N.T. p. 70] On the other hand, the District agreed with the independent evaluator's determination that Student does not appear to be a child in need of special education services through an IEP at this time, and supported the District implementation of the RTI model.

## F. Evaluations

In conducting the evaluation, the school district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information including information provided by the parent, that may assist in determining not only whether the child is a child with a disability, but also whether the student is able to be involved in and progress in the general education curriculum. 34 C.F.R. § 300.304(b). The evaluation must also be sufficiently comprehensive to identify all of the child's special education and related services needs. 34 C.F.R. § 300.304(b)(c)(6). Furthermore, the student must be assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 C.F.R. 300.304(c)(4). Assessment tools and strategies to provide relevant information that directly assists persons in determining the educational needs of the student must be provided. 34 C.F.R. 300.304(c)(7). No single measure or assessment may be used as the sole criterion for determining whether a child is a child

with a disability or determining an appropriate educational program for the child. 34 C.F.R. 300.304(c)(2). Only technically sound instruments that assess the relative contribution of cognitive and behavioral factors in addition to physical or developmental factors may be used. 34 C.F.R. 300.304(b)(3). Assessments and other evaluation materials must be used for purposes for which they are valid and reliable; must be administered by trained and knowledgeable personnel; and must be administered in accordance with any instructions provided by the producer. 34 C.F.R. 300.304(c)(1)(iii-(v). Assessments and other evaluation materials must include those tailored to address specific areas of educational need and not merely those that are designed to produce a single general intelligence quotient. 34 C.F.R. 300.304(c)(2).

There are both federal and Pennsylvania substantive legal standards governing evaluations and the determination of IDEA eligibility which set forth the criteria the School District is required to meet to in order to conduct an appropriate evaluation and determine whether Student is eligible for special education. See, 20 U.S.C. § 1414(b), (c); 34 C.F.R. §§ 300.12, 500(b)(2), 532 536; 22 Pa. Code § 14.123. Federal and state special education rules also define the various conditions which support the determination that a student is a "child with a disability" and add an essential additional eligibility criterion, i.e., that "by reason of such identified condition, the student needs specially designed instruction. 20 U.S.C. §§ 1414(3)(A)(i), (ii), 30(A); 34 C.F.R. § 300.7(a), (c); 22 Pa. Code §§ 14.101, 102(a)(2)(ii).

## G. Appropriateness/Accuracy of the District's Evaluation and Eligibility Determination

The issue of Student's IDEIA eligibility with respect to the whether Student is a "child with a disability" centers on whether Student meets the objective criteria for one or more of the disability categories as defined in the IDEIA statute and

regulations, as well as the additional requirement that "by reason thereof," Student "needs special education and related services." 20 U.S.C. § 1401(3), (30); 34 C.F.R. § 300.7(a)(1), (c)(10), 22 Pa. Code §§ 14.101, 102(a)(2)(ii). *In Re: The Educational Assignment of Vincent D.,* Special Education Opinion No. 1413 (Sep. 23, 2003); *In Re: The Educational Assignment of Michael M,* Special Education Opinion No. 1019 (June, 2000). Here, the District determined that Student was not eligible for special education services under the IDEIA as a child with a specific learning disability because Student was on grade level in both reading and math and any attentional issues Student displayed were not significant enough to create a barrier to accessing Student's education but were instead more of a cognitive style. [N.T. 143-144;]

A "specific learning disability" is defined as,

... a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia.

20 U.S.C. § 1401(30); 34 C.F.R. § 300.7(c)(10), 22 Pa. Code §§ 14.102(a)(2)(ii). Additional criteria relating to evaluations and determining whether a specific learning disability exists found in federal and state regulations specify that a "team of qualified professionals" and the parents must determine "whether a child suspected of having a specific learning disability is a child with a disability" and further specify that the team must include a regular classroom teacher who teaches the child and a school psychologist. 34 C.F.R. § 300.540; 22 Pa. Code § 14.124(a). The regulations further provide that

(a) A team may determine that a child has a specific learning disability if

(1) The child does not achieve commensurate with his or her age and ability levels in one or more of the areas listed in paragraph (a)(2) of this section, if

provided with learning experiences appropriate for the child's age and ability levels and

(2) The team finds that the child has a severe discrepancy between achievement and intellectual ability in one or more of the following areas: (i) oral expression. (ii) Listening comprehension. (iii) Written expression. (iv) Basic reading skill. (v) Reading Comprehension. (vi) Mathematics calculation. (vii) Mathematics reasoning.

34 C.F.R. § 300.541(a).

However, the most recent amendments to the IDEA statute provide that

[W]hen determining whether a child has a specific learning disability as defined in §602 a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability in oral expression, listening comprehension, written expression, basic reading skill, reading comprehension, mathematical calculation or mathematical reasoning.

In determining whether a child has a specific learning disability a local educational agency may use a process that determines if the child responds to scientific, research-based intervention as part of the evaluation procedures described in paragraphs (2) and (3).

20 U.S.C. § 1414(b)(6)(A), (B). Consequently, as of July 1, 2005, determining whether a "severe" discrepancy between achievement and intellectual ability exists is no longer mandatory and response to intervention may be considered in evaluating a child for a specific learning disability.

More specifically, when determining whether a child has a specific learning disability, the District:

(1) must not require the use of the severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability as defined in section 300.8(c)(10);

(2) must permit the use of the process based on

Copyright © 2012 LRP Publications

the child's response to scientific, research based intervention;

(3) may permit the use of other alternative research-based procedures for determining whether a child has a specific learning disability.

Here the testimony and evidence shows that not only is the Student performing at grade level in reading and math, but also the District has developed and is implementing a RTI model[3] where Student was receiving "the core plus more" having been assessed at the benchmark level[4] and placed in Tier 1 receiving reading interventions in comprehension. [N.T. pp. 91-92; 93-96, 98-100, 102] A review of the record also supports the District's contention that Student responded well to the RTI and made academic progress. [N.T. pp. 113; 115-117; 124-126; S-2]

The District witnesses also testified that Student's below basic score on the PSSA test was an aberration and could be explained by the fact that this was the first time Student and the other third graders had ever taken the PSSA's and they were all a little anxious. [N.T. pp. 103; 117-118;]

Finally, the independent neuro-psychologist found that Student does not need special education services through an IEP at this time and instead endorsed the District's efforts to provide Student with educational support through the RTI program. [S-11]

Therefore, for all of the above reasons, this hearing officer finds that Student does not qualify for special education services at this time.

## H. Eligibility Under Section 504

Section 504 states: An otherwise qualified individual with a disability in the United States, ... shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .... @ 29 U.S.C.S. § 794. The substantive requirements of the Rehabilitation Act in the education context are equivalent to the requirements set forth in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. See Ridgewood Bd. of

Educ. v. N.E., 172 F.3d 238, 253 (3d Cir. 1999) (citing W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995). The regulations implementing the Rehabilitation Act provide that districts "shall provide a free appropriate public education to each qualified handicapped person who is in the district's jurisdiction." 34 C.F.R. § 104.33(a); see also W.B., 67 F.3d at 493.

Under Section 504, an individual is disabled if he/she has, or has a record of having, or is regarded as having, a physical or mental impairment that significantly interferes with one of life's major activities. 34 C.F.R. 104.3(j) Major life activities are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 34 C.F.R. 104.3(j)(2)(ii) Therefore, for the purposes of school program eligibility, a student with a disability is "otherwise qualified" if he/she is of school age. 34 C.F.R. 104.3(1)(2)

Students who are eligible for services under IDEIA will always meet the definition of eligibility for Section 504, but the converse is not true. The non-categorical criteria for determining eligibility under Section 504 are generally broader, or more inclusive, than the categories of eligibility under the IDEIA, As a result, there are students eligible for educational program adaptations and services under Section 504 who are ineligible under the IDEIA.

To establish a violation of § 504, Student must demonstrate that (1) he/she is disabled as defined by the Act;[5] (2) he/she is "otherwise qualified" to participate in school activities; (3) the school or the Board receives federal financial assistance; and (4) he/she was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Ridgewood Board of Education v. N.E. 172 F.3d 238, 253 (3d Cir. 1999); J.F. v. School District of Philadelphia, 2000 U.S. Dist. LEXIS 4434, No. 98-1793, (E.D.Pa. 2000); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991); 34 C.F.R. § 104.4(a). In addition, to be liable, the District must have known or have been

Copyright © 2012 LRP Publications

reasonably expected to know of Student's disability. *Nathanson,* 926 F.2d at 1381. However, plaintiffs "need not establish that there has been an intent to discriminate in order to prevail under § 504." *Id.* at 1384. *See, Alexander v. Choate,* 469 U.S. 287, 297, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985); *Ridgewood,* 172 F.3d at 253; *Matula.*

A review of the testimony and documentary evidence in this matter clearly indicates that Student displayed ADHD behaviors which frequently affected Student's ability to learn and Student's academic performance, such that interventions and accommodations used for children with ADHD should be considered. [S-11]

As a resident of the District, Student was "otherwise qualified" to participate in school activities at the District. The issue then, is whether Student was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Student has argued that the District did not provide Student with an appropriate education because the District should have provided Student with a § 504 Service Agreement since the District's ER found Student's scores on the Conners to be clinically significant for attentional issues, the teachers noted Student's distractibility and need for frequent redirection and the independent evaluator recommended that Student be provided with a 504 Plan in order to address attention issues and therefore, not deny Student access to the curriculum and a FAPE.

An "appropriate" education "is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met." 34 C.F.R. § 104.33(b)(1). There are no bright line rules to determine when a school district has provided an appropriate education as required by § 504. *Eric H. v. Methacton Sch. Dist.,* 265 F. Supp. 2d 513 (E.D.PA 2003).

What is known is that § 504 requires a recipient of federal funds to make "reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped" person. 34 C.F.R. § 104.12 (a). Although the Third Circuit has not specifically addressed what is a "reasonable accommodation" in relation to the Rehabilitation Act's requirement of an "appropriate" education, Courts have concluded that a reasonable accommodation analysis comports with the Third Circuit's explanation that an "appropriate" education must "provide 'significant learning' and confer 'meaningful benefit,'" *T.R. v. Kingwood Township Bd. of Educ.,* 205 F.3d 572, 577 (3d Cir. 2000) *(quoting Polk v. Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171, 182, 184 (3d Cir. 1988), but that it "need not maximize the potential of a disabled student." *Ridgewood,* 172 F.3d at 247; *Molly L. v. Lower Merion School District,* 194 F. Supp. 2d 422 (E.D.PA 2002).

Both the District's school psychologist and the independent psychologist recommended a number of accommodations which would provide Student with access to the curriculum. In fact, the independent neuro-psychologist recommended that Student be provided with a 504 Plan as Student's problems with attentional processing and inhibition are likely affecting Student's ability to learn and Student's academic progress, such that interventions and accommodations should be used for children with ADHD should be considered. [S-11] Instead, the District refused to find Student eligible for accommodations under Section 504 because the Parent had not obtained a medical diagnosis. The Office of Civil Rights (hereinafter "OCR") has made it clear that a medical diagnosis, while required for medical treatment, including medication, is neither necessary nor controlling for determining whether a student has ADHD for purposes of Section 504 eligibility. Rather as a matter of consideration, districts should give any available medical diagnoses due weight, but as a matter of determination, they should, after obtaining parental consent, have trained personnel compile the requisite data via professionally accepted instruments. The District should have provided Student with a § 504 Service

Copyright © 2012 LRP Publications

Agreement based on the reasons listed above.

## VI. Compensatory Education

Student has a history of ADHD behaviors including, but not limited to, distractibility; frequent need for redirection; failure to follow through on tasks. The School District has been aware of Student's ADHD behaviors since the initial ER in May of 2008. In February 2009, the District funded an IEE which confirmed that Student required a 504 Service Plan in order to address attentional issues which were likely affecting Student's ability to access the curriculum and make academic progress. Furthermore, the record is replete with evidence that the District's school psychologist, the instructional support teacher and the regular education teacher did not fully understand the eligibility requirements under Section 504.

Thus, for approximately eight months, from May 2008 through June 15th, 2008 and then continuing from September 2008 through April 1, 2009, the Student did not have a 504 Service Plan which typically would constitute a denial of FAPE in violation of Section 504.

Compensatory education may be awarded for the period of time that a school district deprives an eligible student of FAPE. *Ridgewood Board of Education v. M.E. ex. rel. M.E.,* 172 F.3d 238 (3d Cir. 1999) In this case, I will award one hour of compensatory education for each school day which the Student was in attendance between May 9, 2008 and the last day of the 2007-2008 school year and from the start of the 2008-2009 school year up to April 1, 2009.

## VII. Summary

Based upon the evidence of record and the applicable law: the District's evaluation and eligibility determination under the IDEIA was appropriate and its conclusion is supported by both the record and the legal standards applicable to the issue of eligibility; the District did not properly consider the IEE; nor did it appropriately apply the eligibility criteria for eligibility under Section 504; and therefore, based upon the both the record and the legal standards

applicable to the issue of eligibility, the Student meets the eligibility criteria for accommodations under Section 504 and the District must formulate and develop a Section 504 Service Plan.

## VIII. Order

In accordance with the foregoing findings of fact and conclusions of law, it is hereby ORDERED that the Bristol Township School District appropriately evaluated Student and correctly determined that Student is not a "child with a disability," i.e., a student who exhibits the characteristics of a learning or other disability and, "by reason thereof" needs special education.

It is FURTHER ORDERED that the Bristol Township School District develop a 504 Service Plan for Student , and provide Student with compensatory education: one hour for each school day Student was in attendance between May 9, 2008 and the last day of the 2007-2008 school year and from the start of the 2008-2009 school year up to April 1, 2009.

The form and utilization of services shall be decided by the Parent and may include only appropriate developmental, remedial or enriching instruction or therapy. The services may be used after school, on weekends, or during the summer. The services may be used hourly or in blocks of hours. The cost to the District of providing the awarded hours of compensatory education shall not exceed the rate the District would have paid for any like contracted services. The District has the right to challenge the cost of the services.

[1]Student received a "Below Basic" score in reading on the PSSA in the Spring of 2009. [P-1]

[2]Spec. Educ. Op. No. 1528 (11/1/04), quoting 22 PA Code, Sec. 14.162(f). *See also, Carlisle Area School District v. Scott P.,* 62 F.3d 520, 524 (3rd Cir. 1995), *cert. denied,* 517 U.S. 1135 (1996).

[3]The District's RTI is based on school wide assessment of students to determine whether they are at benchmark, in the middle or are at risk and require intensive interventions. Then, the IST and teachers reviewed progress after 6 weeks and determined

Copyright © 2012 LRP Publications

whether the student was making progress or required additional interventions.

[4]Tier II is the strategic level where students receive additional interventions; and Tier III is the intensive level where students are pulled out of class to receive intensive programs in reading likeWilson and SRA.

[5]A "Handicapped person" under Section 504 of the Rehabilitation Act is defined as any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. 34 C.F.R. § 104.3(j).

Copyright © 2012 LRP Publications

# EXHIBIT E

**Resolution Agreement**
**Chicago Public Schools District #299**

The Board of Education of the City of Chicago (Chicago Board) submits the following Agreement to the U.S. Department of Education, Office for Civil Rights (OCR) in resolution of OCR compliance review number 05-10-5001. The Chicago Board submits this Agreement to ensure its compliance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and its implementing regulation at 34 C.F.R. Part 104 and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §12132 and its implementing regulation at 28 C.F.R. Part 35.

The Chicago Board states that this Agreement is not an admission of liability, nor of unconstitutional or illegal conduct by, or on the part of the Chicago Board or any of its current, future, or past officers, agents, representatives or employees. The Chicago Board further acknowledges that the Agreement is made to avoid the further expense in time and money of defending against this OCR compliance review.

The Chicago Board took the following steps to resolve OCR compliance review number 05-10-5001:

1. On August 2, 2010 and August 18, 2010, the Chicago Board sent written instructions to all schools prior to the opening of the 2010-2011 school year outlining the guidelines for ensuring transportation is available on the first day of school for all students who require transportation as a related service pursuant to a 504 Plan or an Individualized Education Program (IEP).

2. The Chicago Board ran daily reports ("daily tracking reports") from August 9, 2010 through September 17, 2010 tracking students with disabilities who had transportation as a related service on a 504 Plan or IEP and were not on a bus route.
   A. Staff from the Bureau of Student Transportation (BST) and the Office of Special Education and Supports (OSES) met daily through September 17, 2010 to identify the problem(s) associated with each student identified in the daily tracking report.
   B. BST notified each school which had a student on the daily tracking report instructing the school to submit a transportation request immediately. If a transportation request had not been submitted because the parent had refused transportation services, the school will continue to be instructed to reconvene the 504/IEP meeting within 30 school days to reflect parent refusal on the 504 Plan or IEP.
   C. The weekends prior to the beginning of the 2010-2011 school year for the Track E and Track R schools, staff from BST and OSES entered into the busing system the students with disabilities who required transportation pursuant to a 504 Plan or IEP and who had not been entered into the busing system by their school.

Page 2  – Resolution Agreement (05-10-5001)

The Chicago Board agrees to take the following steps to resolve compliance review number 05-10-5001:

3.   By September 30, 2010, the Chicago Board will provide OCR a hard copy of the written instructions with attachments referenced in item #1.

4.   By October 19, 2010, the Chicago Board will provide OCR with data from the 20th school day for the Track E (September 7, 2010) and Track R (October 5, 2010) schools which identify the students who require transportation as a related service pursuant to a 504 Plan or IEP and the students who are on a bus route.   For any student who requires transportation pursuant to a 504 Plan or IEP and is not on a bus route on the 20th school day, the Chicago Board will ensure that transportation is provided within 4 school days or provide an explanation as to why the student is not on a bus route.  Legitimate rationales for not providing bus transportation include, but are not limited to, the student was incarcerated; student was placed in a residential or home/hospital setting; student no longer attended a CPS school; or parent refusal.

5.   A.   BST will continue to operate its phone system to troubleshoot the transportation related problems for students with disabilities who require transportation pursuant to a 504 Plan or IEP.  Information about the phone system will be posted on the BST and OSES WebPages on the Chicago Board's website – cps.edu.

B.   By September 30, 2010 and by the first day of school of the 2011-12 school year, BST will provide electronic notice to every principal, Chief Area Officer and case manager informing them of the phone system and how to access it.

C.   By November 1, 2010, the transportation section of the electronic IEP will include a reference to the BST phone system.  When the electronic 504 Plan is rolled-out, the transportation section will include the same reference to the BST phone system.  The Board will provide copies of the written electronic IEP or 504 Plan with the reference to the BST phone system to parents.   Every case manager will be instructed to distribute written information to parents about the phone system during IEP meetings held prior to November 1, 2010 and during 504 Plan meetings held prior to the date the electronic 504 Plan system is implemented.

D.   BST will ensure that the phone system is sufficiently staffed during business hours and able to take messages twenty-four hours a day and seven days a week.

E.   BST will respond to all 504 Plan or IEP related transportation problems reported via this phone system within two business days.

F.   During the 2010-11 and 2011-2012 school years, once a week, BST will provide OSES a written description of each complaint

received via the phone system, including the type of complaint, the resolutions, and the number of school days until resolution. BST will maintain copies of the descriptions for the duration of the Agreement and, upon request, provide access to OCR to review the descriptions.

G.    The Chicago Board will provide OCR with documentation of its compliance with items #5A, B, C, D and E by November 1, 2010 and November 1, 2011.

6.    By November 1, 2010, BST and OSES will jointly create and maintain a monthly reporting system to track all 504 Plan or IEP related transportation complaints received by principals. This monthly reporting system will track the number of complaints received from the beginning of the school year; the type of complaints, the resolutions, and the number of school days until resolution. BST will maintain copies of the monthly reports for the duration of the agreement and, upon request, provide access to OCR to review the reports.

7.    BST will survey its bus vendors quarterly during the 2010-2011 and 2011-2012 school years to determine if they have received transportation complaints related to 504 Plan or an IEP directly from parents and/or principals. The survey will include the number of complaints received; the type of complaints; the resolutions and the number of school days until resolution. The surveys will be completed by January 31, 2011 and June 17, 2011, and January 31, 2012 and June 30, 2012. BST will maintain copies of the survey responses for the duration of the agreement and, upon request, provide access to OCR to review the reports.

8.    The Chicago Board will provide OCR with a monthly report, to be submitted on the last school day of the month from September 30, 2010 through June 30, 2012, that includes:

A.  The names of the students with disabilities who require transportation pursuant to a 504 Plan or IEP and were not on a bus route; the reason for not being on a bus route; and if applicable, the date the student was placed on a bus route.

B.  Beginning December 2010, the monthly report will include a summary of the complaints received from principals and through the BST phone system, including a description of the types of complaints; the resolutions, and the number of school days until resolution.

C.  The February 2011 and June 2011 and February 2012 and June 2012 monthly reports will include a summary of the complaints received from the bus vendors directly, including a description of the types of complaints; the resolutions, and the number of school days until resolution.

D. If the student with disabilities was not on a bus route because of parent refusal and the refusal has been noted in the 504 Plan or IEP, this information will be included in the report.

9. To ensure that students with disabilities who require transportation as a related service are automatically placed on a bus route, the Chicago Board will explore purchasing an IT system which links the transportation indicated on the electronic IEP and 504 Plans to the busing system to eliminate the need for school staff to enter the information twice in two different IT systems. The Chicago Board will take substantially the same actions outlined in items #1, 2, 3, 4, and 5, and submit the reports in items #6, 7 and 8 for the 2011-12 school year unless the following conditions are met: (1) the Chicago Board has fully implemented a new IT system, (2) the Chicago Board has provided documentation to OCR demonstrating that the new IT system is operational and (3) prior to August 1, 2011, OCR and the Chicago Board have agreed to new reporting requirements for the 2011-12 school year.

10. During the 2010-2011 and 2011- 2012 school years, for any student who was unable to attend school for ten or more consecutive school days or there is other evidence the student was denied a free appropriate public education because he/she was not receiving transportation services required by a 504 Plan or IEP, the Chicago Board, with parental consent, will convene an IEP meeting to determine if the student is entitled to compensatory education. The students with disabilities for whom this paragraph applies will be identified through the report generated pursuant to item #8A. The Chicago Board will provide the compensatory educational services within six months of the determination that compensatory education is necessary, unless the IEP team determines that Extended School Year (ESY) services are the compensatory services.

11. During the 2010-2011 and 2011-2012 school years, for any student who was not receiving transportation services required by his/her 504 Plan or IEP and his/her parent had to transport them to and from school until transportation services were provided, the Chicago Board will reimburse the parent in accordance with the Chicago Public Schools Bureau of Student Transportation *Parent Request for Personal Transportation Reimbursement* guidelines. The students with disabilities for whom this paragraph applies will be identified through the report generated pursuant to item #8A. The Chicago Board will provide notice to the parents of these students regarding their right to submit reimbursement claims to the Chicago Board.

12. In its February 2011 and June 2011 and February 2012 and June 2012 monthly reports, the Chicago Board will provide OCR with a report documenting compliance with items #10 and 11. The report will identify

any student who was unable to attend school for ten or more consecutive school days or there is other evidence the student was denied a free appropriate public education because he/she was not receiving transportation services required by a 504 Plan or IEP.  If compensatory services are provided to students after the last day of the school year, the Chicago Board will provide OCR with a report documenting compliance with item #10 for those students by January 1, 2012 or September 30, 2012 as appropriate.

13.    The Chicago Board will identify the students who during the 2009-2010 school year were not receiving 504 Plan or IEP transportation services, and no legitimate rationale exists for the failure to provide 504 Plan or IEP transportation.  Legitimate rationales include, but are not limited to, the student was incarcerated; student was placed in a residential or home/hospital setting; student no longer attended a CPS school; or parent refusal.  For these students for whom no legitimate rationale exists:
A. If any student was unable to attend school for ten or more consecutive school days or there is other evidence the student was denied a free appropriate public education due to the lack of 504 Plan or IEP transportation services, the Chicago Board will convene, with parental consent, an IEP meeting by January 31, 2011 to determine if the student is entitled to compensatory education.  The Chicago Board will provide the compensatory educational services within six months of the determination that compensatory education is necessary, unless the IEP team determines that ESY services are the compensatory services.
B. If any student who was not receiving transportation services and his/her parent had to transport them to and from school until transportation services were provided, the Chicago Board will reimburse the parent in accordance to the Chicago Public Schools Bureau of Student Transportation *Parent Request for Personal Transportation Reimbursement* guidelines. The Chicago Board will provide notice to the parents of these students regarding their right to submit reimbursement claims to the Chicago Board. Parents must submit the appropriate paperwork to BST prior to January 31, 2011.

14.    By April 1, 2011, the Chicago Board will provide OCR with a report documenting compliance with item #13. For compensatory services provided after February 28, the Chicago Board will provide OCR with a report documenting compliance by June 30, 2011.

15.    By August 31, 2011, the Chicago Board will provide training to the principals which includes a discussion about ensuring that transportation is available on the first day of school for all students who require transportation as a related service pursuant to a 504 Plan or an IEP.

Page 6 – Resolution Agreement (05-10-5001)

16.    By September 30, 2011, the Chicago Board will provide a report to OCR documenting compliance with item #15.

The Chicago Board will provide data and other information in a timely manner.  During the monitoring of this agreement, OCR may visit the Chicago Board, interview staff, and students and request such additional reports or data as are necessary for OCR to determine whether the Chicago Board has complied with the terms of this agreement and the provisions of Section 504 and Title II applicable to this compliance review.

The Chicago Board agrees to comply with the terms of this agreement until OCR has released it from monitoring.  OCR will not close the monitoring until it determines that the Chicago Board has fulfilled the terms of this Agreement and is in compliance with the provisions of Section 504 and Title II applicable to this compliance review.

_____          _____
Richard Smith, Chief Officer Special Education          Date
For the Chicago Board


_____          _____
Ryan Solchenberger, Deputy Officer of Operations          Date
For the Chicago Board


_____          _____
Patrick J. Rocks, General Counsel          Date
For the Chicago Board

# EXHIBIT F

112 LRP 37631

### Temecula Valley (CA) Unified School District
### Office for Civil Rights, Western Division, San Francisco (California)
### 09-12-1114
### May 25, 2012

**Judge / Administrative Officer**

David R Rolandelli, Team Leader

## Full Text
## Appearances:

Dear Superintendent Ritter:

The U.S. Department of Education, Office for Civil Rights (OCR), has resolved the above-referenced complaint against Temecula Valley Unified School District (Recipient). OCR investigated whether the District subjected students who have Individualized Education Plans (IEPs) at Vail Ranch Middle School (middle school) to disparate treatment by denying them access to instructional programs in social studies and the sciences.

OCR opened the complaint under the authority of Section 504 of the Rehabilitation Act of 1973 and its implementing regulation. Section 504 prohibits discrimination on the basis of disability in programs and activities operated by recipients of Federal financial assistance. OCR also has jurisdiction as a designated agency under Title II of the Americans with Disabilities Act of 1990 and its implementing regulation over complaints alleging discrimination on the basis of disability that are filed against certain public entities. The District receives Department funds, is a public education system, and is subject to the requirements of Section 504 and Title II.

Upon notification of this complaint, the District acknowledged that beginning in the fall of 2010, the middle school sought to provide special education students an intervention program to improve their English Language Arts and Math skills. The students whose IEP teams determined the intervention

program was appropriate did not receive instruction in science and/or social studies. In February 2012, the District ended this program as it recognized that state law requires all students to receive instruction in the four core academic subjects of Math, English Language Arts, Science and Social Studies and the middle school began scheduling special education students into all core academic classes.

Under the Section 504 regulations, at 34 C.F.R. § 104.4(a) and (b), no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance. The Title II regulations, at 28 C F.R. § 35.130(a) and (b), create the same prohibition against disability-based discrimination by public entities. Under 34 C.F.R. § 104.4(b)(1) and 28 C.F.R. § 35.130(b)(1) a school district may not, directly or through contractual, licensing, or other arrangements, on the basis of disability, (i) deny a qualified disabled individual the opportunity to participate in or benefit from an aid, benefit, or service, or (ii) afford a qualified disabled individual an opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others.

To determine whether an individual has been discriminated against on the basis of disability under Section 504 and Title II, OCR looks at whether there is evidence that the individual was treated differently than non-disabled individuals under similar circumstances, and whether the treatment has resulted in the denial or limitation of services, benefits, or opportunities. If there is such evidence, OCR examines whether the district provided a nondiscriminatory reason for its actions and whether there is evidence that the stated reason is a pretext for discrimination. For OCR to find a violation, the preponderance of the evidence must establish that the school district's actions were based on the individuals disability.

The School replaced instruction in science and/or social studies with math and English intervention for

Copyright © 2012 LRP Publications

special education students who it determined were struggling in these subjects. However, the School provided instruction in science and social studies to all general education students, including those who may have been struggling in math and English. Thus, special education students were subjected to different treatment. The School's proffered reason for the different treatment, to provide special education students with intervention in math and English skills, is not a legitimate, nondiscriminatory reason as State law requires instruction for all students in science and social studies, as well as math and English. Therefore, OCR concluded the preponderance of evidence shows that special education students at the School were treated differently on the basis of disability in violation of Section 504 and Title II.

Once on notice of the School's intervention program for special education students, the District put an end to it. However, because the affected special education students had been denied instruction in science and/or social studies for periods ranging from one to three semesters, resolution of the compliance issue necessitates more than ending the practice. In order to address the Section 504 and Title II compliance issue, the District entered into the enclosed resolution agreement which requires the District to offer each affected student a plan for providing compensatory education. OCR will monitor the District's implementation of this agreement until the terms of the agreement are completed. OCR is informing the complainant of its decision by concurrent letter.

This letter sets forth OCR's resolution of an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

OCR routinely advises recipients of Federal funds and public education entities that Federal regulations prohibit intimidation, harassment or retaliation against those filing complaints with OCR and those participating in the complaint resolution process. Complainants and participants who feel that such actions have occurred may file a separate complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personal information that, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

OCR would like to thank the District for its cooperation in resolving this complaint. If you have any questions please contact Danette Ng at 415-486-5539, Gloria Guinto at 415-486-5519, or me at 415-486-5555.

## Resolution Agreement

## Temecula Valley Unified School District

In order to resolve the issues identified by the U.S. Department of Education, Office for Civil Rights (OCR), in the above referenced complaint filed pursuant to Section 504 of the Rehabilitation Act of 1973 and Title II of the American with Disabilities Act of 1990, the Temecula Valley Unified School District (District), without admitting to any violation of the law, agrees to implement this Resolution Agreement.

### I. Compensatory Education

A. The District will notify the parent(s)/guardians(s) of each student[1] Vail Ranch Middle School provided with additional English Language Arts and/or Math Instruction in lieu of Science and/or Social Studies Instruction during the 2010-2011 and 2011-2012 school years that their child is entitled to compensatory education for these courses. The notice will contain the following:

i. Notice that state law requires school districts to provide a course of study to all students that includes instruction in the four core academic subjects of Math, English Language Arts, Science and Social

Copyright © 2012 LRP Publications                    2

Studies, among others, and a minimum number of minutes of Physical Education.

ii. Notice of the semesters in which Vail Ranch Middle School did not provide their child instruction in Science and/or Social Studies.

iii. An offer to meet with parent(s)/guardian(s) to develop a plan for their child to access compensatory instruction during the summer of 2012, to include a discussion and decision regarding:

1) How the compensatory education will be specifically designed to compensate for the science and social studies instruction their child missed at Vail Ranch Elementary School during the 2010-2011 and/or 2011-2012 school year(s);

2) What, if any, special education services (e.g., specialized academic instruction and transportation) and supports (e.g., assistive technology and/or equipment), are needed for the student to access the compensatory instruction.

3) The locations and dates on which the compensatory education will be delivered;

4) The provider of the compensatory education.

iv. A statement that the compensatory education will be provided to their child at no cost to the parent/guardian.

v. The importance of compensating for the instructional loss prior to the commencement of the 2012-2013 school year.

vi. The name and contact number of a District representative the parent/guardian may contact for questions and assistance.

B. The District will develop a written plan for the delivery of the compensatory education, which will include the following:

i. The name and job title of the District administrators responsible for implementing the plan.

ii. The name of all affected students and the grades they were in during the 2010-2011 and 2011-2012 school years.

iii. A description of how the District will ensure that compensatory education will be designed to align with District curriculum and state standards.

iv. A description of how the District will ensure that all affected students are provided compensatory education in a timely and effective manner.

v. A description of the location and manner through which the compensatory education will be delivered.

vi. A description of how delivery of the compensatory education will be monitored.

## II. Reporting Requirements

A. Within ten (10) days of the date this agreement is signed, the District will provide OCR with the following: the names, transcripts and current IEPs of all students who were not provided with science and/or social studies instruction at Vail Ranch Middle School during the 2010-2011 and 2011-2012 school years, including the eighth grade students who matriculated to high school in June 2011.

B. Within 30 days of the date this agreement is signed, the District will provide OCR with the following:

i. Copies of the letters described in Item I.A.

ii. A draft of the plan described in Item I.B.

C. By July 1, 2012, the District will provide OCR with copies of the individual student plans developed pursuant to I.A.iii. above.

D. By August 31, 2012, the District will provide OCR with documentation that shows that the District has provided compensatory education pursuant to the individual student plans for the loss of science and social studies instructional time during the 2010-2011 and 2011-2012 school years.

## III. Monitoring

The District understands that OCR will not close the monitoring of this agreement until OCR determines that the District has fulfilled the terms of this agreement and is in compliance with Section 504 and Title II.

The District understands that by signing this agreement, it agrees to provide data and other

information in a timely manner in accordance with the reporting requirements of this agreement. Further, the District understands that during the monitoring of this agreement, if necessary, OCR may visit Vail Ranch Middle School, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of this agreement and is in compliance with Section 504 and Title II.

[1]This includes students who were in eighth grade during the 2010-2011 school year and are currently in ninth grade, but excludes students with whom individual settlement agreements have already been reached.

# EXHIBIT G

**57 IDELR 52**

111 LRP 47653

## Santa Monica-Malibu (CA) Unified School District

## Office for Civil Rights, Western Division, San Francisco (California)

### 09-10-1414

### March 18, 2011

### Related Index Numbers

200.052 Shortened School Day

405.030 Discrimination

### Judge / Administrative Officer

Zachary Pelchat, Team Leader

### Case Summary

The decision by staff members to escort SDC students to their buses before the end of the school day so that they could beat the crowds and avoid traffic forced a California district to take remedial action. OCR found that the early dismissals violated Section 504 and Title II. OCR noted that the practice had been going on for two years before being discovered and stopped by a special education coordinator. During that time, teachers and aides escorted the SDC students to the bus between 5 and 30 minutes before the end of the school day. "According to the district, this was done to avoid the end of the school-day crowds of general education students leaving the campus," OCR wrote. Still, OCR explained that a district cannot reduce instructional time for a student with disabilities unless it makes an individualized determination that the student requires a shortened school day. OCR found no evidence that the district in this case evaluated each of the SDC students' needs to determine whether they required an early dismissal. Nor was there evidence that the SDC students were incapable of traveling to the buses alongside their nondisabled peers. As such, OCR determined that the early dismissals were discriminatory. OCR recognized that the district discovered and put a stop to the staffers' practice in September 2010. However, noting that the affected students might be entitled to compensatory education, OCR advised the district to notify each student's parents and determine appropriate compensatory services.

### Full Text

### Appearances:

Dear Superintendent Cuneo:

The U.S. Department of Education (Department), Office for Civil Rights (OCR), has completed its investigation of the complaint referred to above against the Santa Monica-Malibu Unified School District (District). The complaint alleged that the District discriminated against students with disabilities at Santa Monica High School (School). Specifically, the complaint alleged that at the School, the District:

1. did not provide students with disabilities who require District provided bus transportation as a related service based on their disability related needs with an equal amount of instructional time as compared to their non-disabled peers; and,

2. did not provide students with disabilities who are in the School's Transition Program with an equal amount of instructional time as compared to non-disabled students.

OCR investigated the complaint under the authority of Section 504 of the Rehabilitation Act of 1973 and its implementing regulations. Section 504 prohibits discrimination on the basis of disability in programs and activities operated by recipients of Federal financial assistance. OCR also has jurisdiction as a designated agency under Title II of the Americans with Disabilities Act of 1990 and its implementing regulations over complaints alleging discrimination on the basis of disability that are filed against certain public entities. The District receives Department funds, is a public education system, and is subject to the requirements of Section 504 and Title II.

To investigate the complaint, OCR interviewed employees of the District, and reviewed documents

Copyright © 2012 LRP Publications

provided by the Complainant and the District. OCR attempted to interview the Complainant, but was unsuccessful. OCR determined that there is sufficient evidence to support a conclusion that the District was in noncompliance with Section 504 and Title II and the supporting regulation with respect to Issue #1 above. The District, without admitting to any violation of law, agreed to enter into and implement a remedial agreement, which when fully implemented, will remedy OCR's violation determination.

The applicable legal standards, as well as the facts gathered during our investigation, and the reasons for our determination are summarized below.

## Equal Treatment

The Section 504 regulations at 34 C.F.R. § 104.4(a) and (b), no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance. The Title II regulations, at 28 C.F.R. § 35.130(a) and (b), create the same prohibition against disability based discrimination by public entities. Under 34 C.F.R. § 104.4(b)(1)(ii) and 28 C.F.R. § 35.130(b)(1) a recipient public school district may not, directly or through contractual, licensing, or other arrangements, on the basis of disability, afford a qualified disabled individual an opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others.

## Free Appropriate Public Education

The Section 504 regulations, at 34 C.F.R. § 104.33, require public school districts to provide a free appropriate public education (FAPE) to all students with disabilities in their jurisdictions. An appropriate education is defined as regular or special education and related aids and services that are designed to meet the individual needs of students with disabilities as adequately as the needs of non-disabled students are met, and that are developed in accordance with the procedural requirements of §§ 104.34-104.36 pertaining to educational setting,

evaluation and placement, and due process protections. Implementation of an individualized education program (IEP) developed in accordance with the Individuals with Disabilities Education Act (IDEA) is one means of meeting these requirements. OCR interprets the Title II regulations, at 28 C.F.R. §§ 35.103(a) and 35.130(b)(1)(ii) and (iii), to require districts to provide a FAPE at least to the same extent required under the Section 504 regulations.

Under 34 C.F.R. § 104.34(b), in providing or arranging nonacademic and extracurricular activities, including meals, recess periods and counseling, physical recreational athletics, transportation, special interest groups or clubs, or other recreational activities, school districts must ensure that disabled students participate with non-disabled students to the maximum extent appropriate to the needs of the disabled student.

## Issue #1: Whether the District Provided Students With Disabilities Who Require District Provided Bus Transportation Based on Their Disability Related Needs With an Equal Amount of Instructional Time as Compared to Their Non-Disabled Peers

Our investigation showed the following:

- The complaint alleged that disabled students at the School who receive transportation from the District as a related service to meet their disability related needs, were missing class time because the bus schedule caused them to arrive to class late and required them to leave class early.

- District Board Policy 3541.2 regarding "Transportation for Students with Disabilities" states that "[a]rrivals and departures shall not reduce the length of the school day for these students except as may be prescribed on an individual basis."

- According to the District, in "December 2008 the special education teachers who worked with the Life Skills (IS), block class and transition program for 17-22 year olds[1] began delivering students to the buses 5-15 minutes early so that the buses could

depart before the driveway was blocked. On September 22, 2010 a special education coordinator discovered that the special education students who rode the buses were being excused early to allow the buses to depart before the bell. The coordinator immediately took steps to correct this issue so that special education students no longer have an instructional day that is shortened to accommodate the driveway issue."

- School staff told OCR that students with moderate to severe disabilities in SDC who received district provided transportation would be escorted by their aides and teachers from five to 30 minutes before the scheduled end of each school day (3:16pm). Students were escorted to the buses so that the buses were loaded and could drive to the gate to leave right at 3:16pm. According to the District, this was done to avoid the end of the school-day crowds of general education students leaving the campus. This would make it easier for the SDC students to get across the campus and allowed the buses to drive off of the campus with greater ease.

- OCR found that the practice of ending instruction early so that students in the SDC classes could go to the buses had gone on since at least the 2008-2009 school year.

- The School told OCR that some IEP related activities/instruction related to communication and mobility continued while students travelled to the buses.

- OCR found that the early release practice was not discussed in SDC Student IEPs and IEP goals had therefore not been developed specific to this activity.

- This was a practice for all students who received district provided transportation regardless of their individual disability related needs (such as fragility or mobility).

- According to the School, any instructional time lost for SDC students at the end of the day while going to the bus was comparable to the instructional time lost to non-disabled students during passing periods (because the SDC students generally do not have passing periods).

- OCR found that some SDC students do have passing periods, and all students had breaks from instruction during the day, although they were not during an official passing period.

The regulations implementing Section 504 and Title II, at section 104.4(b)(1)(ii) prohibit school districts and other public education providers from providing students with disabilities lesser opportunities to participate in, or benefit from, a benefit or service that is provided to nondisabled students. The regulations specify a number of circumstances under which students with disabilities must receive different educational services from those provided to nondisabled students, in order for their individual needs to be met adequately. The provision of unnecessarily different services, however, is discriminatory (see 34 C.F.R. pt 104, Appendix A). As a matter of equal treatment, students with disabilities may not be provided with inferior facilities, or less qualified teachers than those provided to nondisabled students. For the same reasons, unless an individual determination has been made that a student with disabilities requires a shortened school day, students with disabilities are entitled to a school day that is as long as that provided to their nondisabled peers.

With regard to disabled and non-disabled students of the same age, there is a presumption that they will have equal amounts of instructional time in their school days. As a matter of FAPE there may be individualized determinations that require shorter or longer times for students with disabilities. Here, OCR did not find evidence that any individualized determination was made to establish that SDC students at the School, based on their disability-related needs, either needed a shortened school day, or could not travel to the buses alongside their non-disabled peers after the school-day ended.

With regard to the remaining aspect of this allegation, OCR did not find evidence that busses were regularly arriving to school late, and thereby causing disabled students who rely on district

provided transportation to miss instruction time in the mornings.

## Issue #2: Whether the District Provided Students With Disabilities Who Are 17-22 Years Old in the School's Transition Program, With an Equal Amount of Instructional Time as Compared to Non-Disabled Students

Our investigation showed the following:

- The School operates a Transition Program for students with disabilities who are 17-22 years old, and who have earned a high school certificate of completion.[2] The District describes the Transition Program as a "shorter, more intense instructional day oriented around job training and associated post-secondary life skills" such as "transportation, budgeting, shopping, etc."

- During the 2010-2011 school year, there were 11 students in the Transition Program at the School, with one teacher, 3 classroom aides, and two 1-1 aides.

- The Transition Program starts class at 9:30am each day, and class ends at 3:16pm.[3] Students in the Transition Program receive 295 minutes of instructional time per day (not including lunch), and their entire school-day is 340 minutes from bell to bell (9:30am-3:16pm).

- The general education program for non-disabled and less significantly disabled students provides an average of 323 minutes of instruction per day (class starts at 9:36am on Wednesdays, and at 8:15am the rest of the week).[4]

- Students in the Transition Program travel to workplace settings during the day three days a week for approximately one hour and 45 minutes, and one student attends a trade technical program every day of the week. Students gain work experience such as working with animals, making crafts and products for sale, learning computer and other technical skills, and doing office clerical work. Students also go to the library a couple of days each week, go on trips in the community via school buses about one time a week,

and go on additional trips using public buses. Work assignments and tasks are based on the individual abilities and needs of the students in the program.

- There are no passing periods, so breaks are teacher directed and are generally given after a task or project is completed. Staff told OCR that during breaks, students are asked to do activities that are designed to improve their socialization and other life-skills. According to Staff, during lunch they also do an activity called "circle of friends" which involves the teacher and aides working with students, and targets communication skills.

- There is no program in the District that OCR found for nondisabled students that is comparable to the Transition Program with regard to appropriate age or peer comparisons. The District offers adult education courses, which generally cost $10 and range from about 2.5 hours to 4 hours. These courses include General Education Development (GED) test preparation, and the opportunity to work toward a high school diploma.

As explained above, the regulations implementing Section 504 and Title II, at section 104.4(b)(1)(ii) prohibit School districts and other public education providers from providing students with disabilities lesser opportunities to participate in, or benefit from, a benefit or service that is provided to nondisabled students. However, the Transition Program, which is designed to provide job related skills for students with disabilities who did not receive a diploma due to the severity of their disability related needs, and who are entitled to receive a FAPE through age 22 under IDEA, is a unique program. OCR did not find a comparable program for nondisabled students.

Students in the Transition Program are individuals with disabilities under Section 504, and therefore the District is required (as discussed above) to provide these students with a FAPE under Section 504, as well as under IDEA. As always, in providing a FAPE the District is required to make individualized decisions to meet the disability related needs of students with disabilities. OCR found that broadly,

Copyright © 2012 LRP Publications

the District's Transition Program is designed to meet the specific needs of 17-22 year old students who require additional functional and life skills in order to obtain further employment and life skills. However, through the IEP process, the District must ensure that the Transition Program, including the instructional minutes provided, is tailored as necessary to meet the individual needs of the students served. In some instances, this could include lengthening the instructional day of the Transition Program. Here however, the complaint did not allege any specific facts which would have suggested that the individual needs of any Transition Program students were not being met or were not fully considered in the IEP process, with regard to the amount of instructional minutes provided in the Program.[5]

Therefore, OCR did not determine, by a preponderance of the evidence, that the District's Transition Program provided unequal educational opportunities for students with disabilities, or resulted in a denial of FAPE. OCR does caution the District, however, that additional evidence that such a program is not meeting the individual needs of its students or was not being appropriately tailored to such individual needs, would require a different result.

## Conclusion

OCR reviewed the evidence to determine whether the District was in compliance with Section 504 and Title II with respect to the issues investigated. OCR found that, with respect to Issue #1, the School's practice of having SDC students leave class early to go to the buses was resulting in reduced instruction time for these students. The reduced instruction time was not based on an individualized decision through the IEP process, and therefore violated Section 504 and Title II. OCR did not find sufficient evidence that the District was in violation of Section 504 and Title II with respect to the Transition Program and Issue #2.

OCR notified the District of its conclusions and, without admitting to any violation of law, the District expressed a willingness to collaborate with OCR to resolve OCR's concerns. The District had already ended the practice of having SDC students leave class early to go to the buses in September 2010. The District further agreed to enter into a signed agreement that, when fully implemented, will resolve the issues in this complaint. This agreement requires that the District: (1) notify parents/guardians of students who were denied instruction time as a result of the practice and offer compensatory education for these students; (2) hold an IEP meeting, if requested, for any students whose parents/guardians believe their child requires compensatory education beyond the amount agreed upon by OCR and the District; and, (3) issue a memorandum to all District and site administrators stating that bus arrival and departure times shall not reduce the length of the school day for students with disabilities, except as may be determined on an individual basis, based on a student's individual needs, and as determined by the IEP team.

This concludes the investigation portion of this complaint. The Complainant is being notified concurrently.

OCR routinely advises recipients of Federal funds and public education entities that Federal regulations prohibit intimidation, harassment, or retaliation against those filing complaints with OCR, and those participating in the complaint resolution process, including compliance reviews. Complainants and participants who feel that such actions have occurred may file a separate complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personal information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized

Copyright © 2012 LRP Publications

OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

OCR would like to thank the District for its cooperation in resolving this case, including the Director of Special Education, Dr. Sara Woolverton. If you have any questions, please contact OCR investigator Carolyn Wade at (415) 486-5563, or OCR attorney Brian Lambert, at (415) 486-5524.

[1] Unless otherwise noted, the students with disabilities in the School's Life Skills and Block classes, as well as its Transition Program will hereinafter be referred to as students in the School's Special Day Classes (SDC).

[2] These students were identified as students with disabilities under the IDEA, and based on their disability(ies), are eligible to receive a FAPE through age 22. Because of their disability(ies), these students were on a track to earn a high school certificate of completion, rather than a diploma.

[3] Although, as discussed in Issue #1 above, students left before 3:16pm to catch the bus.

[4] 336 minutes Mondays, Tuesdays, Thursdays, and Fridays (420 minutes bell to bell), and 270 minutes on Wednesdays (340 minutes bell to bell).

[5] Because no such denial of FAPE allegation was included in this complaint, OCR did not conduct a review of every Transition Program student's IEP to determine whether the District failed to engage in an individualized decision with regard to any particular student. OCR also notes that such decisions may fall under the jurisdiction of the California Office of Administrative Hearings, to the extent it may be a placement decision that does not involve a potential procedural violation of Section 504.

## Santa Monica-Malibu Unified School District

### Resolution Agreement

The Santa Monica-Malibu Unified School District (District) agrees to implement this Resolution Agreement (Agreement), in order to resolve the issues being investigated by the U.S. Department of Education, Office for Civil Rights (OCR) in the above referenced case. In agreeing to this plan, the District does not admit to any violation of state or federal law.

I. The District will notify all parents/guardians of students with disabilities in the Life Skills Classes and the bus-riding students in the Block Class who attend Santa Monica High School (School) of the opportunity to receive compensatory extended school year (ESY) services during the upcoming Summer 2011 ESY term (or per item (b) below, the Spring 2011).[1] The written notification will inform parents/guardians that:

a. the compensatory services are optional and are being offered in order to make#up for time that was spent taking students to the buses at the end of each school day at the School, during the previous two years (2008-2009 and 2009-2010) and the first two weeks of the current school year;

b. for students who only attended the School during the current school year (not during the 2008-2009 or 2009-2010 school-year), the compensatory services will consist of 2.5 hours, to be provided during an afternoon in the spring.[2]

c. for students who attended the School during the 2008-2009 or 2009-2010 school year(s), the services will consist of a total of 70 hours, to be provided during an instructional day of 7 rather than 5 hours Tuesday through Friday of each week, and five Mondays of 4 hours and 35 minutes during the regular six-week ESY term;

d. if a parent/guardian believes his/her child requires additional compensatory education services due to his/her unique needs and because he/she missed additional class time as a result of boarding the buses, he/she may request an Individualized Education Program (IEP) meeting to discuss the matter; and

e. in the future, students who need to leave class early in order to board the bus will be identified on an individual basis and appropriate steps will be adopted in the IEP process.

Copyright © 2012 LRP Publications

The District will provide OCR with a draft of the notification by March 9, 2011. Within 20 days of approval from OCR, the District will provide OCR with documentation that the notification has been distributed.

II. The District will offer the compensatory education services described above during the ESY 2011 term, and per item (b), during the Spring of 2011.

The District will provide OCR with a list of the students who received the compensatory services described above during the Summer 2011 ESY term and the Spring 2011 term by August 31, 2011.

III. The District will issue a memorandum to all district and school site administrators stating that bus arrival and departure times shall not reduce the length of the school day for students with disabilities who receive district provided transportation, except as may be determined on an individual basis, based on a student's individual needs, and as determined by the IEP team.

The District will provide OCR with a draft of the memorandum by March 9, 2011. Within 20 days of approval from OCR, the District will provide OCR with documentation that the memorandum has been distributed.

OCR will monitor the District's implementation of all components of this Agreement. The District understands that OCR will not close the monitoring of this agreement until OCR determines that the recipient has fulfilled the terms of this agreement and is in compliance with the regulations implementing Section 504 of the Rehabilitation Act of 1973, at 34 C.F.R. Part 104, and Title II of the Americans with Disabilities Act of 1990, at 28 C.F.R. Part 35, which were at issue in this case.

The District understands that by signing this agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement. Further, District understands that during the monitoring of this agreement, if necessary, OCR may visit the District, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of this agreement and is in compliance with the regulations implementing Section 504 at 34 C.F.R. Part 104, and Title II at 28 C.F.R. Part 35, which were at issue in this case.

[1]This will include students in the transition program attending Santa Monica High School.

[2]These services, and the services called for in (I)(c) below are in addition to the regular ESY services provided by the District.

**Regulations Cited**

34 CFR 104.4(a)
34 CFR 104.4(b)
28 CFR 35.130(a)
28 CFR 35.130(b)
34 CFR 104.4(b)(1)(ii)
28 CFR 35.130(b)(1)(ii)
34 CFR 104.33
28 CFR 35.103(a)
28 CFR 35.130(b)(1)(iii)
34 CFR 104.34(b)

Copyright © 2012 LRP Publications

# EXHIBIT H

**47 IDELR 233**

106 LRP 60797

### Kansas City (MO) #33 School District

### Office for Civil Rights, Midwestern Division, Kansas City (Missouri)

07-06-1115

**August 15, 2006**

### Related Index Numbers

**150.025 Relationship between Misconduct and Disability**

**150.030 Suspension**

**405.030 Discrimination**

### Judge / Administrative Officer

**Alan D. Hughes, Supervisory Attorney**

### Case Summary

Recognizing that a Missouri district developed an appropriate IEP for an elementary school student with an undisclosed disability when the services provided in his 504 plan proved inadequate, OCR nonetheless determined that the district discriminated against the student by failing to provide those 504 services during his 10-day suspension. OCR instructed the district to consider whether its lapse in implementation entitled the student to compensatory education. OCR explained that the student's multiple suspensions, which totaled 26 days over a five-month period, formed a "pattern of exclusion" that amounted to a significant change in placement. The district held an MD review after the student's 10-day suspension in February 2006 and determined that his conduct was a manifestation of his disability. However, OCR pointed out that the district still required the student to serve his suspension after deeming his placement and 504 plan inappropriate. "While the subsequent IEP the district developed ... contains appropriate services for [the student], the evaluation existing at the time of the February suspension showed [the student] needed special services and the district did not provide those services during his suspension," OCR wrote. OCR concluded that the district violated the regulations implementing Section 504 by changing the student's

placement without conducting an evaluation.

### Full Text

### Appearances:

Michelle P. Wimes, Attorney

Spencer Fane Britt & Browne LLP

1000 Walnut Street, Suite 1400

Kansas City, Missouri 64106-2140

Dear Ms. Wimes:

On February 17, 2006, the U.S. Department of Education (Department), Office for Civil Rights (OCR), received a complaint alleging discrimination on the basis of disability against the Kansas City # 33 School District (District), Kansas City, Missouri. This letter is to inform you of our determination regarding this complaint.

Specifically, the complainant alleged the District failed to implement her son's Section 504 Plan by: 1) not allowing her son to work on assignments with a classmate; 2) not having her son meet with someone at school for 5 to 10 minutes a day to ensure that her son had his homework; 3) not informing all staff who work with her son that he has a 504 Plan and what it says; 4) not providing her son with small group social skill training in class or with the counselor; and 5) failing to send home positive notes to encourage and support her son. The complainant also alleged that the District continued her son's suspension even though the District's manifestation hearing determined her son's offense was caused by his behavior. The complainant further alleged she was not provided with a copy of the District's Section 504 Parent/Student Rights in Identification, Evaluation, and Placement until the manifestation hearing on February 21, 2006. This document states that if you disagree with your child's Section 504 Plan you have the right, within 10 calendar days, to request an impartial hearing. The complainant stated that her son has had a Section 504 Plan since September 2005.

OCR is responsible for enforcing:

- Section 504 of the Rehabilitation Act of 1973

Copyright © 2012 LRP Publications

(Section 504), 29 United States Code (U.S.C.) § 794, and its implementing regulation, 34 Code of Federal Regulations (C.F.R.) Part 104. Section 504 prohibits discrimination on the basis of disability by recipients of Federal financial assistance (FFA).

- Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12131, and its implementing regulation, 28 C.F.R. Part 35. Title II prohibits discrimination on the basis of disability by public entities.

As a recipient of FFA from the Department and a public entity, the District is subject to Section 504 and Title II.

## Allegation 1

The complainant alleged the District failed to implement her son's Section 504 Plan by: 1) not allowing her son to work on assignments with a classmate; 2) not having her son meet with someone at school for 5 to 10 minutes a day to ensure that her son had his homework; 3) not informing all staff who work with her son that he has a 504 Plan and what it says; 4) not providing her son with small group social skill training in class or with the counselor; and 5) failing to send home positive notes to encourage and support student.

## Legal Standards

The Section 504 regulation at 34 C.F.R. §§ 104.33(a) and (b)(1) and (1) and 104.35(c) provides:

§ 104.33 Free appropriate public education.

(a) General. A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

(b) Appropriate education. (1) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons

are met and (ii) are based upon adherence to procedures that satisfy the requirements of 104.34, 104.35, and 104.36.

(2) Implementation of an Individualized Education Program developed in accordance with the [Individuals with Disabilities Education Act] is one means of meeting the standard established in paragraph (b)(1)(i) of this section.

§ 104.35 Evaluation and placement.

...

(c) Placement procedures. In interpreting evaluation data and in making placement decisions, a recipient shall (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered, (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the placement decision is made in conformity with § 104.36.

The Title II regulation is interpreted consistent with this Section 504 regulation standard.

## Findings of Fact

The complainant's son attended Mt. Washington Elementary School from February 2004 to March 2006. The complainant's son attended North Rock Creek Korte Elementary School from March 2006 to the present.

On September 15, 2005, the District determined the complainant's son qualified for services under Section 504. On March 3, 2006, the District determined the complainant's son met eligibility criteria for service under an Individualized Education Program (IEP) under the Individuals with Disabilities Education Act. The complainant's son was placed at his neighborhood school, North Rock Creek Korte Elementary School, with 120 minutes of specialized

Copyright © 2012 LRP Publications

instruction daily outside the regular classroom and 30 minutes of counseling per week. The complainant agreed to this placement. OCR compared the services under the Section 504 plan and the IEP. The services the complainant alleged her son was not receiving are not contained in the son's IEP.

## Legal Analysis

In an IEP meeting in March 2006, the District determined the complainant's son should be placed in a more restrictive environment. The complainant agreed to the placement. The complainant's son's new educational placement did not include the services that were previously contained in his Section 504 plan. The District ensured the placement decision for the complainant's son was made by a group of persons knowledgeable about the child and the group was aware of the placement options for the complainant's son as required by the Section 504 regulation at 34 C.F.R. § 104.35(c). Based on this information, the complainant's son was no longer eligible to receive the Section 504 plan services because the services were not required by his IEP.

## Conclusion

Based on the above information, there is insufficient evidence to conclude the District violated the Section 504 and Title II regulations since the Section 504 no longer covered the student plan and currently receives services under an IEP. An IEP team convened in March 2006 concluded that the complainant's son should be placed in a more restrictive environment. The complainant agreed to the placement. The complainant's son's new educational placement did not include the services that were previously contained in his Section 504 plan. The District ensured the placement decision for the complainant's son was made by a group of persons knowledgeable about the child and the group was aware of the placement options for the complainant's son as required by the Section 504 regulation at 34 C.F.R. § 104.35(c). OCR has concluded the District is in compliance with the Section 504 regulation at 34 C.F.R. § 104.35(c) and the Title II regulation

regarding this allegation.

## Allegation 2

The complainant also alleged the District continued her son's suspension even though the District's manifestation hearing determined her son's offense was caused by his behavior.

## Legal Standards

§ 104.35 Evaluation and placement.

(a) Preplacement evaluation. A recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

OCR policy provides if a disabled student receives a series of suspensions that are each of 10 days or fewer in duration which create a pattern of exclusion, this is a significant change in placement under the Section 504 regulation at 34 C.F.R. § 104.35(a). Among the factors that are considered in determining whether a series of suspensions results in a significant change in placement are the length of each suspension, the proximity of the suspensions to one another, and the total amount of time the child is excluded from school. The recipient must then determine using appropriate evaluation procedures whether the misconduct is caused by the child's disability. If the recipient determines the child's misconduct is caused by the disability, the evaluation team must continue the evaluation to determine whether the child's current educational placement is appropriate.

The Title II regulation is interpreted consistent with these Section 504 regulation standards.

## Findings of Fact

According to discipline records provided by the District, during the 2005-06 school year the

Copyright © 2012 LRP Publications

complainant's son was suspended three days in October 2005, two days in November 2005, six days in December 2005, five days in January 2006, and 10 days in February 2006. The complainant's son's suspensions during the two months preceding the February 2006 suspension constitute approximately one-third of the complainant's son's school days.

On February 13, 2006, the complainant's son was disciplined for hitting and kicking his teacher. The complainant's son was suspended for 10 days starting February 13, 2006 and ending February 27, 2006. On February 21, 2006, the District conducted a manifestation hearing. The District's manifestation determination form states the following. "If any items are NO, the 504 team must find the behavior is a manifestation of the student's disability. In order to determine no manifestation exists, all items must be checked YES". The District determined that two of the four items were "NO" (Section 504 and placement were appropriate and supplemental aids and services were being provided). The District required the complainant's son to serve the 10-day suspension. On March 16, 2006, the District held another manifestation hearing and determined the complainant's son's behavior was caused by his disability.

## Legal Analysis

The regulation implementing Section 504 at 34 C.F.R. § 104.35(a) requires that a recipient evaluate a disabled child before making a significant change in placement. Using the legal standards outlined above, OCR first determined whether the series of suspensions constituted a significant change in placement that would require an evaluation.

According to discipline records provided by the District, during the 2005-06 school year the complainant's son was suspended three days in October 2005, two days in November 2005, six days in December 2005, five days in January 2006, and 10 days in February 2006. The complainant's son's suspensions during the two months preceding the February 2006 suspension constitute approximately

one-third of the complainant's son's school days. OCR finds this created a pattern of exclusion that constituted a significant change in placement.

Since the series of suspensions constituted a significant change in placement, OCR next determined whether the District evaluated the complainant's son to determine whether his placement is appropriate. The District conducted a manifestation hearing and determined the behavior was caused by the complainant's son's disability. The manifestation hearing determined the Section 504 plan and placement for the complainant's son were not appropriate. The complainant's son was still required to serve his suspension. While the subsequent IEP the District developed and with which the complainant concurred contains appropriate services for the complainant's son, the evaluation existing at the time of the February suspension showed the complainant's son needed special services and the District did not provide those services during his suspension. Accordingly, OCR finds the District did not follow the requirements of the Section 504 regulation at 34 C.F.R. § 104.35(a) because it significantly changed the complainant's son's placement during the time of the exclusion from school without an evaluation supporting the placement of the son during that time.

## Conclusion

The complainant's son was excluded from the educational environment after a pattern of exclusion that constituted a significant change in placement. The District conducted a manifestation hearing and determined the behavior was caused by the complainant's son's disability. The manifestation hearing determined the Section 504 and placement for the complainant's son were not appropriate. The complainant's son was still required to serve his suspension without any educational services. Based on the above information, the District is in violation of the Section 504 regulation at 34 C.F.R. § 104.35(a). The District needs to convene the IEP team to determine whether the complainant's son needs compensatory services because the District excluded him from services during his suspension.

## Allegation 3

The complainant alleged she was not provided with a copy of the District's Section 504 Parent/Student Rights in Identification, Evaluation, and Placement until the manifestation hearing on February 21, 2006. This document states that if a parent or guardian disagrees with their child's Section 504 Plan, they have the right, within 10 calendar days, to request an impartial hearing. The complainant stated that her son has had a Section 504 Plan since September 2005.

## Legal Standards

§ 104.36 Procedural safeguards.

A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure. ...

The Title II regulation is interpreted consistent with these Section 504 regulation standards.

## Findings of Fact

The District provided a copy of an unsigned letter to the complainant dated April 13, 2005, which stated procedural safeguards were enclosed. The complainant denied receiving this letter. The District also provided a copy of the District's Section 504 Parent/Student Rights in Identification, Evaluation, and Placement (Section 504 Rights), which the complainant signed that she had received on February 21, 2006. On January 4, 2006 and March 7, 2006, the complainant also signed that she received a copy of her procedural safeguards rights.

The District's Section 504 Rights states:

If you wish to challenge the actions of the district's 504/ADA Committee in regard to your child's identification, evaluation, or educational placement, you should file a written Notice of Appeal with the district's 504 Coordinator within 10 calendar days from the time you receive written notice of the 504 Committee's action, a hearing will be scheduled before an impartial hearing officer; and you will be notified in writing of the date, time, and place for the hearing. This Notice of Appeal can be obtained from the District's 504 Coordinator.

On June 8, 2006, the District revised their Section 504 Rights to eliminate the 10-day requirement.

## Legal Analysis

OCR's investigation confirmed the District notified the complainant of her procedural safeguard rights. The complainant signed that she received a copy of the District's Section 504 Rights on January 4, 2006, February 21, 2006, and March 7, 2006.

Until June 8, 2006, the District's Section 504 Rights contained a 10-day limitation on when an individual could challenge the 504 Committee's action. On June 8, 2006, the District revised the Section 504 Rights to eliminate the 10-day limitation. However, the District needs to ensure that the new Section 504 Rights is disseminated to all parents/guardians of students with a Section 504 plan.

## Conclusion

Based on the above information, the OCR's investigation confirmed the District notified the complainant of her procedural safeguard rights. The complainant signed that she received a copy of the District's Section 504 Rights on January 4, 2006, February 21, 2006, and March 7, 2006. There is sufficient evidence to conclude that until June 8, 2006, the District's procedural safeguards notice violated the Section 504 regulation at 34 C.F.R § 104.36 and the Title II regulation by containing a 10-day limitation for challenging the District's 504 Committee's actions. The District's current Section 504 Rights does not contain the 10-day limitation. However, the District needs to ensure that the new

Copyright © 2012 LRP Publications

Section 504 Rights is disseminated to all parents/guardians of students with a Section 504 plan.

The District's counsel informed OCR the District wanted to resolve the issues raised in allegations 2 and 3 of the complaint through a Resolution Agreement. On August 10, 2006, the District signed the enclosed Resolution Agreement to resolve the issues raised in allegations 2 and 3 of this complaint.

OCR will monitor the District's implementation of the Resolution Agreement. Continued compliance with the Section 504 and Title II regulations is contingent on OCR's receipt of documentation showing completion of the actions planned by the District. Failure to implement the Agreement as scheduled will result in OCR immediately resuming the investigation.

Thank you for your cooperation in this matter. OCR is committed to prompt and effective service. If you have any questions, you may contact Diana Goold, Equal Opportunity Specialist, at (816) 268-0561, or 1-877-521-2172 (telecommunications device for the deaf), or by e-mail at Diana.Goold@ed.gov.

## Resolution Agreement

The Kansas City # 33 School District (District), Kansas City, Missouri, submits the following Resolution Agreement to the U.S. Department of Education, Office for Civil Rights (OCR), to resolve OCR Complaint No. 07061115.

The complainant alleged the District continued her son's suspension even though the District's manifestation hearing determined her son's offense was caused by his behavior. The complainant further alleged she was not provided with a copy of the District's Section 504 Parent/Student Rights in Identification, Evaluation, and Placement until the manifestation hearing February 21, 2006. This document states that if you disagree with your child's Section 504 Plan you have the right, within 10 calendar days, to request an impartial hearing. The complainant stated that her son has had a Section 504 Plan since September 2005.

Upon completion of its investigation, OCR has determined the District disciplined a disabled student even though the District determined the behavior that caused the discipline was a manifestation of his disability. OCR also determined the District needs to ensure that the new Section 504 Rights is disseminated to all parents/guardians of students with a Section 504 plan. District officials informed OCR they desire to resolve the complaint through a Resolution Agreement.

The District agrees to implement the following items to resolve this complaint in accordance with the regulation implementing Section 504 at 34 Code of Federal Regulations (C.F.R.) §§ 104.35(a) and 104.36.

1. By October 31, 2006, the District will convene the IEP team and determine if the complainant's son is in need of compensatory education services due to the District's exclusion of the complainant's son from school after a pattern of exclusion that constituted a significant change in placement when the District determined the complainant's son's behavior was a manifestation of his disability and his placement was not appropriate.

2. By October 31, 2006, the District will disseminate their revised Section 504 Parent/Student Rights in Identification, Evaluation, and Placement notice to all parents/guardians of students with a Section 504 plan.

3. By October 31, 2006, the District will provide OCR with written documentation that items # 1 and # 2 have been implemented, including a copy of the IEP team's determination regarding whether the complainant's son needs compensatory education services, the reasons for this determination, and documentation the complainant's son was provided compensatory education if necessary, and documentation that the District has provided notice to all parents/guardians of students with a Section 504 plan of the revised Section 504 Parent/Student Rights.

**Regulations Cited**
34 CFR 104.33(a)

---

Copyright © 2012 LRP Publications

34 CFR 104.33(b)(1)
34 CFR 104.33(b)(2)
34 CFR 104.35(c)
34 CFR 104.35(a)
34 CFR 104.36