**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CHESTER UPLAND SCHOOL DISTRICT, et al.   :      CIVIL ACTION

                          v.                     :

COMMONWEALTH OF PENNSYLVANIA,       :     NO. 12-132
et al.

<u>**MEMORANDUM RE: FINAL APPROVAL OF CLASS ACTION SETTLEMENT**</u>

**Baylson, J.**                                                  **August 15, 2012**

**I.**      **Introduction**

Like opening a window in a dark, stuffy room, a trial brings light and fresh air to the

resolution of disputes, different from any other form of dispute resolution.  The public testimony

of a witness under oath, supported or contradicted by documents and cross examination, is

invaluable.

Even though this case is now before the Court for approval of a class action settlement,

the benefits of a ten-day trial have been immense.  The trial brought out into public light:

- A school system in dire financial straits

- Dysfunctional fiscal controls

- Lack of committed and consistent leadership

- Some public concern, but also a lot of public apathy

- Education of children with disabilities—the principal focus of this case—that did not follow the mandates of federal law

Running a school system is not an easy job.  Competing interests from parents, teachers

and students as well as program demands and financial constraints, pose problems and

challenges.  School board members serve long hours, without pay, and sometimes without any citizen appreciation, either.

Although this Court claims no expertise about education in general or running a school system specifically, this case, and an earlier case, have given the Court insights in to how schools are run.[1]

The Chester Upland School District ("District") faces unique issues and problems, many of which are detailed below.  The District has a long history of a declining tax base, a poor, if not poverty stricken, population, and of low success rates in standard achievement tests and post-secondary education.  Yet, its students still deserve the best opportunities that a nation, state and community can provide.

Out of these problems will grow successes but also frustrations, failures, and, as experience has shown, law suits.  Courts are not necessarily the best places, and certainly not the only places, to resolve these disputes.  However, when negotiation, arbitration and other forms of dispute resolution fail, courts must try to reach reasoned and fair decisions.

When a trial of a case brought as a class action has taken place, and witnesses have been presented, but the trial is followed by a settlement, in some ways this is the best of all possible outcomes.  Public testimony exposed the issues, but the settlement avoids labeling one side as the winner and the other side as the loser.  A class action requires the Court to scrutinize the settlement carefully to make sure that the result is fair to members of the class as they are bound

---

[1]     See Doe v. Lower Merion Sch. Dist., No. 09-cv-2095, 2010 WL 2595278 (E.D. Pa. June 24, 2010); aff'd, 655 F.3d 524 (3d Cir. 2011), cert. denied, 132 S. Ct. 2773 (2012).  In addition, This Court has reviewed many claims under IDEA and Section 504 of the Rehabilitation Act, which involved appeals from administrative decisions concerning the sufficiency of special education for specific students.

by the result.  In the context of a suit concerning the operation of a school system, there is obviously also a great deal of public interest and public concern, if only because there are likely to be consequences for the settlement to students, parents, teachers, and taxpayers in terms of finances, expenses, program content, etc.

This controversy, arising out of the District's near insolvency earlier this year, has resulted in a constructive settlement that has the potential of giving thousands of school children a quality education.  However, the near disaster which threatened to close the District's schools this year will be repeated if the lessons learned are forgotten, and if the conduct which led to the dire financial circumstances, including the District's own acts and omissions, is repeated.

Although this case was brought against the Pennsylvania Department of Education ("Department"), the Court must, in all fairness, note that there was little if any testimony to support the allegations against the Department.  The main thrust of Plaintiffs' case was that the District was underfunded, and that may well be true.  However, as the Court made clear in several hearings and orders in this case, funding to public schools in Pennsylvania is determined by the Legislature, and no judge has the power to require additional funds be appropriated to a school system.  Although the Court appreciates that the parties have voluntarily reached a settlement which will result in infusion of funds into the District, money does not solve all problems.  This settlement must be accompanied by continued supervision by the Department, dedication by local school officials, commitment and participation by parents and teachers, and hard work by the students.

## II.       Procedural History

### A.       Initial Pleadings

Faced with the catastrophic possibility that its empty coffers would necessitate closing

school mid-year, the District, along with its School Board ("Board"), and other related individual

Plaintiffs (collectively, "Plaintiffs") filed an emergency suit in this Court in January 2012.

Plaintiffs sought a temporary retraining order and preliminary injunction enjoining the

Commonwealth of Pennsylvania, Department of Education, Secretary of Education Ronald

Tomalis (collectively, "Commonwealth Defendants"), Governor Tom Corbett, President Pro

Tempore of the Senate Joseph Scarnatti, and Speaker of the House Samuel Smith, from

withholding funding to the District.  After a preliminary hearing, the Court approved the parties'

agreement that the Commonwealth would release $3.2 million to the District to cover the

District's next payroll and other immediate critical expenses. (ECF No. 17).

A host of other parties intervened in the case, including the group of parents of District-

educated students with disabilities that this Court eventually certified as a class ("class") and the

Pennsylvania State Conference of the National Association for the Advancement of Colored

People ("PA-NAACP") (together, "Intervenor Plainiffs"), and the Chester Community Charter

School.

Recognizing the significant public interest in the case, and the need to resolve the issues

before the start of the 2012-13 school year, this Court encouraged the parties to come to a

settlement agreement, and set an expedited schedule for additional pleadings, motions, discovery,

and trial.

Eventually, ruling on a motion to dismiss on subject matter jurisdiction, a more general

motion to dismiss, a motion for summary judgment, and Plaintiffs' voluntary motion to dismiss the legislative branch defendants, the Court narrowed the parties involved in the case, as well as the remaining claims.  Only the executive-branch Commonwealth Defendants remained in the case.

> **B.** **Parties' Joint Efforts to Ensure District Remained Open for 2012-13 School Year**

At a February 1, 2012 hearing, the Secretary of Education agreed to comply with the Court's suggestion that he promptly convene settlement discussions with all parties.  On February 2, 2012, the Court entered an Order to this effect, and directed the Secretary to issue a report and recommendation on the District's financial status by mid-March 2012 if no settlement could be reached. (ECF No. 49).  The Secretary appointed as his Designee Stephen J. Harmelin, Esquire, a distinguished member of the Philadelphia Bar, to facilitate the settlement discussions and then draft the report.  Mr. Harmelin prepared an extremely thorough "Report and Recommendations to the Secretary of Education Regarding Funding for Chester Upland District and Charter Schools for 2011-12 Fiscal Year."  The Secretary then adopted this Report as his own "Report and Recommendation Regarding Funding for District and Charter Schools Serving Children in the Chester Upland School District (March 1 - June 30, 2012)" ("Report") (ECF No. 81).

Constrained by the fact that he could not increase the Commonwealth's remaining appropriation to the District for the 2011-12 school year, nor could he resolve the pending legal claims, Mr. Harmelin nevertheless endeavored to prioritize funding among the relevant District-run schools and charter schools.  Report at 1-4.  In preparing the Report, Mr. Harmelin was assisted by Public Financial Management ("PFM"), a financial consultant firm the Department

retained to assess the District's fiscal performance.  Id. at 1.  PFM discovered a number of inefficiencies and other problems within the District's financial infrastructure, which are detailed later in this Memorandum.  Id. at 28-30.  Strikingly, the District's spending practices caused Mr. Harmelin "to conclude that the District's former leadership team adopted the strategy of failing to pay the District's known financial obligations; redirecting those funds to pay other expenses that were less essential; and dealing with the consequence of this conduct only when the funds appropriated to [the District] inevitably ran out."  Id. at 12.  He further reasoned that "[i]t is not unreasonable to infer that the District leadership consciously determined that PDE could not recoup money that had already been spent and believed that it would leave the Commonwealth with no option but to locate additional, non-appropriated funds in order to avoid a catastrophic shutdown of the District's schools."  Id.  Mr. Harmelin did acknowledge some "necessary and often painful spending cuts" the District implemented.  Id.

Mr. Harmelin reviewed the available funds, essential costs, and apparent opportunities for savings.  He then recommended how the District's remaining state subsidy should be divided among the District-run schools and relevant charter schools, including recommending that the Commonwealth pay directly certain creditors such as the Delaware County Intermediate Unit, which provides special education services to some of the District's students with disabilities.  Id. at 3.  Mr. Harmelin recognized that the funds he suggested the Commonwealth should pay the District exceeded the District's remaining state subsidy for 2011-12, and consequently urged the Secretary to use up to $4.5 million in unallocated state "empowerment funds" to bridge that funding gap.  Id. at 4.  Mr. Harmelin also proposed that, as a cautionary measure, a third party receive the designated funds and apply them to expenses approved by the Commonwealth.  Id. at

3-4.

On March 28, 2012, Defendants filed a motion requesting the Court to establish a process for disbursement and expenditure of funds in a manner consistent with the Report. (ECF No. 101). Defendants contended that such a process was needed to further the parties' shared objective that the District schools continue to operate through the end of the 2011-12 school year. After receiving input from all counsel, the Court entered an Order setting up a procedure for processing payments from the Department to the District to cover the costs of critical vendors. (ECF No. 117).

The District and Department were each required to designate a representative to communicate regularly and negotiate the applicable funding issues. The protocol also provided that any disputes should be resolved by an agreed-upon arbitrator or the Court. The District designated its Chief Financial Officer, Mr. Robert Bruchak, and the Department designated Dr. Carolyn Dumaresq, Deputy Secretary for Elementary and Secondary Education. At trial, Mr. Bruchak testified that he never had to resort to arbitration as a result of the Department's unwillingness to pay a vendor the District identified as critical. To the parties' great credit, they were indeed able to work through all funding issues and keep the District's school doors open through the end of June.

### C.    Class Certification

On April 25, 2012, the Court certified a class and two sub-classes pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure (ECF No. 137). The class sought only injunctive relief. The Court appointed Michael Churchill and Sonja Kerr of the Public Interest Law Center of Philadelphia ("PILCOP") to serve as class counsel ("class counsel"). After

Defendants moved for reconsideration of the class definition (ECF No. 141) and class counsel

stated that they did not object to revising the class definition, on May 7, 2012, the Court entered

an Order (ECF No. 155) modifying the class definition to include the following individuals:

> All parents of students who attend Chester Upland School District
> who are obtaining or are eligible to obtain services under the
> IDEA/and or are protected by the Rehabilitation Act, (including
> rights to child find evaluations and other services), excluding
> parents of students attending a charter school.

T.F., a parent of a child receiving special education services in the District, became the sole

named class representative.

### D.    Trial and Settlement

In May 2012, the Court held a ten-day bench trial on Plaintiffs' and Intervenor Plaintiffs'

claims arising under the Individuals with Disabilities Education Improvement Act[2] ("IDEA"), 20

U.S.C. § 1400 et seq., and Section 504 of the Rehabilitation Act[3] ("Section 504"), 29 U.S.C. §

794, as to the 2012-13 school year only.[4]  Below, the Court has summarized the trial evidence.

---

[2]    As explained in previous Memoranda in this case, the IDEA requires states that
receive federal funding to implement "a policy that ensures all children with disabilities the right
to a free appropriate public education [("FAPE")]."  T.R. v. Kingwood Twp. Bd. of Educ., 205
F.3d 572, 576-77 (3d Cir. 2000) (quoting 20 U.S.C. § 1412(1)). Students with disabilities must
receive FAPE in the least restrictive environment.  Id. at 577.

[3]    Section 504 prohibits programs that receive federal funding from discriminating
on the basis of disability.  P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009).

[4]    The following specific claims were before the Court:
(1)    Plaintiffs' claim that Defendants' reduced funding to the District would
"prevent the School District from providing educational services to special
education and regular students in the School District, effectively requiring
the closing of schools in the School District." Plaintiffs averred that the
subsequent school closings would trigger violations of the IDEA,
including the requirement that all students with disabilities be provided a
free appropriate public education ("FAPE").

After the testimony in the bench trial concluded, but before the parties made their closing arguments, the parties informed the Court that they had reached a settlement on all claims, including the class claim.  At a conference in the Court's chambers on July 27, 2012, the parties presented the Court with a copy of the settlement ("Settlement Agreement").  The settlement terms are outlined below.  During a hearing held on the record the same day, the parties discussed the form of notice to be made to the class.  The Court the approved the proposed settlement on a provisional basis and authorized notice to the class members. (ECF No. 242).

On July 30, 2012, Plaintiffs and the class submitted a Joint Motion for Provisional Approval of Settlement Agreement (ECF No. 243), which this Court will treat as a motion for final approval of the settlement.  No member of the class filed an objection to the proposed settlement.  Some parties filed comments on the settlement, which are discussed in detail below. The Court held a fairness hearing on August 15, 2012.  For the reasons that follow, the Court APPROVES the class settlement agreement.

## III.   Description of the Proposed Settlement Agreement

Under the Settlement Agreement, Defendants shall make direct payments to vendors and other payees in the amount of $20.5 million to cover the District's debt as of June 30, 2012. Without these payments from Commonwealth Defendants, the District expected it would have to

---

(2)   Plaintiffs' claim that the Pennsylvania special education subsidy payment formula (P.S. § 25-2509-5) violates the IDEA and Section 504.

(3)   Plaintiffs' claim that Defendants have violated the IDEA by failing to use federal IDEA funds to support special education services for students with disabilities in the District.

(4)   The claim brought by the class and the PA- NAACP that Defendants, as well as the District as a third party defendant, would violate the IDEA rights of students with disabilities if the District were to close its doors or change services to students with disabilities outside of the IEP process.

carry this debt into the 2012-13 school year.  In addition, the Commonwealth will give the

District an addition $9.7 million to fund services in the 2012-13 school year.

     In return for these funds, the District has promised to substantially implement the "2012-

13 Special Education Enhancement Schedule," attached to the Settlement Agreement at Exhibit

A, which consists of target deadlines for specific improvements to the District's special

education program.  These improvements include hiring a Director of Special Education,

additional Special Education Supervisor, school psychologists, a special Education Assistant for

ACCESS funds, guidance counselors, and addition special education staff members.

     The Commonwealth Defendants have also agreed to designate and fund a Special

Education Officer ("SEO") to work on-the-ground in the District.  The SEO must be "an

individual with significant experience in special education and Section 504."  The Settlement

Agreement charges the SEO with "the authority to direct such action within the District as is

necessary to ensure a free appropriate public education for the District's students with

disabilities."  The SEO will monitor, among other things:

     (1) staffing to ensure to ensure the provision of FAPE;

     (2) revising the District's Special Education Plan and Special Education Manual, as well as completing implementation of the CUSD's IEP Writer Tracking Database;

     (3) timeliness of initial evaluations and re-evaluations, authorization of Independent Educational Evaluations, and the provision of functional assessments and behavior intervention plans;

     (4) timeliness and appropriate IEP development, with appropriate progress reporting;

     (5) provision of education in the Least Restrictive Environment; and

     (6) provision of extended school year programming.

The SEO will also serve as a resource to class members and class counsel, and will provide the

10

parties monthly reports on the provision of FAPE in the District.

The class, as well as the other Plaintiffs, have also agreed to discontinue the present litigation as well as a host of related legal proceedings in the Pennsylvania Commonwealth Court and other fora.  This Court does retain limited jurisdiction of this matter until June 20, 2013 to hear any complaints that the Settlement Agreement is not being implemented on a class-wide basis, although the Settlement Agreement sets up a procedure for the parties to attempt to resolve any conflicts internally before class counsel seeks Court enforcement of the Settlement Agreement.

Individual class members who believe their rights under the IDEA or Section 504 have been violated maintain the right to file due process hearings or complaints through the Commonwealth's administrative processes.

On top of the $20.5 and $9.7 million the District will receive, the Commonwealth will pay class counsel $260,000 in fees and expenses, which counsel represents constitutes a "substantial discount" from the lodestar.

## IV.    Standing

The Court previously reserved decision on the question of which Plaintiffs and Intervenors have standing to pursue their claims**.**  The Court concludes and Defendants do not dispute that the certified class has standing.  See Defs.' Proposed Findings of Fact, Legal Argument, and Proposed Conclusions of Law (ECF No. 236) at 20 & n.7.  The IDEA provides a private right of action to children with disabilities and their parents.  Lawrence Twp. Bd. of Educ. v. New Jersey, 417 F.3d 368, 371 (3d. Cir 2005).

To have standing, a plaintiff must satisfy three elements:

> First, the plaintiff must have suffered a concrete, particularized injury-in-fact, which must be actual or imminent, not conjectural or hypothetical.  Second, that injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, the plaintiff must establish that a favorable decision likely would redress the injury.

Toll Bros., 555 F.3d at 137-38 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)) (internal quotation marks and citations omitted)).

In a class action for prospective relief, such as this, to satisfy the standing requirements, only one member of the class must demonstrate a "sufficiently real and immediate" threat of injury.  McNair v. Synapse Group Inc., 672 F.3d 213, 223 (3d Cir. 2012) (quoting Roe v. Operation Rescue, 919 F.2d 857, 864 (3d Cir. 1990)).  In this case, T.F., the only class member to testify, detailed the ways in which her son has been already deprived of special education services.  Below, the Court describes the other evidence of special education rights violations that occurred during the 2011-12 school year.  To be sure, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."  Id. (citations omitted).

Still, troubling evidence of the District's ongoing financial problems, including Mr. Bruchak's testimony that the District would be broke by January 2013, and the lack of any final plan from the Department for providing special education services in the least restrictive environment in the event of such a closure, arose at trial.  The Court consequently finds that the prospective injury to the class, in the form of imminent violations of their rights under the IDEA and Section 504, is "sufficiently real and immediate" to establish standing.

Having determined that the class has standing, and having found previously that the Court possesses jurisdiction over the subject matter, the Court will proceed to consider the proposed class settlement. Because the Court examines the fairness of the settlement only as it pertains to the class, and not any individual parties, the Court need not reach the issue of whether the District, the PA-NAACP, or other Plaintiffs outside the class possess standing.

## V.    Review of the Evidence Presented at Trial

Although the Court refrains from making formal factual findings at this stage, a review of the evidence presented at trial will provide a baseline from which to judge the fairness of the settlement, and hopefully aid the parties and the citizens of Chester Upland in avoiding the problems that led to this suit being filed.

### A.    The District's Demographics

The District has a total school-age population of approximately 7,000 students, who reside in the City of Chester, Township of Chester, or the Borough of Upland, in Delaware County, Pennsylvania. Approximately 3,500 children attend schools run by the District, while roughly fifty percent of the students eligible to attend District-run schools have chosen to enroll in charter schools. About 2,800 students attend Chester Community Charter School, 350 attend Widener Partnership Charter School, and 350 attend cyber charter schools.

Relevant to this case, the District has an elected school board, of which Ms. Wanda Mann is the President. Dr. Tony Watson is currently Acting Superintendent, Dr. Thomas Persing is Acting Deputy Superintendent, Mr. Robert Bruchak is Chief Financial Officer, and Ms. Mary Payne is the Special Education Supervisor.

13

### B.      District's Financial Troubles

When this case commenced, the District alleged it was on the verge of financial collapse, and the evidence at trial supports this allegation.  However, the District is somewhat responsible for its financial crisis.  Even though the District was losing many students to charter schools, it was very slow to downsize and reduce fiscal outlays, despite knowing that fewer students would equate to a reduced subsidy from the Department.  During the 2011-12 school year, the District struggled to pay its bills.  Many vendors, including some of those providing special education services to children with disabilities served out-of-district, threatened to withdraw services for lack of payment.  Critical services, such as water and power, were in danger of being shut off.  As a startling example of just how bad things got in the District, at one point—before the state began providing extra support to the District—an unpaid fuel vendor cut off supplies, forcing the District to siphon off diesel from school buses with full fuel tanks to feed into buses with empty tanks in order to transport the students home.  Without drastic intervention, the District expected to owe roughly $28.5 million to vendors, including charter schools, at the close of the 2012-13 school year.

The District presented testimony that it made some "tough choices" in response to the declining student population and the budget crisis.  Although the District did not cut athletics or transportation, it eliminated enrichment programs such as music, art, language courses, advanced placement courses, extra-curricular activities such as band and chorus, and reduced the kindergarten from a full to half day program.  It also brought its alternative education program in-house to save money.  Mann Dep. Tr. 65:13-16.  In addition, the District closed two school buildings, allowing it to discontinue rent payments on a leased building.  At the time of trial, Mr.

Bruchak and Dr. Persing had also begun to look at other potential sources of cost savings or increased revenues as they planned for the 2012-13 budget.

The District was also forced to slash its teaching staff—115 teachers and 84 support staff were laid off; however, some number of those employees were recalled in order to comply with state caseload standards and special education law.  Class size increased as a result of the cuts, in some cases to approximately 40 students per class.  The District additionally froze the salaries of all remaining staff, instituted a day a month of "take back" from administrators, and chose not to rehire for certain administrative positions that became available.

The District's financial problems are deep-seated, dating back to at least the early 2000s.  For some period of time during the previous decade, the District was governed by a state education empowerment board.  When the District's elected School Board regained control of the District on July 1, 2010, the District was already $3.1 million in the red.  The budget for the 2011-12 school year was also $17 million less than the previous year's, due to cuts in state and federal funding.

Approximately half of the District's tax-base is exempt, and roughly twenty-nine percent of owed taxes are delinquent each year, further contributing to the District's financial plight.  While Mr. Bruchak and Dr. Persing intended to recommend a tax increase to the Board, under a Pennsylvania law known as "Act 1," the District would only be able to implement a marginal increase in taxes.  While there are exceptions to the Act 1 cap on tax increases, there was conflicting evidence at trial as to whether Chester Upland would be eligible for such an increase, and this Court entered a factual finding on the record that a tax increase is not a viable solution to the District's budget crisis.

15

The District's finances have been exacerbated by the exodus of its students to local and cyber charter schools.  Charter schools are funded out of the District's state appropriations.  The District has to pay the charter schools approximately $9,800 per student in the regular education program and approximately $24,000 for a student receiving special education students.  This amount does not vary based on the charter schools' actual costs or on the needs of the child.  On account of its financial struggles, in the 2011-12 school year, the District stopped payments to the charter schools in whole or part, and the state began making direct payments to the charter schools out of the District's subsidies.[5]

The District also received an $8.8 million loan from the state prior to the 2011-12 school year, which the state recouped in July 2011, depleting the District's available cash flow even further.

---

[5]     Chester Community Charter School (CCCS) and parents of students at that school were originally a part of this case, having moved to intervene. The Court ruled that it did not have subject matter jurisdiction to consider their claims that the Commonwealth Defendants and District had violated the Pennsylvania charter school law.  (ECF No. 91).  The parents of students at CCCS then withdrew their one remaining claim, which had arisen under the IDEA.  Despite these parties' absence, the extent to which the District's debt to the charter schools contributed to its dire financial condition was the "elephant in the room" throughout the case.

The charter schools were able to pursue their state-law claims in the Pennsylvania Commonwealth Court and Pennsylvania Supreme Court, all of which actions have apparently been settled along with this case.

The Court is well aware of Pennsylvania's education policy, which is not only to allow, but fully support, emerging charter schools.  No doubt, competition in education, as in most endeavors, can be healthy.  Parents and students, who have choices about education suppliers, should enjoy the benefits of competition.  Nonetheless, the evidence in this case shows distinct financial burdens on school districts such as CUSD from the requirements of Pennsylvania law requiring financial support for charter schools out of school districts' budgets.  The Court has no authority to change this, but recommends this topic be analyzed closely by the executive and legislative branches in Pennsylvania because the state required allocation of significant funds to charter schools will obviously have an adverse impact on the public schools, particularly as to children with disabilities.  Cf. Report at 7-9.

### C.    Special Education Funding

Dr. Bruce Baker, one of Plaintiffs' witnesses and an expert on special education funding, explained how, in his opinion, the Pennsylvania special education funding formula disadvantages the District.  For example, the state special education subsidies derive, at least in part, from an assumption that sixteen percent of the District's students receive special education services, which is known as the average daily membership ("ADM").  As a result, Dr. Baker opined, because the District's special education population is roughly twenty-two percent—which is significantly higher than the assumed sixteen percent—the District receives $1.9 million less per year in state special education subsidies than it would receive were the subsidy calculated based on the actual special education student population.  5/29/12 Tr. 28:3-8.

The formula's assumption that sixteen percent of the student body qualifies for special education also drives up the amount that the District must pay charter schools per special education student.  As Dr. Baker explained, the charter schools are paid based on an assumed cost-per-pupil that is calculated by dividing the total cost of special education by the assumed ADM.  According to Dr. Baker, this results in the District owing about $24,000 to charter schools for each special education student, rather than the $20,000 it would owe if the cost were calculated using actual numbers of special education students in the District.  Dr. Baker testified that this causes a loss to the District of approximately $2.48 million per year. 5/29/12 Tr. 39:8-40:22.  If the charter schools were serving special education students with more severe disabilities, the potential $2.8 million loss would be somewhat diminished; however, Dr. Baker concluded that in fact the charter schools were serving students with less severe, and therefore

less expensive, disabilities than the District served.[6]  5/29/12 Tr. 43:10-13, 46:5-21, 49:11-22, 50:19-25.

The District may also be negatively impacted by the Commonwealth's decision to use regional Intermediate Units ("IUs") to direct federal IDEA dollars to the school districts.  As described by Defendants' witnesses, Ms. Hozella and Mr. Girolamo, the Commonwealth receives roughly $23 million from the federal government in relevant IDEA funds.[7]  The Commonwealth allocates funds to the regional IUs calculated as a base amount, plus additional funds, of which eighty-five percent is distributed based on the total number of children in private and public schools, and fifteen percent is allocated based on the number of children in the region living in poverty, which is calculated by the free and reduced lunch schedule.  The IUs then divide up that money among the districts in their region, based on the number of special education students in each district.  Consequently, a school district like Chester Upland, which is more impoverished than most other districts in its region, receives only some of the benefit of the increased funding that flows from the poverty allocation.[8]  6/18/12 Tr. 23:10-26:23.

---

[6]        Mr. Ralph Girolamo, an expert testifying for Defendants, countered Dr. Baker's opinion about the severity of disabilities within the District by noting that the PennData Report the District provided to the Commonwealth on December 1, 2011, lists sixty percent of special education students as "learning disabled," which he testified is a milder disability category.  He stated that the needs of students in the other categories the District identified—emotionally disturbed, retarded, and within the autism spectrum—will vary.  The District did not identify any students as falling into the "deaf/blindness," "multiple disabilities," "orthopedic impairment," or "traumatic brain injury" categories, which are more severe disabilities.  He did not compare this information to reports from other school districts in the state. 6/16/12 Tr. 37:3-40:9.

[7]        These funds are allotted under IDEA, Part B, which pertains to school-aged children (ages 3-21), as set forth in 34 C.F.R. § 300.705.

[8]        Mr. Girolamo pointed out that this funding structure has been implicitly approved by the U.S. Department of Education ("DOE").  In his previous work, Mr. Girolamo worked to

The District receives certain state and federal dollars specifically targeted to fund special education services, but numerous witnesses confirmed that school districts in the Commonwealth must utilize multiple sources of funding to cover their special education costs. There was conflicting testimony about how much money the District therefore has in its budget to provide special education, and what is the average cost of educating a child who receives special education services.

Mr. Bruchak estimated that the District receives $3,289,061 to pay for special education. He cited the state special education subsidy, and federal IDEA and Access funds as the sources directly targeted at providing these services. This resulted in an allocation of only $4,475 per special education student in the District-run schools. Mr. Bruchak then used the budgeted special education budget to estimate that it costs the District on average $22,914 to educate a student who receives special education services. Mr. Bruchak's numbers are unfortunately only estimates, and do not take into account the other funding sources school districts can use to cover the costs of special education. These other funding sources, including the state Basic Education Subsidy and tax revenues, are not specifically targeted at special education, but numerous witnesses testified that it is expected and indeed routine for school districts in the Commonwealth to utilize all of their funding sources to pay for special education.

In the opinion of defense expert Mr. Ralph Girolamo, however, the District should have

---

ensure Pennsylvania received what it was owed in federal IDEA funds. Each year, every state has to submit an application for the use of IDEA, Part B funds. Mr. Girolamo testified that the application includes a "state plan budget" which lays out in broad categories how the state anticipates using those funds. The Commonwealth's method of distributing IDEA, Part B funds through the Intermediate Units is included in the Commonwealth's state plan. DOE has implicitly approved this funding structure by providing funds based on the Commonwealth's state plan. 6/18/12 Tr. 23:10-26:23.

enough funds to provide special education in the 2012-13 school year.  6/18/12 Tr. 58:1-6.  Mr. Girolamo used the District's proposed 2012-13 budget to calculate that the District would in fact have an average of $21,375 per special education student educated in the District-run schools. However, Mr. Girolamo did not take into account the huge amount the District owed to vendors that would carry forward into the 2012-13 school year.[9]

### D.   Deficient Internal and Local Financial Controls

Throughout the trial, it became clear that the District's financial woes resulted in substantial part from the District's own financial mismanagement.  Mr. George Crawford, a consultant with over thirty years of experience in school district business administration, worked directly with various administrators in Chester Upland in 2012, including Mr. Bruchak.  Mr. Crawford testified that he has never found the District's cash flow reports credible—he repeatedly found errors in the revenues and expenditures listed.

Defendants' expert, Mr. David Sallack, whom the Court accepted as an expert in the area of public school finance, is a principal of Public Financial Management ("PFM"), which spent ten days investigating the District's finances before producing a report in March 2012.[10]  Mr. Sallack opined that the District made three crucial errors, such that it is impossible to determine whether a lack of funding was the cause of any deficiencies in special education.  Specifically, he found that the District failed to implement an effective budgeting process, failed to properly

---

[9]   The fact that the settlement provides for direct payment of these outstanding bills is a major reason to approve the proposed settlement.

[10]   As noted above, the March 12, 2012 "Report and Recommendations to the Secretary of Education Regarding Funding for Chester Upland School District and Carter Schools for 2011-12 Fiscal Year" (ECF No. 81) prepared by Stephen Harmelin, Esq., as the Secretary of Education's Designee, cites many of the PFM findings.

administer the budget, and failed to maintain accurate and timely information about revenues and

expenses during the budget year.  5/29/12 Tr. 133:23-134:7.

PFM documented a series of troubling shortfalls in the District's financial accounting

methods, including the following:

(1)     The District had not reconciled the checks it issued against those it put in the
bank, which effectively precludes it from knowing how much money it has available and from
being able to tie its balances back to legitimate expenditures.  At the time of trial, the District had
just begun to address this problem.  Mr. Crawford also noted that the lack of bank reconciliations
was hindering the District's ability to create an accurate budget for the 2012-13 school year.

(2)     There was no effective connection between human resources and payroll in the
District.   Mr. Sallack explained that this prevents the District from budgeting accurately.
Remedying this disconnect could also lower costs.  For example, appropriately controlling the
use of staff leave time cuts down on the need for substitutes and overtime pay.  As Dr. Dumaresq
explained, even if the District has policies and protocols, it cannot implement them without data
– e.g. if it has a policy that an employee can only take a certain number sick days but then does
not track the number of sick days an employee takes, it cannot enforce the policy.  While Ms.
Chapman, the District's Director of Human Resources, explained that the District has some
informal mechanisms to check these things, no formal system exists.

(3)     The District lacked an accurate budget for 2011-12.  The District also lacked
sufficient information about its finances to accurately budget for 2012-13.

(4)     The District failed to maintain concurrent and accurate accounting records for
what its revenues and expenditures are.

(5)     The District did not separately account for state and federal funding sources.  Mr.
Sallack testified that this is significant in three ways: (1) the local education agency is
accountable for spending federal funds and there are penalties for inappropriately using federal
funds, (2) if the District does not document its use of funds, it cannot draw them down; and (3)
the District could inadvertently over-spend the federal dollars on non-mandated programs.

(6)     At least through March 2012, the District failed to prepare monthly financial
reports. The District therefore also failed to provide any monthly statements to the Board.

(7)     The District did not submit an Annual Financial Report ("AFR") for 2010-11,
despite the fact that the AFR was due to the Department of Education on October 1, 2011.
Failing to timely submit an AFR is significant because: (1) submitting the AFR is legally
required and financial penalties can be imposed; (2) the AFR is needed to set up a baseline for
revenues and expenditures; and (3) the Department of Education needs the information to

21

determine distribution of its funds.  Mr. Bruchak testified that he had not submitted the AFR because he was uncomfortable with the numbers in the District's accounting records.

(8)     The District lacks a plan to deal with financial and management issues in the future.

In a March 2012 report on the 2010-11 school year, the District's independent auditor found many of the same problems.  While the District has started to address some of these issues, and Mr. Crawford had no reason to believe the District was not committed to following through on its promise to improve its accounting processes, the District has not resolved the issues. Importantly, Mr. Sallack determined that the District had not even created an effective action plan for remedying the problems identified in the audit report.

A lack of involvement and oversight by the Superintendent and the Board has also contributed to the District's financial crisis.  Mr. Sallack found that the Superintendent did not take appropriate action to inform the Board of the full extent of the District's budget problems. Expert Report of David Sallack (Defs.' Ex. 27) at 16.  In addition, the Board was uninformed about the District's finances because it did not require or receive monthly updates.  Significantly, although at some point the Board learned that checks were being drawn up for payment but not submitted to vendors, the Board never took steps to investigate or remedy this.  Mann Dep. Tr. 96:9-13, 98:12-16, 99:3-6, 100:22-24, 101:1-7, 15-24, 102:1-4, 112:17-24, 113:1-12, 114:1-6, 115:6-24, 116:1-3, 120:3-8, 124:8-16, 126:13-23, 127:8-17, 132:11-16, 136:10-17 138:2-5, 18-23.  The Board did not hold a non-public meeting to discuss the District's 2012-13 budget until April 16, 2012, which only four of the nine Board members attended. 5/9/12 Tr. 118:16-119:4, 119:14-16; 5/16/12 Tr. 175:3-176:19.  The Board also never held a meeting to discuss the findings of the internal auditor for the 2010-11 school year. Mann Dep. Tr. 148:12-17.

Mr. Sallack explained that the Board is responsible for approving the District's budget. In Mr. Sallack's opinion, the District is not engaged in responsible budgeting for 2012-12.  It has failed to comply with a series of best practices for budgeting, including:

(1) having a deep understanding of each source of revenue;

(2) developing a detailed budget calendar;

(3) budgeting for multiple years at a time; and

(4) developing both and operating and capital budget.

There are also no budgets assigned to individual schools.

In the spring of 2011, Dr. Dumaresq and other Department employees provided advice to the Department about making curriculum changes to be most cost-effective.  For example, when a district is in financial trouble, it should eliminate curriculum offerings that are not mandated, or are poorly attended.  The District did not respond.

In addition, the District has contributed to its own financial problems through poor decision-making and a lack of consistent leadership.  For example, through the PlanCon program, the District could seek state reimbursement for building or renovating school buildings. Dr. Dumaresq testified that the District was eligible for PlanCon funds but did not apply for them.  Similarly, the federal ACCESS program would reimburse the District for certain medical expenses for qualifying students with medical conditions, and the National School Lunch Program would reimburse the District for the costs of lunch for low-income children, but at the time of trial, the District had not filled out the paperwork to obtain all of the funds it could.  The Commonwealth has already begun to assist the District in filing the required forms.  ACCESS and free lunch reimbursement do, however, require parental consent, which has prevented the

District from filing the appropriate paperwork in some cases.

In addition, at one point the state withheld federal funds from the District because the District did not have an appropriately elected, commissioned Superintendent as required, despite being warned about this by Dr. Dumaresq.

The District did not cut athletics, and although this is at least in part because the expensive football equipment—including helmets priced at $1,500 a head—had been purchased before the Board considered cutting the athletic program, there is no evidence the District undertook any formal cost-benefits analysis with respect to athletics.  <u>See</u> Mann Dep. Tr. 65:17-24, 66:3-18.  The District did not cut its transportation budget either, despite the large reduction in the number of students.

While some efforts were made to consolidate buildings and sell off others, the District has not undertaken a formal facilities assessment and the Board has chosen to avoid certain school consolidations for fear the community would "get[] upset."Mann Dep. Tr. 77:7-13, 78:10-12.

There is some good news.  The District, through the efforts of new members of its administration, made great strides in 2011-12 toward improving their business accounting and other processes.  The Commonwealth also stepped in to provide an enormous amount of direct assistance to the District by providing funds to pay critical vendors as well as other support, including two on-the-ground consultants.  A financial software package the Commonwealth paid for will help get the District's accounting practices in order.  The Court credits Mr. Bruchak in particular for improving the District's accounting systems; however, unfortunately, at the time of trial Mr. Bruchak had already submitted his resignation.

### E.       Denials of Special Education Services

At trial, different witnesses presented different estimations of the number of children

receiving special education services in the District.  The most reliable number is 735 students,

which Stephen Vaughn, the District's Director of Child Accounting, reported as the correct count

as of May 2012.

Dr. Kenneth Thurman, an expert in special education who testified for Plaintiffs, cited

various shortfalls in the District's special education program, and Plaintiffs' fact witnesses

provided further evidence of disruptions in special education services.

Due to the drastic staffing cuts, the District now has far fewer special education teachers

and support staff than in previous years.  There is only one Special Education Supervisor—Mary

Payne—while there were two in the 2010-11 school year, and there is no longer a Director of

Special Education or Director of Personnel.  There are two speech teachers, thirty-eight teaching

assistants, seventy-four classroom teaching assistants, and thirty-nine personal care assistants,

who are assigned one-on-one to students as their IEP requires.  There are two guidance

counselors, three nurses, one librarian, and one psychologist.  There are no longer any behavior

support specialists or  job coaches.

The reduction in staff had a particular impact on students with functional behavioral

assessments and individualized accommodation plans under Section 504.[11]  The school counselors

---

[11]       "A Section 504 plan specifies the accommodations and modifications that a
school district will provide to ensure that a disabled student receives an appropriate education."
S.M. ex rel. G.M. v. Sch. Dist. of Upper Dublin, No. 10-cv-4038, 2012 WL 2953727, at *1 (E.D.
Pa. July 20, 2012) (citing Blunt v. Lower Merion Sch. Dist., 262 F.R.D. 481, 486 n.4 (E.D. Pa.
2009)).  In Pennsylvania, the state regulations require section 504 service agreements to detail
"the specific related aids, services or accommodations the student shall receive . . . . the date the
services shall begin, the date the services shall be discontinued, and, when appropriate, the

had previously been responsible for the 504 plans, but Dr. Thurman testified that 504 plans were not being created after the counseling staff was reduced. 5/21/12 Tr. 53:13-19. Similarly, the behavior support specialists, whom the District cut entirely, had previously been in charge of carrying out the functional behavioral assessments.

There was extensive testimony comparing the services the District actually provided in the 2011-12 school year, to those it promised to provide in its Special Education Plan, a document submitted to and approved by the state in June 2011. The state requires the District to submit such a plan every three years to document how the District will provide FAPE to its students with disabilities. Comparisons to this document do not suffice to establish violations of the IDEA, however, as in some cases the programs and number of staff detailed exceeded what was legally required.

T.F., the only class member to testify, explained that her son is either not receiving the services detailed in his IEP, or is not receiving them in the same quantity or quality as he did in the 2010-11 school year. For example, her son's IEP called for one to two hours of daily reading and math instruction from the special education teacher, but he has only received some reading instruction. Her son's special education teacher, Ms. Mitchell, used to have an aide to assist with teaching duties, but no longer does.

T.F.'s son also previously received counseling, but did not in the 2011-12 school year; there is no counselor at his school this year. Dr. Thurman determined that in fact many children in the District were either not getting counseling, or were not getting it as often as they should, or were getting it in a group instead of as individuals. 5/21/12 Tr. 45:5-10.

procedures to be followed in the event of a medical emergency." 22 Pa. Code § 15.7(a).

Various teachers and T.F. testified that in 2012-13, the teachers have been unable to provide IEP progress reports.

Anita Brown, a special education teacher who provides "supplemental" services, meaning that she supports students with disabilities outside of the general classroom, testified that she has been unable to provide required services to all students on her caseload.  This would seem to be an inevitable result of Ms. Brown's work assignment, which required her to provide services five days a week to students at two different schools.  While there was no direct evidence of the services detailed in her students' IEPs, Ms. Brown's testimony about competing obligations that prevent her from providing services at the required frequency, and her sense that she feels like she is lying to parents at IEP meetings, indicates that Ms. Brown's students' are being denied FAPE.  Ms. Brown also highlighted two cases in which the decrease in services caused the students to regress academically and emotionally.

Because there are no substitute teachers available to cover teachers' classrooms while they participate in IEP meetings, those meetings are taking place in a round-robin format—where the teachers take turns talking to the parent—instead of involving team discussion and problem-solving.  Dr. Thurman noted that this is not an appropriate method for conducting IEP meetings. 5/21/12 Tr. 50:15-20.

Although the IDEA requires that evaluations for special education eligibility be completed within sixty calendar days from the date the child's parent gives permission to evaluate, the District fell behind and evaluations were routinely delayed.  Ms. Payne, the District's Special Education Supervisor, attributes this delay to the fact that the District has only one psychologist, who is the individual responsible for evaluations, as well as many other duties.  Ms. Mitchell

testified that Ms. Payne in fact directed teachers not to issue "permission to evaluate forms"—the form a parent must sign before a child can be evaluated for special education eligibility—because there was no psychologist available to evaluate them. The Commonwealth eventually stepped in, however, and provided independent contractors to help the District timely complete evaluations, significantly reducing the backlog.

There are some schools that lack the specialized staff to meet their students' needs. For example, at the Science and Discovery High School, only itinerant services[12] are available, despite the fact that certain students enrolled at that school require a higher level of services. There are also special education students attending the Allied Health High School, Chester Upland School of the Arts, and Main Street Elementary, who received a lower level of services than needed.

There was conflicting testimony about the extent to which speech and language, physical therapy, and occupational therapy services were disrupted in the District. Ms. Payne testified that speech and language services in the District had been cut off since December 2011 and that physical therapy services had been disrupted at certain schools since October 2011. George Walker, a learning support teacher at Columbus Elementary School, testified that his students were deprived of speech and language services from October 2011 to March 2012, and that, at the time of trial, no one was providing occupational therapy to students at his school. Dr. Thurman opined that at least 46 students were not receiving the speech services to which they were entitled. 5/21/12 Tr. 39:8-12.

Diane Fongheiser, the founder and owner of Pediatric Therapeutic Services ("PTS"),

---

[12]      Itinerant services involve a special education teacher providing services to special education students, as well as other students, within the general education classroom.

which provides physical and occupational therapy as well as provide supplemental speech services to the District, presented a different picture of the service interruptions.  She testified that as of December 2011, PTS was providing all three of those services—the only disruption in services at that time was one classroom with six students for which PTS had problems obtaining a physical therapist.  This was not the result of insufficient funding, but rather PTS's difficulty recruiting a therapist due to therapists' one hundred percent employment rate in the field as well as a perceived security problem within the District.

Funding did, however, cause broader disruptions in PTS speech therapy services starting in January 2012.  In view of the District's financial crisis, PTS decided to reduce services to the District on January 11, 2012.  Even though the next day, PTS instructed its therapists to return to work in the District, within the 24-hour period in which they were not working, these speech therapists were hired by a charter school.  PTS then had a difficult time recruiting new speech therapists, resulting in some level of missed speech therapy services between January and May 2012.  Ms. Fongheiser confirmed that physical and occupational therapy services were never disrupted.

The Court concludes that at least some services required by the students' IEPs were not provided in the 2011-12 school year as a result of the District's financial troubles.

At the time of trial, it was also unclear whether the District would be able to provide an Extended School Year ("ESY") program.  ESY is essentially a summer school for special education students who would otherwise be unable to retain the information they learned during the school year.

A lack of supplies and equipment has also deprived some students of FAPE.  For example,

Mr. Walker testified that some of his students have "working with computers" in their IEPs, but he is unable to provide this support because there is only one computer technician for the District.

Fearing the District's imminent closure, and recognizing its ultimate responsibility to provide special education services, the Department drafted a plan to educate the special education students of Chester Upland to implement if the District were to shut down. Dr. Dumaresq, and Ms. Patricia Hozella, Assistant Director for the Bureau of Special Education for the Department, testified that the plan was always intended to provide education for a temporary period. Ms. Hozella acknowledged that the Commonwealth would need to implement a different course of action should the District close permanently. The draft temporary plan was created without considering how to educate the special education students with their non-disabled peers, despite the fact that the "least restrictive environment" for many would have been an inclusive setting. Ms. Hozella's explanation for this was that she had no authority to make decisions about regular education. The draft was never finalized because circumstances in the District changed as a result of this litigation. Because of the settlement, there is no likelihood that the District will close.

**VI.    Special Education Considerations**

  **A.    Outside Comments on the Settlement Agreement**

The Court received three sets of comments on the Settlement Agreement: a letter from Dr. Janice Willis, a retired educator from the District; a letter from Charles Pugh, an attorney representing parents of children with disabilities, writing on behalf of himself and two unnamed class members; and a Statement of Interest of the United States, submitted by the United States Department of Justice, Civil Rights Division ("DOJ").

Although none of these comments were presented as formal objections, DOJ's submission

prompted the Court to hold a conference call on the record on August 14, 2012.

DOJ was concerned that the Settlement Agreement did not sufficiently lay out a process through which individual class members whose children were denied FAPE or other rights under the IDEA and/or Section 504 could obtain compensatory education services or other available remedies. DOJ also argued that the Settlement Agreement did not provide for proper notice to class members about their right to obtain relief for past and future violations of the IDEA and Section 504.

During the conference, the Court discussed appending to the Settlement Agreement a provision for "plain language" notice to the class members and a section regarding the formation of a Parents Council. The Court then directed the parties to circulate draft language to append to the Settlement Agreement. The final agreed-upon language of the notice is appended to this Memorandum and Order as Appendices A and B.[13]

### B.    Additional Considerations

From the trial testimony, and various reports that have been filed, and the relevant federal laws, the Court believes that the following procedures and remedies should be employed as part of the parties' conduct under the settlement:

(1)    Parents of children with disabilities in the District need to be heavily involved in their education—the testimony shows that many parents did not have a full understanding of the federal support for education of children with disabilities, had not been advised of their rights under federal law, and/or had not made enough of an effort to meet with their children's teachers

---

[13]    The Court notes that the Education Law Center of Pennsylvania (http://www.elc-pa.org/) and the Office for Dispute Resolution (http://odr-pa.org) both offer a wealth of resources regarding the education rights of students with disabilities in Pennsylvania.

to assist in the education and maturation of their children.

(2)     The District must make available to all parents of children with disabilities a plainly worded, easily understood document, and counseling, advising parents of the District's obligations under the IDEA, and the rights of parents to pursue litigation if they believe their child is not receiving a FAPE.  These provisions should include assistance with filing appropriate petitions and counseling on the process.

(3)     The District should adopt standardized measures by which individual teacher efforts and results can be measured, such that teachers can be held accountable, taking into account any unique challenges facing teachers who work primarily with students with disabilities.

(4)     The District must increase its access to evolving methods of educating special education students, and exposure to experts and commentators in the field.[14]

## VII.   Adequacy of Notice to the Class

As a threshold matter, the Court must evaluate whether the class received adequate notice of the proposed settlement. When a class action is settled, courts "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  "Providing adequate class notice is among the 'important . . . fiduciary duties shared by counsel and the court' and 'ensure[s] that absentee class members have knowledge of proceedings in which a final judgment may directly affect their interests.'"  Rowe v. E.I. Dupont De Nemours & Co., Nos. 06-cv-1810, 06-cv-3080, 2011 WL 3837106, at *6 (D.N.J. Aug. 26, 2011) (quoting Greenfield v. Villager Indus., Ind., 483 F.2d 824, 832 (3d Cir. 1973)).  What is more, only class

---

[14]     For a topical discussion on school reform, see generally STEVEN BRILL, CLASS WARFARE: INSIDE THE FIGHT TO FIX AMERICA'S SCHOOLS (2011).

members that receive adequate notice and other due process protections can be bound by a class

settlement.  McAlarnen v. Swift Transp. Co., Inc., No. 09-cv-1737, 2010 WL 365823, at *5 (E.D.

Pa. Jan. 29, 2010) ("Due process requires that class members receive adequate notice because they

are bound by the judgment entered in the action" (quoting Fry v. Hayt, Hayt & Landau, 198

F.R.D. 461, 474 (E.D. Pa. 2000))); In re Diet Drugs Prods. Liab. Litig., 431 F.3d 141, 145 (3d Cir.

2005) ("A class member must have certain due process protections in order to be bound by a class

settlement agreement.").

      This Court concludes that notice of the proposed settlement in this case was sufficient.

The District had records of all identifiable class members and mailed them written notice of the

settlement.[15]  The Department also contacted class members who filed complaints with the state

Bureau of Special Education or filed for a due process hearing in the last two years.  In addition,

the District, class counsel, and the Department all posted notice of the settlement on their

websites.  Two local publications—the Delco Times and the Chester Spirit—twice posted news of

the settlement.  The Court also takes judicial notice of the fact that the Philadelphia Inquirer and

Delco Times published an article about the settlement.  As most class members received actual

notice through first-class mail, and any others will have ample opportunity to learn of the

settlement through the newspaper and website publications, the Court deems the notice adequate.

---

[15]    Mr. Leo Hackett, counsel for the District, provided the Court an affidavit
certifying that the District mailed notice of the settlement to all the listed parents of Chester
Upland School District enrolled in special education students.  The certification states that the
mail was sent on August 31, 2012, but Mr. Hackett clarified that the date should read July 31,
2012.

VIII.   **Fairness of Settlement**

A.      **Legal Standard**

"The standard which a district court must apply in approving a class action settlement is whether the settlement is fair, adequate, and reasonable."  Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 965 (3d Cir. 1983) (citations omitted).  Courts should presume a class settlement is fair when four factors apply: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  In re Warfarin, 391 F.3d 516, 535 (3d Cir. 2004) (quoting In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

In addition, to determine if a proposed settlement is fair, reasonable, and adequate, district courts must  analyze nine factors set forth by the Third Circuit in Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1983): "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of proceedings and the amount of discovery completed; (4) the risk of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."[16] Id. at 157 (ellipses omitted) (citing City

---

[16]      As the class sought prospective relief only, the fifth and seventh Girsh factors (risk of establishing damages and defendants' ability to withstand a greater judgment) are inapplicable. Hawker v. Consovoy, 198 F.R.D. 619, 632 (D.N.J. 2001) ("Because the issue of compensatory damages is not applicable here, the fifth Girsh factor does not warrant discussion. The seventh Girsh factor looks to the Defendants' ability to withstand a greater judgment. This factor is also inapplicable because no compensatory damages are sought"); Serventi v. Bucks Technical High Sch., 225 F.R.D. 159, 167 (E.D. Pa. 2004) ("Th[e] [seventh Girsh] factor is

of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)).

When appropriate, on top of the Girsh factors, courts should also consider other factors, including:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt-out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Rowe, 2011 WL 3837106, at *11-*12 (quoting In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (quoting In re Prudential Ins. of Am.,148 F.3d 283, 323 (3d Cir. 1998))).

In determining the fairness of a settlement, courts should not "substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms." Rowe, 2011 WL 3837106, at *12 (quoting Pet Food, 629 F.3d at 350 (citing Prudential, 148 F.3d at 317)).  Nor should they "withhold approval simply because the settlement may not be the best settlement, or a better settlement might have been reached." Rowe, 2011 WL 3837106, at *12. When applying all these considerations, the Court is also cognizant of the Third Circuit's instruction that "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged." Warfarin, 391 F.3d at 535 (citations omitted).

---

inapplicable in this case because the plaintiffs never sought monetary damages. They were only seeking injunctive and declaratory relief.").

B.      Analysis

1.      Presumption of Fairness

The Court presume that the class action settlement here is fair.  First, it is beyond dispute that the settlement negotiations were conducted at arm's length.  Rigorous discussions spread out over many months led to the compromise now before the Court.  At the Court's instruction, the parties first tried to settle their claims in February and March 2012, assisted by Mr. Harmelin. They were unsuccessful at that time.  Later, Magistrate Judge Strawbridge, an extremely effective mediator, worked with the parties to forge an agreement.  Again, the parties were unable to agree. It was only after a full trial that the parties managed to reach an accord.

The fact that there were three sets of attorneys involved—counsel for the District and other Plaintiffs, counsel for the class and PA-NAACP, and counsel for Defendants—also ensured that the settlement resulted from legitimate negotiations rather than back-room dealings intended to benefit someone outside the class.  All counsel involved in this case are well-seasoned, professional, zealous advocates for their clients and the Court is confident that the settlement negotiations in this case were in no way collusive.

In addition, discovery was complete on the remaining claims, a full trial on the merits took place, and the parties responded to remaining legal questions this Court posed, all of which allowed the parties to ascertain their relative legal positions and come to a settlement that would be the most effective at resolving the various issues in the case.

Moreover, as the Court stated when appointing class counsel, PILCOP has an abundance of experience in class action litigation, and expertise on special education and Section 504 matters.  The Court therefore gives great weight to class counsel's opinion that the settlement is

36

fair.

Finally, the Court considers it highly significant that no class members have objected to the settlement.  Because of these reasons, the Court finds that the settlement is entitled to a presumption of fairness.

### 2.    Application of <u>Girsh</u> Factors

The <u>Girsh</u> factors also support this Court's finding that the settlement is fair, reasonable and adequate.

**Factor 1: the complexity, expense and likely duration of the litigation**

"By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably."  <u>In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 812 (3d Cir. 1995).  Although the parties here have already incurred significant expenses in motion practice, discovery, and a full trial on the merits, the class will still save a substantial amount of money by settling at this time.  First, if the case had not settled, it is highly likely that the non-prevailing party would have appealed to the Third Circuit. Even parties dismissed early in the case would have had a chance to re-litigate the issues on which this Court ruled.  These appeals would be costly, and would delay any benefits to the class.

In addition, this Court severed Plaintiffs' claims of racial discrimination and due process violations from the claims tried in May 2012, and granted Plaintiffs leave to re-pleaded those claims.  If there were no settlement, and Plaintiffs successfully re-pleaded those claims, this case could proceed for years, generating more expenses for all involved.

**Factor 2: the reaction of the class to the settlement**

Court must examine "the number and vociferousness of the objectors."  <u>Id.</u>  Although,

given "the practical realities of class actions," silence does not always indicate agreement, "courts have generally assumed that 'silence constitutes tacit consent to the agreement.'" General Motors, 55 F.3d at 812 (quoting Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)). From the fact that no class member has objected to the settlement, and that the one named class member is in favor of it, the Court finds that the class has reacted favorably to the settlement, further suggesting the settlement's fairness.

### Factor 3: the stage of proceedings and the amount of discovery completed

By examining "the degree of case development that class counsel have accomplished prior to settlement . . . . courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." Serventi, 225 F.R.D. at 167 (quoting General Motors, 55 F.3d at 813). Among other things, the Third Circuit has instructed district courts to consider when a case began to determine whether "the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action." General Motors, 55 F.3d at 814. As explained above, although this case commenced less than a year ago, the parties have already engaged in extensive briefing, discovery, and a full trial, such that this Court concludes counsel were versed in the merits and their prospects of success at the time they agreed to settle. This factor weighs in favor of approving the settlement.

### Factor 4: the risk of establishing liability

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." Id. at 814 (citing In re Baldwin-United Corp., 105 F.R.D. 475, 482 (S.D.N.Y. 1985)). All parties in this case face some uncertainty as to their chances of

succeeding after the bench trial.  This Court did find deficiencies in the District's special

education program, but has expressed doubt as to whether Plaintiffs and the class met their burden

of proof as to proving that these deficiencies resulted from a lack of state funding, as opposed to

the District's own mismanagement.  The degree if any to which the Department was responsible

for the special education shortcomings was also a point of contention.  Among other things,

Plaintiff's expert Dr. Baker criticized the state's method of funding special education.  Particularly

in view of the novelty and complexity of many of the legal issues in this case, it is also possible

that this Court's rulings in the case would be reversed on appeal, obscuring even further the

parties' ability to assess the ultimate strength of their positions.  Additionally, no party can be sure

of the course the litigation would take should Plaintiffs and the class successfully replead their

discrimination and due process claims.  These risks to the class also weigh in favor of approving

the settlement.

**Factor 6: the risks of maintaining the class action through the trial**

The Court already certified the class pursuant to Federal Rule of Civil Procedure 23(b)(2).

Although "[u]nder Rule 23, a district court may decertify or modify a class at any time during the

litigation if it proves to be unmanageable," Prudential, 148 F.3d at 321 (citations omitted),

defendants have not argued that the certified class should be modified in any way, and the

evidence presented at trial did not present any reason to question the class definition.  This factor

therefore bears little weight in this Court's analysis of the fairness of the settlement.[17]

---

[17]    This factor is in fact of limited importance because all class actions carry a "'risk'
or possibility of decertification." Prudential, 148 F.3d at 321 (in a comment pertaining to
"settlement only" class actions, noting that "[b]ecause the district court always possesses the
authority to decertify or modify a class that proves unmanageable, examination of this factor in
the standard class action would appear to be perfunctory"); see also In re Schering-Plough/Merck

**Factors 8 and 9: the range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation**

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." Warfarin, 391 F.3d at 538. "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." Id. (citing Prudential, 148 F.3d at 322). "In the class action context, the relief sought in the complaint serves as a useful benchmark in deciding the reasonableness of a settlement." General Motors, 55 F.3d at 810 (quoting Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)) (internal quotation marks omitted).

The putative class originally sought three main forms of relief: (1) that the District schools not close due to budgetary constraints, but rather remain open and provide educational services in accordance with federal law; (2) that the Court appoint a special master to examine the District's finances and obtain relevant information from Defendants to protect the interests of the class; and (3) that the Court ensure that the special education services provided to students with disabilities services not be changed, without proper due process, because of funding problems. District Parents' Compl. (ECF No. 39), Request for Relief ¶¶ 1-3.

As class counsel explain in their brief on provisional approval of the settlement, all three elements have been satisfied. (Memorandum of Law in Support of Joint Motion for Provisional Approval of Settlement at 8 (ECF No. 243-1)).

The large infusion of funds to the District will ensure the District schools continue to

---

Merger Litig., No. 09-cv-1099, 2010 WL 1257722, at *11-*12 (D.N.J. March 26, 2010) (citations omitted)).

operate, and that the District will be able to meet its obligations under the IDEA and Section 504.

Mr. Harmelin's Report, discovery and testimony in this case, especially Mr. Sallack's expert report and the PFM findings, have illuminated the details of the District's budget and problems with the District's accounting methods, and eliminate the need for an additional special master to investigate the District's and Commonwealth's finances.

The District's promise to improve its special education program through increased staffing and other measures, coupled with the active involvement of the SEO, will protect the rights of students with disabilities to a FAPE in the least restrictive environment.

The other safeguards in the settlement—including class counsel monitoring implementation of the settlement, this Court retaining jurisdiction to hear class-wide disputes, and the class members' rights to proceed with any individual claims—also increase the reasonableness of the settlement.

The settlement looks particularly favorable in view of the risks of continuing litigation, discussed above, and the fact that any award this Court could give the class would reflect the limited power of the judicial branch in a case of this nature, as explained in prior Memoranda.  To be sure, this Court could never provide the class what this settlement does: millions of dollars of appropriated funds from the Pennsylvania Legislature.

These and the other Girsh factors weigh heavily in favor of approving the settlement.

C.    **Other Fairness Considerations**

Finally, the Court notes that there are no obvious problems with the settlement.  This is not a settlement where the named class representative gets a windfall.  Based on class counsel's representation that their fees are less than their lodestar, the Court deems the attorney's fees

reasonable (and notes that the fees do not come out of class funds, and that class counsel will receive no additional fees for monitoring the settlement over the course of the next year). Additionally, class members retain their right to bring individual claims.

Public policy also favors approving the settlement. This case involves the rights of over 700 students with disabilities. Settling this case is not only cost-effective for the judicial system and the parties, it also provides over 700 children with disabilities a tangible benefit without unnecessary delay. Through this settlement, the students and parents of the District can rest assured that they will receive the education to which they are entitled.

The Court concludes that the settlement is not only fair, adequate and reasonable, it represents an excellent outcome for the class.

## IX.    Conclusion

The Court expedited the proceedings in this case in an effort to resolve this matter before the start of the 2012-13 school year. Counsel must be commended for providing high quality advocacy despite the tight deadlines. The Court is pleased that all parties have timely come to a fair settlement agreement that will benefit Chester Upland students with disabilities, and, by extension, all students in the District.

The Court nevertheless cautions that money is not a panacea. By rescuing the District from its chasm of debt, the Commonwealth has bestowed upon the District the rare gift of a clean financial slate. Yet, many of the District's challenges will not dissipate so easily. Competition with charter schools is now a fact of life. The District's tax base is unlikely to grow substantially in the near future. And it is unlikely that the District will ever again receive such an influx of extra funds. Moreover, in view of the District's myriad accounting deficiencies, overwhelmed

leadership, and history of financial obstacles, the District must devise a concrete plan to ensure its survival beyond the 2012-13 school year. This will involve downsizing, prioritizing, and making even harder choices than it already has.

The Court believes that the SEO, whom the parties agreed the Department would appoint to work on-the-ground in the District for the 2012-13 school year with the sole task of ensuring that students with disabilities receive FAPE, will be instrumental in ensuring the District utilizes the settlement funds to improve its special education program. Special education has been the focus of this case, and the Court is hopeful about the progress the SEO will make.

The Court also urges the District to consider the testimony of the Department's witnesses, all of whom were credible, knowledgeable, and offered constructive feedback on areas for improvement in the District's processes. Since the start of this litigation, the Department has assisted the District by providing funds, consultants, training, and the financial software package. The trial record discloses that the District employees, particularly Mr. Bruchak and Dr. Persing, and Department consultants or contacts, including Mr. Crawford, Mr. Sallack and Dr. Dumaresq, worked cooperatively toward the joint goal of improving the District's financial state and special education program. The Court expects that this cooperative spirit will continue into the coming school year, to the benefit of the Chester Upland students.

At this outset of this case, the Court cautioned, as a metaphor to the claim of the District for more funds, how the struggle for gold in Wagner's epic drama "The Ring" led to death and destruction. (Order Re: Intervenor Motions and Letters at 2 n.1 (ECF No. 33)). The Court's fears were unfounded. This case has now ended not only with more money for the District, but more promise and potential for the students.

43

Every student with disabilities in the District has the potential to succeed academically, graduate high school, and become a productive adult.  Because this fair settlement agreement will help each of those students realize that potential, the Court gladly approves it.

An appropriate Order follows.

O:\CIVIL 12\12-132 Chester v Comm\12cv132.Final Memo Settlement 8-15-12.wpdj

## PARENTS' COUNCIL

The Court strongly urges class counsel to use their best efforts to form and guide a Parents' Council.  Membership will be open and free to all parents of children with disabilities. The Parents' Council will, inter alia:

a.      Meet periodically with class counsel and the SEO to exchange ideas and information about the CUSD performance under the settlement agreement.

b.      Designate representatives to negotiate with CUSD, as necessary.

c.      Distribute information on the legal rights of parents under federal and state law.

## APPENDIX A

12cv132.Final Memo Settlement 8-15-12.wpdO:\CIVIL 12\12-132 Chester v Comm\12cv132.Final Memo Settlement 8-15-12.wpd

## NOTICE TO PARENTS OF CHILDREN WITH DISABILITIES IN CUSD

Under federal law and the settlement agreement between Chester Upland School District ("CUSD") and the Commonwealth of Pennsylvania, each child with a disability is entitled to an Individual Education Plan ("IEP"), updated on an annual basis.  The purpose of the IEP is to ensure that all students with disabilities receive a free appropriate public education.

At each student's annual IEP meeting, the IEP team will determine whether the student received the special education services the student was entitled to during the 2011-2012 school year.  If not, CUSD intends to provide, in each IEP, services that remedy any prior deficiency in educating the student.  This is known as compensatory education.

Students with plans developed under Section 504 are also entitled to a determination about needed compensatory education and can appeal the decision through an impartial hearing.

If a parent is not satisfied with the IEP prepared by CUSD, the parent has the right to initiate the following:

(1)     Due Process Hearing:  In this proceeding, an administrative judge will consider the IEP and the parents's objections.  There is no charge to initiate a due process hearing.  The administrative judge will decide the matter as promptly as possible, and may order CUSD to take corrective action.  Either the parent or the district can appeal the decision of the administrative judge to a federal court. If the parents are represented by a lawyer and are successful, the parents have the right to receive compensation for the services of their attorney.

(2)     State Complaint: A parent can file a complaint with the Pennsylvania Department of Education, Bureau of Special Education (BSE).  BSE will investigate the claim, and, if

**APPENDIX B**

appropriate, order CUSD to take corrective action.  There is no fee to file the complaint.

(3)     Mediation: If the parent and school district agree, the Pennsylvania Office for Dispute Resolution will arrange for a neutral person to help resolve the dispute. Mediation is a free, voluntary, and confidential alternative to a formal due process hearing. No lawyers may be present at mediation.

Attached are forms **[to be appended by class counsel]** you can use to request a due process hearing, file a complaint, or ask for mediation.  If you have questions about your rights and/or need help filling out the paperwork, contact ConsultLine at 1-800-879-2301.  The Special Education Officer is also available as a resource for parents.

If you have other questions, you should contact Class Counsel:

> The Public Interest Law Center of Philadelphia
> Chester Line: 267-546-1305
> Chester Email: cusdsettlement@pilcop.org

You are also encouraged to join the Parents Council, comprised of parents of children with disabilities in CUSD, to exchange information and ideas and join together to communicate with CUSD.

In order to join, please contact _____.

O:\CIVIL 12\12-132 Chester v Comm\12cv132.Final Memo Settlement 8-15-12.wpd